# PLAINTIFFS' EXHIBIT 1

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| (1) NATIONAL SECURITY COUNCIL<br>(2) THE WHITE HOUSE OFFICE<br>(3) U.S. HOUSE OF REPRESENTATIVES<br>(4) U.S. SENATE | EMANUEL MCCRAY<br>400 W MCLOUGHLIN BLVD APT 5<br>VANCOUVER, WA 98660<br>trump.genius@yahoo.com |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY  ☒ CIVILIAN | 4. DATE OF BIRTH<br>06/15/1955 | 5. MARITAL STATUS<br>SINGLE | 6. DATE AND DAY OF ACCIDENT<br>12/31/2019  TUESDAY | 7. TIME (A.M. OR P.M.)<br>11:00AM |
|---|---|---|---|---|

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

This is a CLASS ACTION. The People of the U.S. were attacked with a bioweapon named "SARS-COV-2." Congress never declared war. The NSC was primarily responsible for the response. Unsafe vaccines were acquired under OWS & through a novel interpretation of Public Law 115-92 by the DoD, et al. Personnel detailed to the White House CoV Task Force were under the administration of the White House Office. Millions have been permanently infected and or murdered. 100s of class members have been denied access to their test results conducted by Atlas Genomics, CLIA No. 50D2079714. See attached documents.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

NATIONWIDE. See attached documents.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

Wages; social security, medicare, welfare, employment & unemployment benefits; expenses responding to the biological terrorist attack; irreparable harm to individual birth and death certificates. See attached documents.

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Each Class Member has been permanently infected with "SARS-COV-2," which carries the possibility of death.
Some Class Members have already been murdered by the virus as indicated on each Death Certificate labeled "COVID-19."
Some Class Members have already been murdered as indicated by vaccine injury reporting.
Some Class Members are suffering from mental issues caused by the biological attack. See attached documents.

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| over 1,000,000<br>various names<br>See attached documents. | various addresses nationwide<br>See attached documents. |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| 100,000,000,000,000 | 200,000,000,000,000 | 100,000,000,000,000 | 400,000,000,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side).<br>*Emanuel McCray* | 13b. PHONE NUMBER OF PERSON SIGNING FORM<br>(360) 518-3428 | 14. DATE OF SIGNATURE<br>02/23/2025 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

# PLAINTIFFS' EXHIBIT 2

■■■■■■■■■■■■■■■                                    ■■■■■■■■■■■■■■■

March 24, 2020

To whom it may concern:

This letter identifies *Emanvel McCray* as an Essential Employee of ■■■
■■■■■, located at:

■■■■■■
Vancouver WA 98663     Portland OR 97203

■■■■■■
Beaverton OR 97006     Clackamas OR 97015

All of ■■■■■■ clients that remain open and are currently staffed by ■■■■■■ fall
under Essential Business. ■■■■■■ will continue to staff jobs for the following: food
manufacturing facilities, auto, any and all warehousing operations that supply PPE gear to
hospitals around the world. Any operations that are in the "supply chain" will also be staffed by
■■■■■■ if they are in the supply chain that is considered by county orders section 10
(f)(15) which clearly outlines the above info.
This was reinforced by the Department of Homeland Security Memorandum on Identification of
Essential Critical Infrastructure Workers During COVID-19 Response.

Please contact our main headquarters at ■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■

■■■■■■■■

Notice of COVID 19 Risk

Date:    March 30, 2020

To:      ████████████████

From:    Human Resources

As you know the company has gone through great lengths to sanitize the facility and Vans to prevent any exposure to COVID 19. We learned that one of your peers in the accessory area tested positive COVID 19.

We do not believe this associate was in contact with anyone in ████████ The Americans with Disabilities Act restricts the company from disclosing the associate's name due to privacy requirements. As a precautionary measure we are doing a deep clean of the facility and workstations today.  For this reason, we will be sending everyone home.

Please plan to resume your **normal schedule** beginning tomorrow. We will continue to sanitize the facility, Vans and breakrooms.

We know this is a scary time for everyone however we want to keep you informed and healthy. Continue to take preventive measures like keeping a proper distance, washing your hands and avoid touching your face. If you feel sick or have symptoms of acute respiratory illness you are recommended to stay home and not come to work until you are free of fever (100.4° F [37.8° C] or greater using an oral thermometer), for at least 24 hours, without the use of fever-reducing or other symptom-altering medicines (e.g. cough suppressants)."

If you have any question or suggestion on how we can improve call your Regional HR Manager, ████████████████

# PLAINTIFFS' EXHIBIT 3

JRB/BAM: USAO2024R00498

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. PX26CR138 |
| | * | |
| DAVID M. MORENS, | * | (Conspiracy Against the United States, |
| | * | 18 U.S.C. § 371; Destruction, |
| Defendant | * | Alteration, or Falsification of Records |
| | * | in Federal Investigations, |
| | * | 18 U.S.C. § 1519; Concealment, |
| | * | Removal, or Mutilation of Records, |
| | * | 18 U.S.C. § 2071; Aiding and Abetting, |
| | * | 18 U.S.C. § 2) |
| | * | |
| | * | **FILED UNDER SEAL** |
| | * | |

*******

## INDICTMENT

The Grand Jury for the District of Maryland charges that at all relevant times to this indictment:

### COUNT ONE
### (Conspiracy Against the United States)

### INTRODUCTION

1.      On or about March 13, 2020, President Donald J. Trump declared a nationwide emergency because of the world-wide spread of the then-novel coronavirus, SARS-CoV-2 ("COVID-19") (hereinafter, the "COVID-19 pandemic"). On or about March 15, 2020, states began to implement restrictive measures to prevent the spread of the virus.  Businesses were shuttered, schools were closed, millions became sick, and over one million Americans died. And as the nation braced itself against the impact of the COVID-19 pandemic, it sought answers about the origin of the virus and how it could be prevented and treated.  The COVID-19

pandemic had a profound impact on the United States, and the records generated by its agencies and employees responsible for leading the nation's response to the virus had significant historical, institutional, scientific, medical, and public value.

2.      As explained herein, **DAVID M. MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and others defrauded and committed offenses against the United States by hiding from public view various federal records related to this significant historical event.

3.      The National Institute of Allergy and Infectious Diseases (NIAID) was an agency of the United States and was part of the National Institutes of Health (NIH), a component of the Department of Health and Human Service (HHS).  NIAID played a leading role in the national response to the COVID-19 pandemic.  NIAID was responsible for identifying and responding to emerging public health threats. NIAID, through its leadership in the Office of the Director, provided public health guidance and informed the public about the nature, origin, and effects of COVID-19.  NIAID's Office of the Director was located on NIH's main campus in Bethesda, Maryland.

4.      **MORENS** resided in Montgomery County, Maryland.  **MORENS** was a medical doctor.  For much of his career, **MORENS** was a federal employee and public official.  From 1979 to 1982 and 1998 to 2021, **MORENS** served in the U.S. Public Health Service, and ultimately reached the rank of Captain.  From 1983 to 1998, **MORENS** was in the U.S. Army Reserves, where he served to the rank of Lieutenant Colonel.  From in or about 2006 through December 31, 2022, **MORENS** served as Senior Advisor to Senior NIAID Official 1, in the Office of the Director (OD).

5.      **MORENS**'s duties as Senior Advisor were broad. **MORENS** advised Senior NIAID Official 1 and other senior level NIAID staff on a host of substantive scientific and public

health management matters involving the full range of NIAID's short and long-term major infectious disease-related activities. Among other things, his tasks included advising on senior-level policies, developing recommendations and solutions to issues impacting NIH, and writing and editing manuscripts. **MORENS** provided guidance and expertise to senior staff members on epidemiological studies and issues related to infectious disease planning and management, including those involving issues of significant importance to the public, Congress, and scientific communities. **MORENS** was responsible for advising Senior NIAID Official 1 for meetings with officials from Congress, the White House, NIH, HHS, other Federal agencies, and outside organizations. **MORENS** was responsible for assuring that Senior NIAID Official 1 was provided with sound alternatives for courses of action to ensure that priorities and policies were implemented and the public was as fully protected against public health threats as possible.

6.      As Senior Advisor, **MORENS** gathered information from grantees and others in the scientific community to establish facts regarding the nature of COVID-19, to understand NIH and NIAID's historical activities in coronavirus research, to assist in formulating policy and procedures, and to brief Senior NIAID Official 1 and assist Senior NIAID Official 1 in briefing others, including the President of the United States, Congress, and the public. As part of his duties, **MORENS** authored and co-authored numerous papers related to the COVID-19 outbreak that placed the pandemic in its historical context, advocated for continued surveillance of animal populations (like bats) to detect the source of coronaviruses, or both.

7.      CO-CONSPIRATOR 1 was the President and Chief Executive Officer of COMPANY #1, from 2009 to January 2025. CO-CONSPIRATOR 1 was a resident of New York.

8.      COMPANY #1 was a non-profit organization headquartered in New York, New York, with a stated mission of protecting people, animals, and the environment from emerging infectious diseases. Through COMPANY #1, CO-CONSPIRATOR 1 researched the origins, transmissibility, virility, and impacts of potentially emergent infectious diseases, including those associated with coronaviruses originating from animals like bats (i.e. zoonotic viruses).

9.      In a Notice of Award (NOA) dated May 27, 2014, NIH/NIAID awarded Grant Number 1R01AI110964, "Understanding the Risk of Bat Coronavirus Emergence," to COMPANY #1. CO-CONSPIRATOR 1 was the Project Director (PD)/Principal Investigator (PI) for the bat coronavirus grant. The Wuhan Institute of Virology (WIV) in Wuhan, China received a subaward from COMPANY #1 on the bat coronavirus grant.

10.     CO-CONSPIRATOR 2, an individual known to the grand jury, was a physician, scientist, and professor who worked for an academic institution that also received grant monies from NIH, but not for the bat coronavirus grant. CO-CONSPIRATOR 2 was named as a Co-Investigator with CO-CONSPIRATOR 1 on a grant application related to Emerging Infectious Disease Research Centers filed by COMPANY #1 in June 2019 and awarded by NIH during the summer of 2020.

### The Federal Records Act (FRA)

11.     The preservation of federal records is crucial to accountability and transparency. Federal records hold informational value and document the transaction of public business, functions, policies, decision, procedures, and the operations of the organization.

12.     In recognizing the importance of federal records, Congress enacted the FRA in 1950. The FRA governs the creation, management, and disposal of federal records by agencies. A federal "record" encompasses all recorded information, regardless of form or characteristics,

made or received by a federal agency under federal law or in connection with the transaction of public business, and preserved or appropriate for preservation by that agency. 44 U.S.C. § 3301.

13.    In accordance with federal law, HHS established safeguards against the removal or loss of federal records determined to be necessary and required by regulations of the National Archivist. 44 U.S.C. § 3105. The safeguards included making it known to officials and employees of the agency (1) that records in the custody of the agency are not to be alienated or destroyed except in accordance with the applicable law, and (2) the penalties provided by law for the unlawful removal or destruction of records.

14.    Federal law prohibited an officer or employee of an executive agency from creating or sending a record using a non-official electronic messaging account unless such officer or employee—(1) copied an official electronic messaging account of the officer or employee in the original creation or transmission of the record; or (2) forwarded a complete copy of the record to an official electronic messaging account of the officer or employee not later than 20 days after the original creation or transmission of the record. 44 U.S.C. § 2911.

15.    NIH provided yearly training on its employees' obligations with respect to the FRA. According to the training **MORENS** received, "[t]he interactions between NIH and its staff with the public and other federal agencies are also captured through federal records." **MORENS** was instructed that if information or material facilitated agency business, then it was a federal record. **MORENS** was instructed that if he was not sure if a document was a federal record, then he should consult a record liaison.

16.    **MORENS** was also informed that: (1) federal records could be in any form or medium, such as electronic formats; (2) federal records were the property of the federal government; (3) employees were required to store federal records in agency-approved

recordkeeping systems; (4) email records were required to be created, sent, or received using an NIH email account; and (5) he was not to use a personal email account to conduct NIH business.

17.    **MORENS** was further informed that records were only considered personal files if the materials were not used to conduct agency business. Personal files included materials created outside an employee's responsibilities and work at NIH.  Personal files were required to be kept separate from federal records.

18.    Within the NIH, most federal records were temporary records that could be destroyed after a required holding period.  To manage the disposal of email records, the NIH adopted the "capstone approach."  For non-capstone employees, such as **MORENS**, the holding period for emails was generally seven years.

19.    The NIH, however, was required by law to suspend any destruction of records responsive to a Freedom of Information Act request until the request was satisfied.  Any email deleted or removed from the email system before the seven-year minimum retention was an unauthorized destruction or removal of a federal record.

### The Freedom of Information Act (FOIA)

20.    "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA provides that any person has a right to obtain access to federal agency records, except to the extent that such records are protected from public disclosure by one or more of nine exemptions or by one or more of three special law enforcement record exclusions.  FOIA thus established a statutory right of public access to executive branch information in the federal government.

21.     HHS implemented FOIA for HHS records. HHS's implementing regulations for FOIA, at 45 C.F.R. Part 5, set forth the process by which records could be requested, the reasons why some records were exempt from disclosure, and the administrative and legal remedies available should a requester disagree with an initial disclosure determination made by HHS.

22.     HHS administered FOIA with a presumption of openness. HHS FOIA regulations called for the disclosure of records or information even if exempt from disclosure under FOIA whenever disclosure would not foreseeably harm an interest protected by a FOIA exemption and disclosure was not prohibited by law. 45 C.F.R. § 5.2.

23.     A FOIA Officer was an HHS official who had been delegated the authority, among other things, to release or to withhold records in response to a FOIA request. Pursuant to HHS FOIA regulations, "only FOIA Officers have the authority to release or withhold records or to waive fees in response to a FOIA request."

24.     The FOIA Officer for NIAID was responsible for receiving FOIA requests, distributing FOIA requests to personnel likely to have responsive records ("affected personnel"), instructing affected personnel to conduct searches for materials responsive to FOIA requests, monitoring and receiving returns of such information, and recommending FOIA exemptions for certain responsive records.

25.     A FOIA request meant a written request that reasonably described the records sought under the FOIA provisions. The scope of a FOIA request could be narrowed through negotiation and agreement between a FOIA officer and a requestor.

### Multiple FOIA Requests Sought Information and Communications Concerning MORENS, COMPANY #1, and/or CO-CONSPIRATOR 1

26.     In the period between April 2020 and December 2022, NIAID received hundreds of FOIA requests related to COVID-19. Of those requests, many sought access to

communications involving **MORENS**, COMPANY #1, and/or CO-CONSPIRATOR 1, including but not limited to the following:

    a.  Request 54052 filed by Judicial Watch, Inc. on April 22, 2020;

    b.  Request 54085 filed by *Science* Magazine on April 28, 2020;

    c.  Request 57014 filed by an individual on September 8, 2021;

    d.  Request 57707 filed by U.S. Right to Know on January 21, 2022;

    e.  Request 57811 filed by the Whistleblower Protection Project on February 5, 2022;

    f.  Request 58690 filed by the Heritage Foundation on July 22, 2022; and

    g.  Request 58647 filed by an individual on July 11, 2022.

### January 2020 – March 2020, The Onset of COVID-19

27.    Beginning in January 2020, **MORENS** and CO-CONSPIRATOR 1 began communicating about the emerging coronavirus in China. On or about January 9, 2020, **MORENS** sent an email, using his official NIH email account, Dmorens@niaid.nih.gov, to CO-CONSPIRATOR 1 and others to inquire whether CO-CONSPIRATOR 1 and others had "any inside info on this new coronavirus that isn't yet [in] the public domain?" That same day, on or about January 9, 2020, CO-CONSPIRATOR 1 responded that he had "lots of information" and referred to COMPANY #1's "coronavirus grant specifically focused on China."

28.    On or about January 27, 2020, CO-CONSPIRATOR 1 emailed bullet points about COMPANY #1's bat coronavirus grant to **MORENS** at his NIH email account. CO-CONSPIRATOR 1 stated in the beginning of his email that he was providing this information so that **MORENS** might relay it to Senior NIAID Official 1 for public use, stating: "a few things

for your information and hopefully to pass on to [Senior NIAID Official 1] for when he is being interviewed re[:] the new CoV."

29. That same day, on or about January 27, 2020, **MORENS** responded from his NIH email account stating, in relevant part: "I WILL pass this on to [Senior NIAID Official 1]." **MORENS** then emailed the information provided to him by CO-CONSPIRATOR 1 to Senior NIAID Official 1 through Senior NIAID Official 1's Chief of Staff.

30. Beginning in or about February 2020, **MORENS** wrote about coronaviruses as part of his NIH duties. **MORENS** used his NIH email account to participate in an email chain with CO-CONSPIRATOR 1 and NIH colleagues to suggest publications on topics related to the outbreak of COVID-19. This included, according to an email from **MORENS** to CO-CONSPIRATOR 1 and other NIH employees, "timely commentaries about key aspects of the coronavirus situation, things that are 'from 30,000 feet,' i.e., broad perspectives, and publishable either in journals willing to publish quickly or in key newspapers or other media."

31. Between February 2020 and March 2020, **MORENS** and CO-CONSPIRATOR 1 authored and co-authored articles and commentaries about the COVID-19 pandemic. Their correspondence, including those discussed above, occurred using **MORENS**'s NIH email account.

32. On or about April 19, 2020, NIH issued a letter notifying COMPANY #1 that it was reviewing allegations that WIV released the coronavirus responsible for the COVID-19 pandemic. While it reviewed the allegations, NIH instructed COMPANY #1 to cease providing any funds from Grant Number R01AI110964 to WIV.

33. On or about April 24, 2020, NIH emailed CO-CONSPIRATOR 1 a letter notifying him that NIH had elected to terminate Grant Number R01AI110964 (the "termination

letter"). CO-CONSPIRATOR 1 forwarded the termination letter to CO-CONSPIRATOR 2 the same day. CO-CONSPIRATOR 2 urged CO-CONSPIRATOR 1 to challenge the termination but "certainly not before the EIDRC funding comes through." COMPANY #1 had applied to NIH for funding of an Emerging Infectious Disease Regional Center (EIDRC), a grant worth in excess of $7 million. The EIDRC grant had not yet been awarded.

## THE CONSPIRACY AND ITS OBJECTS

34.     Beginning in or about April 2020 and continuing through at least in or about June 2023, in the District of Maryland and elsewhere, the defendant,

### DAVID M. MORENS,

knowingly and willfully conspired and agreed with CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and with others known and unknown to the Grand Jury, to:

a.     commit offenses against the United States, namely to commit violations of 18 U.S.C. § 1519, whereby **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and their co-conspirators knowingly destroyed, concealed, and covered up a record, document, and tangible object with the intent to impede, obstruct and influence the investigation and proper administration of a matter of within the jurisdiction of the Department of Health and Human Services, National Institute of Health, and the National Institute of Allergy and Infectious Diseases, a department and agencies of the United States, and in relation to or contemplation of any such matter or case;

b.     commit offenses against the United States, namely to commit violations of 18 U.S.C. § 2071(a), whereby **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and their co-conspirators willfully and unlawfully and with the intent to take, conceal, remove,

mutilate, obliterate, and destroy, and attempt to do so, a record, paper, document, and thing filed and deposited with any public officer of the United States;

c. to commit offenses against the United States, namely to commit violations of 18 U.S.C. § 201(c), whereby CO-CONSPIRATOR 1, a federal grantee, directly and indirectly gave, offered, and promised things of value to **MORENS**, a public official, who directly and indirectly demanded, sought, received, accepted, and agreed to receive or accept anything of value, otherwise than as provided by law for the proper discharge of official duties, for and because of official acts performed and to be performed by **MORENS** for CO-CONSPIRATOR 1 and COMPANY #1; and

d. defraud the United States, that is, to hamper, hinder, impede, and obstruct by craft, trickery, treachery, deceit, and dishonest means, the lawful and legitimate functions of the Department of Health and Human Services, National Institute of Health, and the National Institute of Allergy and Infectious Diseases in complying with the Freedom of Information Act and the Federal Records Act.

### MANNER AND MEANS OF THE CONSPIRACY

It was part of the conspiracy that:

35. **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury used **MORENS**'s personal, non-government-issued email account(s) to create, transfer, and exchange federal records that pertained to **MORENS**'s responsibilities as a Senior Advisor at NIAID. The federal records created, transferred, and exchanged via **MORENS**'s personal, non-government-issued email address included the following types of records, among others::

a. controlled NIH work product;

b.      records concerning efforts to influence NIH to fund COMPANY #1;

c.      records concerning the COMPANY #1 bat coronavirus grant termination,
reinstatement, suspension, and subsequent negotiation, including the drafting and editing of
statements and responses on behalf of COMPANY #1 to NIH;

d.      records concerning public writings on the origins of the COVID-19 virus;

e.      records concerning congressional oversight of NIH and its grants related
to COVID-19;

f.      records concerning **MORENS**'s access to Senior NIAID Official 1 and his
use of that access to convey information on behalf of COMPANY #1 to influence Senior NIAID
Official 1.

36.      **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known
and unknown to the Grand Jury concealed, removed, destroyed and caused the concealment, and
removal of federal records to evade FOIA and the FRA.

37.      **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known
and unknown to the Grand Jury concealed their communications so that they could utilize
**MORENS**'s stature, connections, and access within the scientific community as a result of his
position as Senior Advisor to Senior NIAID Official 1 to advance the interests of COMPANY
#1; within NIH/NIAID, the scientific community, and publicly.

38.      **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known
and unknown to the Grand Jury concealed their communications so that they could communicate
with others in the scientific community in support of COMPANY #1 and published papers,
articles, and other writings supportive of COMPANY #1—but without directly including CO-
CONSPIRATOR 1 in the communications or as a contributor to the papers, to generate the

appearance of disinterested scientific consensus and avoid the necessity of declaring competing interests.

39.    **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury policed the use of **MORENS**'s government-issued email account by (1) reminding **MORENS** to avoid communicating using his government-issued email account and (2) explicitly requesting that those contacting **MORENS** do so through his non-government-issued email accounts to avoid exposing their communications to FOIA requests.

40.    CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury emailed information to **MORENS** at **MORENS**'s non-government-issued personal Gmail account for **MORENS** to relay to Senior NIAID Official 1—while instructing **MORENS** to use means of communication that would not be discovered in a FOIA search.

41.    **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury shared facts, press reports on the origin of COVID-19 and COMPANY #1, information regarding the administrative proceedings on the bat coronavirus grant, information regarding Congressional inquiries and activities related to COVID-19 and the bat coronavirus grant, information regarding the drafting and publication of articles, editorials, and letters, and information relating to FOIA requests. **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury shared that material and information to anticipate press reactions, develop talking points, and coordinate responses.

42.    CO-CONSPIRATOR 1 provided and promised to provide **MORENS** with things of value for and because of official acts and "behind the scenes shenanigans" favorable to CO-CONSPIRATOR 1 and COMPANY #1. CO-CONSPIRATOR 1 and **MORENS** concealed their

conduct by communicating via **MORENS**'s Gmail account and sending items to **MORENS**'s residence.

43.    **MORENS** received and agreed to receive things of value from CO-CONSPIRATOR 1 for or because of official acts favorable to CO-CONSPIRATOR 1 and COMPANY #1, including by engaging in "behind the scenes shenanigans." **MORENS** and CO-CONSPIRATOR 1 concealed their conduct by communicating via **MORENS**'s Gmail account and sending items to **MORENS**'s residence.

## OVERT ACTS

44.    In furtherance of the conspiracy, and to effect the objects thereof, at least one of the co-conspirators committed or caused to be committed at least one of the following overt acts, among others, in the District of Maryland, and elsewhere:

### The Co-Conspirators Plotted to Conceal Federal Records to Evade FOIA

45.    **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2 exchanged emails and took actions directed in whole or in part towards ensuring written communications between them related to government business would not be available to HHS, NIH, or NIAID to respond to any applicable FOIA request. The conspirators accomplished this objective by keeping discussions related to COMPANY #1, CO-CONSPIRATOR 1, the bat coronavirus grant, and other NIH/NIAID or government business on **MORENS**'s Gmail account. Set forth below are select communications where **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and others expressed their intent to conceal their correspondence to avoid public disclosure via FOIA of their communications. Except where specifically indicated, the following emails were all sent from or received by **MORENS** exclusively at his Gmail account.

a.    On or about April 25, 2020, after learning about the cancellation of the bat coronavirus grant, **MORENS** forwarded his communications with CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 from his NIH email account to his Gmail account. **MORENS** then emailed CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2, stating, *"**This is sent from my gmail account. Please send all replies here To gmail** [...] There are things I cant say except [Senior NIAID Official 1] is aware and I have learned that there are ongoing efforts within NIH to steer through this with minimal damage to you, [CO-CONSPIRATOR 1], and colleagues, and to nih and niaid."* (emphasis added).

b.    On April 26, 2020, CO-CONSPIRATOR 1 wrote to **MORENS** and CO-CONSPIRATOR 2, with copies to others, including COMPANY #1 staff, stating: "David – We'll communicate with you via gmail from now on."

c.    On or about April 28, 2020, CO-CONSPIRATOR 1, in an email titled "More FoIAs on their way – this time to NIAID, incl. emails to us," wrote to **MORENS** to alert him about a group "targeting [Senior NIAID Official 1] and looking for email to us and others re. Wuhan." **MORENS** responded by thanking CO-CONSPIRATOR 1 "for the heads up," stating, "We all dread these FOIAs, they take up so much time."

d.    On or about May 3, 2020, **MORENS** emailed members of a prominent professional medical organization to enlist them in speaking out on behalf of CO-CONSPIRATOR 1 and COMPANY #1 because of the termination of the bat coronavirus grant. The email stated, in part:

> Colleagues, *I need to keep this correspondnce [sic] off of USG emails for obvious reasons, so am sending from gmail [...] I am under Multiple FOIAs already*, and [CO-CONSPIRATOR 1] is facing orchestrated death threats ... We, [CO-CONSPIRATOR 2] and I, have advised [CO-CONSPIRATOR 1] to lay low, not go to the press, work through nih to get a face to face meeting, and let others come to his defense."

(emphasis added).

    e.    On or about May 15, 2020, **MORENS** emailed CO-CONSPIRATOR 1 falsely stating that the NIAID FOIA officer had told **MORENS** that he could "cover" his "rear" "by deleting emails and making use of foia delays," and that he would "soon need to train" himself "to use only gmail," and that he appreciated that CO-CONSPIRATOR 1 was "sensitive to that."

    f.    On or about May 16, 2020, **MORENS** emailed CO-CONSPIRATOR 1 about an article **MORENS** was drafting in part to benefit CO-CONSPIRATOR 1 and COMPANY #1, stating: "We all agree that we want to keep off Of it any fingerprints of you, [North Carolina Scientist 1] and any [COMPANY #1] or grant colleagues." **MORENS** concluded by stating: "I need to keep this off of govt email and govt phone text."

    g.    On or about July 2, 2020, **MORENS** sent an email from his NIH account to his Gmail account with the subject: ***"[CO-CONSPIRATOR 1] in outlook. Dele [sic] or send to gmail."*** (emphasis added).

    h.    On or about July 3, 2020, **MORENS** submitted and caused the submission of a scientific commentary to a prominent medical journal for publication that advocated COVID-19 emerged from nature and not from a lab. The piece was authored by **MORENS** and was intended to benefit COMPANY #1 and CO-CONSPIRATOR 1.

    i.    On or about August 27, 2020, after learning that NIH had awarded a $7.5 million grant to COMPANY #1, the same EIDRC grant the conspirators had been concerned might be affected by the termination of the bat coronavirus grant, **MORENS** emailed CO-CONSPIRATOR 1 from his NIH email account, stating: "Ahem.... do I get a kickback???? Too much fooking money! DO you deserve it all? Let's discuss...." In response, on or about August

28, 2020, CO-CONSPIRATOR 1 emailed **MORENS** at his Gmail account stating, in part, "of course there's a kick-back [sic]. *It starts with 5 more years of FoIA [sic] requests* [...] I just hope it doesn't culminate in 5 years in Federal jail [...]" (emphasis added).

j.     On or about November 19, 2020, in an email with the subject line, "Attacks on [COMPANY #1] continue," CO-CONSPIRATOR 1 wrote **MORENS** and CO-CONSPIRATOR 2 stating, in part: "*David, I'm using your gmail address to keep you out of the FoIA target*...Just wanted you to know that we're still under attack here at COMPANY #1. The US Right to Know (an anti-GMO, anti-vaxx group associated with Organic consumers.org) Foia'd NIH for our emails and grants. NIH refused, they've now sued." (emphasis added).

k.     On or about February 23, 2021, **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2 exchanged emails, under the subject line "Briefing [Senior NIAID Official 1]," where CO-CONSPIRATOR 2 told **MORENS** to "pay attention to the email address you use," stating: If you get FOIA'ed and have to respond it will have [CO-CONSPIRATOR 1], and, of lesser importance, me on the correspondence. The less we provide the enemy the better."

l.     On or about February 24, 2021, **MORENS** emailed CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2, under the subject line "Briefing [Senior NIAID Official 1]," stating, in part: "[I] learned from our foia lady here how to make emails disappear after I am foia'd but before the search starts, so i think we are all safe. Plus I deleted most of those earlier emails after sending them to gmail."

m.     On or about February 25, 2021, **MORENS** emailed CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 stating that he and Senior NIAID Official 1 received a "huge FOIA yesterday seeking any and all documents, emails, etc., that mention the words 'Wuhan

Institute' or 'WIV' [. . . .]You[r] names will not show up in this FOIA, at least not from my info.d"

n.      On or about June 17, 2021, **MORENS**, in an email with the subject line, "CONFIDENTIAL WITHIN OUR SMALL GROUP, PLEASE," emailed CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others stating that he received a production request from "5 US Senators" about "some of the issues we have been dealing with over the past year, focusing on the origins of COVID-19, the terminat6ion [sic] of NIH's major sarbecovirus grant, and related issues." **MORENS** added that he had "retained very few documents on these matters, and continue to request that correspondence on sensitive issues be sent to me at my gmail address, [. . ..]@gmail.com."

o.      On or about October 5, 2021, **MORENS** emailed CO-CONSPIRATOR 1 to warn CO-CONSPIRATOR 1 that "a foia picked up an email" he had sent CO-CONSPIRATOR 1 about [Senior NIAID Official 1]. **MORENS** wrote: "I deleted that email but i now learn [sic] that every email I ever got/sent since 1998 is captured and will be turned over, whether or not i instantly deleted it [...] *Gmail, phone, text.... i need to scrupulously rely on those exclusively*." (emphasis added).

p.      On or about October 6, 2021, CO-CONSPIRATOR 1 emailed **MORENS**, CO-CONSPIRATOR 2, and others to warn them about prior emails that were either sent to or received from **MORENS**'s NIH account that could become public because of FOIA requests. The email had the subject line, "1st batch of emails with David Morens'@Niaid address that might have been FoIA'd." CO-CONSPIRATOR 1 attached 27 emails, and wrote in the body of the email:

> David's NIH email address was FoIA'd and they're pulling out emails to me or [Senior NIAID Official 1] and about Wuhan etc. You're in some of these. We

started using David's gmail address in April 2020 around the time of the cancelation of our grant, but some slipped through the net, as is expected ... "There is some embarrassing stuff in there, the most heinous is: [. . .] Some details of what happened with NIH cancelation [sic] and what my response to that was, and how you helped me shape it [. . .] if these emails are with reporters, they'll use them to create stories as per above, and with headlines like: [']Powerful cabal of scientists from within NIH helped draft anti lab-leak narrative['] and '[CO-CONSPIRATOR 1] suspected WIV may have continued GoF work outside of NIH grant['][.]

    q.    On or about October 6, 2021, CO-CONSPIRATOR 1 sent **MORENS**, CO-CONSPIRATOR 2, and others an email with the subject like: "2nd batch of emails possibly FoIA'd." This email had approximately 34 prior emails. CO-CONSPIRATOR 1 identified emails that may cause issues for the co-conspirators if they were disclosed to the public via FOIA, including an email that CO-CONSPIRATOR 1 described as continuing "the story that we were working in a Cabal to orchestrate stuff." CO-CONSPIRATOR 1 concluded by stating: "*I will massively increase my scrutiny of all emails that come from David or cc him to make sure the NIH address is replaced by his gmail from now on. Really important!*" (emphasis added)

    r.    On or about October 27, 2021, **MORENS** emailed CO-CONSPIRATOR 2 about his continuing efforts to keep emails away from FOIA, stating: "i just want to let you know i am working with our IT guys to get a fix where my gmail no longer gets on my govt phone or computer," and that "[s]o far it seems that my phone and my gmail are fairly safe." **MORENS** then asked that CO-CONSPIRATOR 2 "let [CO-CONSPIRATOR 1] know i am following events and will stay in touch with him through you."

    s.    On or about October 27, 2021, **MORENS** emailed CO-CONSPIRATOR 2 stating that "it is PROBABLY safe for u to contact me on gmail but if there is anything sensitive or about [Senior NIAID Official 1], best to use the phone."

    t.    On or about October 27, 2021, in a note to himself, **MORENS** emailed his NIH account a contentless email with the subject line, "gmail signature remove nih."

u.      On or about November 18, 2021, **MORENS** emailed CO-CONSPIRATOR 2 declaring that his "gmail is now safe from FOIA and hacking on all of my devices" and that it "should be safe to communicate safely with you, [CO-CONSPIRATOR 1], and others, as long as we use my private gmail." **MORENS** added:

> Please pass this on to [CO-CONSPIRATOR 1] and *I ask you both that NOTHING gets sent to me except to my gmail, and make sure that what gets sent to my gmail doesn't have a cc to another government employee who could be FOIA'd."* (emphasis added)

v.      On or about December 7, 2021, in an email with the subject line, "[CO-CONSPIRATOR 1] and the Salem Witch Trials," **MORENS** emailed the Chair of the COMPANY #1 Board "to put in a word for [CO-CONSPIRATOR 1] and the [COMPANY #1] team," and reminded the recipients of the email to "*keep all communications like this on private email so that it can't be retrieved via a FOIA*." (emphasis added).

w.      Between on or about September 15, 2022, and on or about September 18, 2022, **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others participated in an email exchange regarding a "FOIA Request – PDN [Pre-Disclosure Notification] Contact." CO-CONSPIRATOR 1 anticipated headlines that might come from the public disclosure of the emails, such as "leading scientists conspire to undermine investigation into lab leak theory via back-channel to [Senior NIAID Official 1]."

### The Use of MORENS's Gmail Account to Create and Conceal Federal Records, Exchange Non-Public NIH Information, and Secretly Provide Information to Senior NIAID Official 1

46.     **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others used **MORENS**'s Gmail account to create, exchange, and conceal federal records, including to pass non-public NIH information, and to "back-channel" information to Senior NIAID Official 1, as

set forth below. Except where specifically indicated, the following emails were all sent from or received by **MORENS** at his Gmail account.

a.    On or about April 28, 2020, **MORENS** emailed CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, the Chair of COMPANY #1's Board, and CO-CONSPIRATOR 1's Chief of Staff a copy of two internal and nonpublic NIH records. The first NIH record **MORENS** emailed was titled "NIAID COVID-19 Implementation Plan." The record was marked "FOUO" (For Official Use Only) on every page, and identified, among other things, COVID-19-related research. The second NIH record **MORENS** emailed was titled "NIAID SARS-CoV-2 Research Updates." Each page of this document was also marked FOUO.

b.    On or about January 21, 2021, CO-CONSPIRATOR 1 emailed **MORENS** and others telling **MORENS** to "please ask [Senior NIAID Official 1] to ask [the U.S. Secretary of State] to send me an email with the information in it and I'll share it with the WHO team." CO-CONSPIRATOR 1 asked **MORENS** to "[p]lease get the message to [Senior NIAID Official 1] that the only way to really understand the risk of these viruses, and protect the planet against the next COVID has to be working with our China counterparts." At the time, CO-CONSPIRATOR 1 was in China on a World Health Organization (WHO) mission to investigate the origins of COVID-19. CO-CONSPIRATOR 1 was the only U.S. member on the mission.

c.    On or about February 16, 2021, CO-CONSPIRATOR 1 emailed **MORENS** and CO-CONSPIRATOR 2 that he hoped **MORENS** "might whisper in [Senior NIAID Official 1]'s ear" or "smooth the right passage" regarding reinstatement of the bat coronavirus grant.

d.    On or about February 21, 2021, CO-CONSPIRATOR 1 emailed **MORENS** stating that it was "a v. good idea re. Briefing [Senior NIAID Official 1]" and that he

would offer to brief "[Senior NIAID Official 1] and the NIAID senior staff" before briefing the "NIAID COVID group."

      e.     On or about March 10, 2021, CO-CONSPIRATOR 1 introduced a Nobel Laureate to **MORENS** over email stating, "introducing you to David Morens who works directly for [Senior NIAID Official 1]." CO-CONSPIRATOR 1 wrote that the Nobel Laureate was "speak[ing] out about the abuse of the funding system for political gain," and that the Nobel Laureate wanted to "reach out to [Senior NIAID Official 1] by email but obviously that's difficult these days" and that he was hoping **MORENS** would "make sure an email from [the Nobel Laureate] to [Senior NIAID Official 1] would be read." CO-CONSPIRATOR 1 concluded the email by stating – "I will now exit the conversation because of my clear conflict of interest!"

      f.     On or about March 29, 2021, **MORENS** made edits and comments to CO-CONSPIRATOR 1's written response to two letters the NIH Deputy Director for Extramural Research had sent about COMPANY #1's bat coronavirus grant. **MORENS** was aware that the letter would be read by the NIH Deputy Director for Extramural Research and possibly others, stating, "this will probably be read by [the NIH Deputy Director for Extramural Research] but will perhaps be leaked and ready by many oth-ers [sic]." Below is one of the comments **MORENS** made to strengthen the letter for the benefit of CO-CONSPIRATOR 1 and COMPANY #1.



g.      On or about April 11, 2021, CO-CONSPIRATOR 1 submitted and caused

the submission of the written response to the NIH Deputy Director for Extramural Research,

incorporating **MORENS**'s edits and suggestions.  CO-CONSPIRATOR 1 did not disclose that

**MORENS** participated in drafting the letter.

h.      On or about April 21, 2021, **MORENS** and CO-CONSPIRATOR 1, with

copies to others, exchanged emails regarding a "Zoom meeting with [Senior NIAID Official 1]

tomorrow."  In the body of the email, **MORENS** described various topics relating to the Zoom

meeting, including "what info or docs" CO-CONSPIRATOR 1 "would or would not want"

**MORENS** to share, and issues Senior NIAID Official 1 would be concerned about, including

"the possibility the NIH funded scientists or other esteemed scientists, are in cahoots with

politicians wanting to attack him or niaid." **MORENS** added that *"it might be best to connect

you two, in an off the record manner"* because *"[w]e are getting FOIA'd non stop, so its most

important that [Senior NIAID Official 1] not have anything on the record that could come

back to bite."* (emphasis added).

i. On or about April 21, 2021, CO-CONSPIRATOR 1 emailed **MORENS** regarding the Zoom meeting with Senior NIAID Official 1. CO-CONSPIRATOR 1 told **MORENS** to "Please feel free to share any docs that I've sent to you, with [Senior NIAID Official 1]. *Hopefully you can do that in a way that avoids FoIA, and if not possible, just show him stuff on the screen share on Zoom.*" (emphasis added). CO-CONSPIRATOR 1 attached a document titled "Political actions regarding [COMPANY #1]'s work on Coronavirus."

j. On or about October 24, 2021, CO-CONSPIRATOR 1 emailed **MORENS**, CO-CONSPIRATOR 2, and the COMPANY #1 Chief of Staff with the subject line, "Draft response to [NIH Deputy Director for Extramural Research] – please review." CO-CONSPIRATOR 1 wrote that he was "trying to rapidly respond to [the NIH Deputy Director for Extramural Research]'s letter . . . as well as to [the NIH Principal Deputy Director]'s public statement that COMPANY #1 failed to comply with reporting restrictions" in connection with the bat coronavirus grant. CO-CONSPIRATOR 1 attached several documents, including a letter titled, "Response_to_[NIH Deputy Director for Extramural Research]_October_2021_DRAFT.docx." CO-CONSPIRATOR 1 finished the email by stating: "David–I'll send some bullets for you to pass on to [Senior NIAID Official 1] later on."

k. On or about October 25, 2021, CO-CONSPIRATOR 1 emailed **MORENS** under the subject line, "Short version of our response to NIH – bullets for sharing." Attached to the email was a "single sheet with bullets" for **MORENS** to share with Senior NIAID Official 1 to convince "folks at NIH" that the NIH Principal Deputy Director was wrong to criticize "[COMPANY #1]'s reporting compliance." Referencing the draft letter CO-CONSPIRATOR 1 had circulated on October 24, 2021, **MORENS** responded to CO-

CONSPIRATOR 1 stating, "[CO-CONSPIRATOR 1], this is an excellent draft. I will suggest

some wordsmithing tweets [sic] later today."

l.        On or about October 25, 2021, CO-CONSPIRATOR 2 replied to the

October 24, 2021 email exchange with the subject line, "Draft response to [NIH Deputy Director

for Extramural Research] – please review." CO-CONSPIRATOR 2 replied only to CO-

CONSPIRATOR 1 and the COMPANY #1 Chief of Staff, leaving **MORENS** off the email.

CO-CONSPIRATOR 2 wrote:

> I just spent some time on the phone with David.  He is concerned about the privacy
> of text and other messages from his cell phone to you and me because he has been
> using a government phone which permits personal conversations as well.  So even
> things via gmail sent and received on his cell phone could be FOIA'able.

CO-CONSPIRATOR 2 then communicated **MORENS**'s edits and suggestions to CO-

CONSPIRATOR 1's draft letter to the NIH Deputy Director for Extramural Research, stating

"[**MORENS**] wanted to reiterate a couple of things [:]"

> First, on the timeline to make it more specific with dates and details. [NIH Program
> Manager for the bat coronavirus grant] is really important and being sure he is well
> informed, acknowledges the timeline and the communications you mention, and is
> on board because he will certainly be questioned. [**MORENS**] also suggested that
> you discuss with him the need for NIH to check the records and to confirm when
> documents were filed and acknowledged. And that when you were aware that it
> was necessary to file the 5 year report the system shut you out and you presumed
> that was normal process as you were then into the new grant year 1.

m.        On or about October 26, 2021, CO-CONSPIRATOR 1 submitted and

caused the submission of a letter to the NIH Deputy Director for Extramural Research containing

**MORENS**'s suggestions, including the explanation for why COMPANY #1 failed to timely

submit its "5 year report" in connection with the bat coronavirus grant.

### CO-CONSPIRATOR 1 Provided and Promised to Provide MORENS With Illegal Gratuities and Sought to Conceal their Discovery

47.     **MORENS** used his role as Senior Advisor to Senior NIAID Official 1 to engage in official acts favorable to CO-CONSPIRATOR 1 and COMPANY #1. For and because of such official acts, some of which are identified above, and "behind the scenes shenanigans," CO-CONSPIRATOR 1 provided and promised to provide things of value to **MORENS**, which **MORENS** received and agreed to receive. CO-CONSPIRATOR 1 and **MORENS** concealed their conduct by communicating via **MORENS**'s Gmail account and sending items to **MORENS**'s residence.

a.     On or about June 11, 2020, **MORENS** emailed CO-CONSPIRATOR 1 from his NIH email account stating, "let's win this anti science battle, get you refunded and über funded, then settle scores and kick some ass."

b.     On or about June 25, 2020, CO-CONSPIRATOR 1 gave **MORENS** two bottles of The Prisoner Red Napa Valley wine from Bounty Hunter Rare Wine & Spirits, which was delivered to **MORENS**'s residence in Maryland. The wine included the following message from CO-CONSPIRATOR 1 to **MORENS**:

> This is the first of what I hope will be a continued series of expressions of gratitude for your advice, support, and behind-the-scenes shenanigans in my battle against your bosses boss, his boss, and the ultimate boss on the hill. It takes courage and commitment to do what you've done, given your job and the vindictive nature of the Administration. I am eternally grateful for that, and hope I will be able to return the favor one day. In the meantime...Cheers!

c.     On or about June 25, 2020, upon receipt of the wine, **MORENS** emailed CO-CONSPIRATOR 1 from his Gmail account thanking him for the wine and stating: "Now i am actually going to have to do something to deserve it. Let me think...." **MORENS** then identified acts that he had performed for CO-CONSPIRATOR 1 and COMPANY #1, including

writing a "scientific commentary that outlines the importance of what [CO-CONSPIRATOR 1] and others have been doing, but without mentioning [CO-CONSPIRATOR 1] or the grant termination[.]"

     d.     On or about June 26, 2020, CO-CONSPIRATOR 1 emailed **MORENS** at his Gmail account promising additional things of value, stating: "Consider this my phase II gift. Phase III might actually involve a meal - the Michelin starred restaurants are opening in Paris - DC and New York will do eventually!"

     e.     On or about July 3, 2020, **MORENS** submitted and caused the submission of a scientific commentary to a prominent medical journal for publication that advocated COVID-19 emerged from nature and not from a lab. **MORENS** was listed as an author on the scientific commentary. The scientific commentary was to benefit COMPANY #1 and CO-CONSPIRATOR 1, and was "funded in part by the intramural research program of the National Institute of Allergy and Infectious Diseases (NIAID), National Institutions of Health (NIH)."

     f.     On or about October 6, 2021, in an email with the subject line "2nd batch of emails possibly FoIA'd," CO-CONSPIRATOR 1 emailed **MORENS** at his Gmail account, and other individuals, to identify emails sent from **MORENS**'s NIH account that may cause issues for the co-conspirators if they were disclosed to the public via FOIA. In the email, CO-CONSPIRATOR 1 specifically referenced one email where CO-CONSPIRATOR 1 had "sent David a bottle of wine," but noted that "it's not absolutely cut and dried [sic] that this happened, but it gives that impression." CO-CONSPIRATOR 1 also opined: "I believe if the wine has a value of $20 or less, that's fine."

18 U.S.C. § 371

## COUNTS TWO AND THREE
### (Destruction, Alteration, or Falsification of Records in Federal Investigations)

1.      The allegations in paragraphs 1 through 33 and 35 through 47 of Count One are incorporated herein by reference.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

## DAVID M. MORENS,

knowingly altered, destroyed, mutilated, concealed, covered up and falsified a record, document, and tangible object, as identified below, with the intent to impede, obstruct, and influence the investigation and proper administration of the Federal Records Act and the Freedom of Information Act, matters within the jurisdiction of the Department of Health and Human Services and the National Institutes of Health, a department and agency of the United States, or in relation to or contemplation of any such matter or case.

| COUNT | APPROXIMATE DATE | RECORD, DOCUMENT, OR TANGIBLE OBJECT |
|---|---|---|
| 2 | April 21, 2021 | Email correspondence of MORENS, CO-CONSPIRATOR 1 and others, related to MORENS's official government business |
| 3 | October 24, 2021 | Email correspondence among MORENS, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and others, related to MORENS's official government business |

18 U.S.C. § 1519
18 U.S.C. § 2

## COUNTS FOUR AND FIVE
### (Concealment, Removal, or Mutilation of Records)

1.      The allegations in paragraphs 1 through 33 and 35 through 47 of Count One are incorporated herein by reference.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

### DAVID M. MORENS,

willfully and unlawfully and with the intent to take, conceal, remove, mutilate, obliterated, and destroy, or attempt to do so, a record, paper, document, and thing filed and deposited with any public officer of the United States.

| COUNT | APPROXIMATE DATE | RECORD, DOCUMENT, OR TANGIBLE OBJECT |
|-------|------------------|--------------------------------------|
| 4 | April 21, 2021 | Email correspondence of CO-CONSPIRATOR 1, **MORENS**, and others, related to **MORENS**'s official government business |
| 5 | October 24, 2021 | Email correspondence among CO-CONSPIRATOR 1, **MORENS**, and CO-CONSPIRATOR 2, and others, related to **MORENS**'s official government business |

18 U.S.C. § 2071(a)
18 U.S.C. § 2

Kelly O. Hayes /by ONO

Kelly O. Hayes
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**
Foreperson

Date: April _16_, 2026

# PLAINTIFFS' EXHIBIT 4

# Executive Grant of Clemency

## JOSEPH R. BIDEN, JR.
### *President of the United States of America*

**TO ALL TO WHOM THESE PRESENTS SHALL COME, GREETING:**

BE IT KNOWN, THAT THIS DAY, I, JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, PURSUANT TO MY POWERS UNDER ARTICLE II, SECTION 2, CLAUSE 1, OF THE CONSTITUTION, HAVE GRANTED UNTO

### DR. ANTHONY S. FAUCI

#### A FULL AND UNCONDITIONAL PARDON

FOR ANY OFFENSES against the United States which he may have committed or taken part in during the period from January 1, 2014, through the date of this pardon arising from or in any manner related to his service as Director of the National Institute of Allergy and Infectious Diseases, as a member of the White House Coronavirus Task Force or the White House COVID-19 Response Team, or as Chief Medical Advisor to the President.

IN TESTIMONY WHEREOF I have hereunto signed my name and caused the seal of the Department of Justice to be affixed.



*Done at the City of Washington this 19th day of January in the year of our Lord Two Thousand and Twenty-Five and of the Independence of the United States the Two Hundred and Forty-Ninth.*

**JOSEPH R. BIDEN, JR.**
**President**

# PLAINTIFFS' EXHIBIT 5

**Opening Statement of Chairman Ron Johnson**
**Permanent Subcommittee on Investigations**
**May 21, 2025**

*As submitted to the record:*

I would like to welcome Ranking Member Blumenthal and all the members, new and old, to this, the first hearing of the Permanent Subcommittee on Investigations in the 119th Congress. I look forward to working with all of you as we conduct oversight and investigations to uncover and expose the truth on issues that are important to the American people.

My hope is that our work will be largely non-partisan—there should be nothing partisan about revealing the truth. That was this Subcommittee's experience in the last Congress, as we conducted bipartisan investigations into the assassination attempts on President Trump and the Coast Guard's cover-up of sexual abuse, and attempted to obtain information the government withheld from the 9/11 families.

In addition to the Subcommittee's bipartisan record, its reputation for conducting thorough investigations spans decades. Since the 1940s, this Subcommittee has been the epicenter of major Congressional oversight efforts. I hope to use this Subcommittee to build on that legacy by bringing much-needed transparency to the public, revealing the truth, and exposing wrongdoing. But it won't be easy. Wrongdoers are very good at covering their tracks, and we are aware of allegations suggesting document destruction and purposeful evasion of FOIA.

The title of today's hearing is, "The Corruption of Science and Federal Health Agencies: How Health Officials Downplayed and Hid Myocarditis and Other Adverse Events Associated with the COVID-19 Vaccines."

As chairman of the full committee, I held multiple hearings in the first year of the pandemic that opened my eyes to the capture and corruption of federal health agencies and scientific research. So much of our miserably failed response to COVID made no sense. Masking, devastating shutdowns, the sabotage of early treatment, rapid approval of Remdesivir, and the maniacal reliance on the COVID-19 injections as the only way to end the pandemic.

As ranking member of this subcommittee, I was unable to interest the Subcommittee or full Committee Chairs in joining my oversight of our pandemic response. So instead of formal hearings, I held public events giving those injured by the COVID-19 injection a platform to appeal to federal health officials and the public for help. I also provided opportunities for eminently qualified doctors and medical researchers who disagreed with our pandemic response to offer second opinions. More often than not, those who spoke up were vilified, censored, and suffered various forms of retaliation.

Fortunately, the retaliation did not deter them and they continued to speak out. Even better, they were joined by others. Some of those individuals are testifying today or are in the audience. I want to personally thank them for their courage and persistence.

Today, I am releasing an interim report that is based in large part on documents that were obtained by individuals who filed Freedom of Information Act ("FOIA") requests over the last several years. These documents, obtained by reporters and private citizens, contained heavy redactions applied by the Biden administration. Yet, despite those obstructive efforts, these individuals initially raised awareness of the Biden's administration's failure to immediately warn the public about myocarditis and other adverse events linked to the COVID-19 injections.

I want to credit the tenacious reporting of Brenda Baletti, Ed Berkovich, Brian Hooker, Amy Kelly, Zachary Stieber, and Naomi Wolf. I also want to thank the individuals associated with React19, the Informed Consent Action Network, the book The Pfizer Papers, as well as the reporters at Epoch Times, The Defender, Just the News, the Daily Clout, and many others who worked persistently to expose the truth.

Over the last four years, under the Biden administration, federal health officials withheld information from the public regarding the government's response to the COVID-19 pandemic and the safety and development of the COVID-19 injections. During that period, I sent over 70 oversight letters to the Biden administration seeking information related to COVID-19 that were either completely ignored or inadequately addressed. Many of these letters requested documents and data on COVID-19 vaccine adverse events, vaccine safety surveillance analyses, and government communications about the injections' potential health risks. These crucial government records belong to the American people, but the Biden administration refused to release them.

Why? If the COVID-19 injections were as safe and effective as Biden health officials consistently touted, then what would they have to hide?

Why would the Biden administration need to suppress evidence demonstrating the safety of the COVID-19 injections?

Records that the Subcommittee has obtained to date offer a simple, yet troubling, answer to these questions: Biden administration officials knew in early 2021 that the mRNA COVID-19 injections could result in adverse health events and they downplayed the risks to avoid alarming the public and create vaccine hesitancy. As a result, they violated what should be the inviolable principle of informed consent.

In late January of this year, shortly after I was named chairman of the Subcommittee, I subpoenaed the Department of Health and Human Services ("HHS") for COVID-19 vaccine safety data and records the Biden administration previously withheld. While HHS's production of responsive records is far from complete, the information produced to date contains evidence of the Biden administration's efforts to downplay and delay warning the public about the risks of cardiac-related adverse events, such as myocarditis, associated with the mRNA COVID-19 injections.

The interim report I am releasing in conjunction with today's hearing highlights records detailing HHS's awareness of and response to cases of myocarditis—a type of heart

inflammation—following COVID-19 injection. As previously mentioned, while portions of some of these documents have already been made public over the years with various redactions through FOIA requests, the public will finally have complete access to various presentations, communications, and data reports absent excessive redactions.

The records discussed in the interim report show, in part:

- **On February 28, 2021**, the Israeli Ministry of Health notified officials at the CDC of "large reports of myocarditis, particularly in young people, following the administration of the Pfizer vaccine."[1]

- **On April 12, 2021**, a Department of Defense ("DoD"), Defense Health Agency ("DHA") consultant presented to various federal health officials noting that the vaccine safety surveillance system called V-safe, lacked the ability to detect reports of myocarditis and cardiac-related adverse events.[2] Regarding V-safe's omission of inquiries related to cardiac-related symptoms, the DHA consultant questioned her colleagues: "If you do not ask, you will not see it, but does that mean it does not exist?"[3]

- **In mid-April 2021**, CDC officials discussed safety signals for "myocarditis with mRNA vaccines" based on DoD and Israeli data, but still did not take immediate steps to warn the public.[4] For context, by the end of April, 2021, just four months into the COVID injection rollout, VAERS was already reporting 2,926 deaths worldwide within 30 days of injection, with 46.1% of those deaths occurring on day 0, 1, or 2 following injection.[5] When I asked then-NIH Director Francis Collins about what VAERS was showing at that point in time, he acknowledged six deaths had been attributed to the Johnson & Johnson injection, but as to the other 2,920 deaths reported on VAERS he callously stated: "Senator, people die."

- **From May 17, 2021 – May 21, 2021**, CDC officials discussed whether to issue a formal health warning—called a Health Alert Network ("HAN") message—on myocarditis,

---

[1] PSICOVID_0000009-14; FOIA production: https://childrenshealthdefense.org/wp-content/uploads/23-00056-for-2-24-2023-Close.pdf at 710-713.

[2] *See, e.g.*, PSICOVID_00008808, 4651; FOIA production: https://s3.documentcloud.org/documents/23656227/cdc-emails-chat-messages-on-post-vaccination-myocarditis.pdf at 257-258.

[3] PSICOVID_00008808.

[4] FOIA production: https://drive.google.com/file/d/1K6B25XjBdKmjW5yEIEpZ1cvnr6jp3RAY/view at 301-302.

[5] *See* VAERS database query: United States Department of Health and Human Services (DHHS), Public Health Service (PHS), US Department of Health and Human Services, Centers for Disease Control and Prevention (CDC), Food and Drug Administration (FDA), Vaccine Adverse Event Reporting System (VAERS), 1990-4/23/2021, CDC WONDER On-line Database, accessed April 23, 2021, http://wonder.cdc.gov/vaers.html. Query criteria—Vaccine Products: VOCID-19 Vaccine (COVID19); COVID-19-2 (COVID-192). Group By: Month Received. State/Territory: All locations. Event Category: All Events. Show Totals: True. Show Zero Values: False; VAERS database query: United States Department of Health and Human Services (DHHS), Public Health Service (PHS), Centers for Disease Control (CDC), Food and Drug Administration (FDA), Vaccine Adverse Event Reporting System (VAERS) 1990-4/23/2021, CDC WONDER On-line Database, accessed on April 23, 2021, http://wonder.cdc.gov/vaers.html. Query criteria—Vaccine Products: COVID-19 Vaccine (COVID19); COVID-19-2 (COVID-192). Group By: Month Received. State/Territory: All locations. Event Category: Death. Show Totals: True. Show Zero Values: False.

noting that health care professionals across the nation may not be aware of the risk because "providers aren't reporting these cases to VAERS [Vaccine Adverse Event Reporting System]."[6]

- **Following a May 24, 2021** vaccine safety meeting that included FDA and CDC officials, U.S. public health officials exchanged draft meeting notes which included the question: "Is VAERS signaling for myopericarditis now?"; and the answer: "For the age groups 16-17 years and 18-24 years, yes."[7]

- **On May 25, 2021**, one day following the meeting where FDA and CDC officials acknowledged a safety signal for myopericarditis, the Biden White House distributed talking points to top U.S. health officials, including then-National Institute of Allergy and Infectious Diseases Director Anthony Fauci, downplaying the risk of myocarditis.[8]

- **From May 25, 2021 – May 27, 2021**, a CDC official provided up-to-date information on the status of the HAN to Pfizer and Moderna representatives, indicating CDC's preference to keep the vaccine companies more informed about vaccine adverse events than the American people.[9]

- **On May 26, 2021**, two days after the meeting where FDA and CDC officials acknowledged a safety signal for myopericarditis, then-Acting FDA Commissioner Janet Woodcock emailed then-CDC Director Rochelle Walensky noting that the "FDA does not concur with the issuance of the myocarditis HAN as written[.]"[10]

  o Records show that on May 26, 2021, CDC and FDA decided to "nix the HAN" and instead opted to publish less formal "clinical considerations" about myocarditis on CDC's website.[11]

- **On May 27, 2021**, three days after the meeting where FDA and CDC officials acknowledged the safety signal for myopericarditis, FDA's then-Director of the Center for Biologics Evaluation and Research, Peter Marks, wrote to Walensky and Woodcock and appeared to raise concerns about even posting "clinical considerations" about myocarditis.[12] He wrote "I need to ask for your patience with me. We still have concerns here if myocarditis and pericarditis have not actually signaled."[13]

  o That same day, as CDC officials edited the statement for CDC's website, Dr. Demetre Daskalakis, then then-Director of the Division of HIV/AIDS Prevention, discussed the need to "walk back" a sentence advising doctors to "consider

---

[6] PSICOVID_00004649-4650; FOIA production: https://s3.documentcloud.org/documents/23656227/cdc-emails-chat-messages-on-post-vaccination-myocarditis.pdf at 257-258.

[7] PSICOVID_00009452.

[8] PSICOVID_00005295-5312.

[9] *See, e.g.*, PSICOVID_00004649-4650, 4808-4809.

[10] PSICOVID_00005565.

[11] PSICOVID_00005569.

[12] PSICOVID_00005568.

[13] *Id.*

restricting patients with myocarditis from rigorous activity like competitive sports for at least 3 months until cleared by a healthcare professional."[14]

- **On May 28, 2021**, four days following the apparent discussion confirming a safety signal for myopericarditis, CDC posted on its website "clinical considerations" about myocarditis rather than issuing a formal HAN. These "clinical considerations" omitted any mention that doctors should "consider restricting patients with myocarditis from rigorous activity like competitive sports for at least 3 months until cleared by a healthcare professional."[15]

Rather than provide the public and health care providers with immediate and transparent information regarding the risk of myocarditis and pericarditis following COVID-19 injection, the Biden administration waited until late June 2021 to announce changes to the labels for the Moderna and Pfizer COVID-19 vaccines based on the "suggested increased risks" of myocarditis and pericarditis.[16]

The safety signal for myopericarditis that CDC and FDA officials discussed at a May 24, 2021 vaccine safety meeting, should have been more than sufficient justification to formally warn the public about the health risk through the HAN which is CDC's "primary method of sharing cleared information about urgent public health incidents[.]"[17]

Instead, the following day, on May 25, 2021, the Biden White House distributed talking points to top U.S. health officials which stated that reports of myocarditis and pericarditis occurring after vaccination were "rare" and that "getting vaccinated gets us back to normal."[18]

Federal health officials' primary concern was not vaccine adverse events linked to myocarditis, but instead appears to have been vaccine hesitancy and mandating the injection for virtually every American.[19] It is not surprising then, that they weren't finding what they weren't looking for.

It is also not surprising why, for four years, the Biden administration kept the vast majority of this information hidden from the public and Congress. They did not want the public or Congress to ever know the complete extent of their awareness of and lack of response to mRNA COVID-19 vaccine adverse health events. Now, as a result of the Subcommittee's

---

[14] PSICOVID_00005566.

[15] *Id.*; Clinical Considerations: Myocarditis and Pericarditis after Receipt of mRNA COVID-19 Vaccines Among Adolescents and Young Adults, Centers for Disease Control and Prevention, May 28, 2021, archived: https://web.archive.org/web/20210528145419/https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html.

[16] Coronavirus (COVID-19) Update: June 25, 2021, Food and Drug Administration, Jun. 25, 2021, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-june-25-2021; Jack Phillips, FDA Adds Warning About Heart Inflammation to COVID-19 mRNA Vaccines, Epoch Times, Jun. 27, 2021, https://www.theepochtimes.com/article/fda-adds-warning-about-heart-inflammation-to-covid-19-mrna-vaccines-3876245.

[17] Health Alert Network (HAN), Centers for Disease Control and Prevention, Last Reviewed: Mar. 12, 2025, https://emergency.cdc.gov/han/.

[18] PSICOVID_00005297, 5305.

[19] PSICOVID_00005305, 5309.

Page 6 of 6

oversight efforts, the public can finally review unredacted documents that should have been released years ago.

Today's revelations, while necessary and important, will not fix the damage done by the Biden administration's failure to immediately and transparently warn the public about the health risks associated with the COVID-19 injections. Most of the witnesses at today's hearing will testify about their experience of actually treating patients with serious and life-changing COVID-19 vaccine adverse side effects. How many individuals would have benefited from knowing what the Biden administration knew in early 2021 about cardiac-related adverse events associated with the injections prior to vaccination?

The Biden administration's decision to downplay the COVID-19 injection health risks and delay warning the public about cardiac-related adverse events associated with the injections jeopardized the public's health.

As more documents that have been hidden, redacted, and withheld for years become available, the Permanent Subcommittee on Investigations will provide transparency and let the American public see what is their right to see.

I thank the witnesses for their testimony.

# PLAINTIFFS' EXHIBIT 6

PSI Hearing, May 21, 2025 – "The Corruption of Science and Federal Health Agencies: How Health Officials Downplayed and Hid Myocarditis and Other Adverse Events Associated with the COVID-19 Vaccines"

The Opening Statement of Ranking Member Richard Blumenthal:

*Sen. Blumenthal*: Thank you, Mr. Chairman, and thank you for having this first hearing of our Permanent Subcommittee on Investigations. I think we all agree that this hearing and our efforts in this Subcommittee ought to be nonpartisan and nonpolitical, and that we should de-politicize science, strictly adhere to the evidence, medical evidence, without ideological predilection. And that there ought to be warnings about side effects from any medicine, and that the warning should be as prompt as possible. I think we should all agree on that fact. And there ought to be a very rigorous review of any kind of medical treatment by the FDA, to make sure it is safe and effective before it's used in the public. But I want to take us back to January 2021. I know it's hard to recall the sense of real fear during the worst of the pandemic, more than 20,000 Americans died from coronavirus each week. I remember seeing pictures of people who were in the hospital on gurneys because there was inadequate space for them in the hospital. The morgues overflowed, and we were looking to some way to stop the spread and the deep-seeded pervasive fear.

During the worst of the pandemic, more than 25,000 Americans died. That was during the last week of President Trump's term of office. Not only were hospitals overwhelmed, but nonurgent procedures were postponed, and doctors and nurses were working around the clock, in fact putting themselves at risk. Those health care providers to this day are among my heroes, as patients filled the hallways. As we talk about the side effects of COVID vaccines, I think we need to be clear about the most important fact. For all Americans, COVID-19 vaccines have saved millions and millions of lives. There is no scientific question about that fact. It saves lives. In the past five years, more than 1.2 million Americans have lost their lives to COVID-19. That is 1.2 million parents, children, friends, and loved ones, and we all know someone who has perished as a result of COVID-19. But when the vaccine became widely available in 2021, deaths sharply declined, and many lives have been saved in the years since. Many in this room, speaking for myself as well as others, probably have been saved from this disease because of those vaccines. One study found that 3 million American deaths were averted. 18 million hospitalizations were avoided, and $1 trillion in health care costs were saved in the United States in just the first two years after COVID vaccines were distributed.

I would like this study entered into the record, Mr. Chairman if there's no objection. *Chairman Johnson*: Without objection. *Sen. Blumenthal*: Now, vaccines not only saved American lives, they allowed us to get back on our feet economically. They enabled the American economy to recover. Let's try to think of where we were five years ago, with a deadly, unknown virus spreading through America and through the world. We were only able to come so far because of the vaccines, and the researchers who develop them and the public health officials who distributed them. And now those individuals are again under attack, our public officials.

I looked at those documents, maybe not all of them, that the Majority alleges show that the Biden administration or those public health officials suppressed evidence of side effects. Let's be clear, the allegation is that they purposely concealed evidence. I am unable to support that conclusion with this evidence. In fact, the primary piece of evidence for this claim is that the CDC did not issue any notice on its health alert network, HAN, in May 2021, while it was still analyzing the evidence about myocarditis. We are talking about myocarditis, the Chairman has referenced other side effects, I'm not sure what he means. But what I see, as I look at that evidence, is public health officials wrestling with what to do, and what kind of warning to issue. And, again, side effects must be studied and communicated, and that's what I see happening in these documents that the Majority has released.

So we have to distinguish, I think, between differences of opinion under the pressure of a pandemic and separate the opinions of scientists, who are working for the greater good, and, frankly, others who may simply be seeking to sow distrust, while they profit off misinformation and fear. And I am, frankly,

deeply concerned about some of today's witnesses, because they have a financial interest in fomenting distrust of COVID-19 vaccines and pushing untested alternative remedies over proven treatments. In fact, two of today's witnesses are executives at something called the Wellness Company, which sells the disproven treatment, ivermectin, and a host of untested supplements, which include something called "Ultimate Spike Detox," that cost $89.99 a bottle. Another makes money from suing vaccine companies, and still others are pushing unsupported research while rejecting the proven scientists on COVID and other vaccines.

Let's be very clear that fear mongering and rushing to conclusions without examining the evidence can lead to tremendous harm, and this risk is not just hypothetical or rhetorical. Misinformation about the safety of vaccines has led to a deadly outbreak of a preventable disease, we all know it, measles. Just twenty-five years ago, measles was declared eliminated in the United States. Since then, conspiracy theories, some financially motivated, have caused vaccination rates to plummet. Last September, the CDC warned that declining childhood vaccinations could lead to a resurgence of a preventable disease like measles and rotavirus, exactly what is happening today. As of today, more than 1000 Americans have been diagnosed with measles this year, in 31 states, many of them children, so far three have died. These deaths were preventable. They could have been avoided, but for the efforts of misinformation proponents that have spread lies and created fears. There has been so much misinformation and fear since COVID-19 emerged that during the height of the pandemic, health care workers and public health officials were often harassed and threatened, some of them continue to fear for their lives.

During the first frightening year of the pandemic, the Trump administration withheld critical information from the public, made baseless promises that the virus will magically disappear. I'm quoting the president, "magically disappear," engaged in unfounded conspiracy theories and sham science about COVID-19 treatment and sowed the seeds of distrust in public health institutions. And then to the tremendous credit of President Trump, he fast-tracked the vaccines. Let me repeat, to the credit of the Trump administration, the President of the United States fast-track the vaccine and saved lives.

We need to learn from history. We are seeing the same pattern now. Those same seeds of doubt and distrust have been nurtured by the President's choices for key positions in this administration, including the decision to install a well-known vaccines skeptic as the head of HHS and to fill our public health agencies with conspiracists. And, let's bring it right to the present day. Just yesterday, it was announced that the FDA may start restricting access to new COVID boosters, to those over 65, or with a narrow set of pre-existing conditions. Now, we ought to be very frank here. Discerning what exactly this new guidance may be at the moment is confusing. And the troubling news leaves many questions unanswered about whether and how people can actually access vaccines, if they want to do so. Will Americans who live with elderly or immunocompromised relatives, for example, have access to these vaccines? We don't know. And so far, those questions are unanswered. The manner and timing of this decision, frankly, reek of politics, not science. And, again, science ought to be the lone star.

So, I think we need to be looking at the present. We need to be looking forward. In the first four months since the President took office, he and his health secretary have fired at least 10,000 employees from public health agencies and cut more than $2.7 billion in funding for research, including $4.2 million for vaccine clinical trials. Let me repeat, clinical trials, money cut to do them. How does that make us safer? More than $3.8 million for safety monitoring, and more than $2 billion for state immunization programs, a drastic cut that is already hampering our measles response. These reckless cuts are undermining our ability to respond, not just the measles, but to what may come next. And we all know, something will come next. That is the history. We need to learn from history and science.

Let me just finish by saying the capacity of our agencies to warn is compromised by these cuts. The capacity of our agencies to do science and rely on science is compromised when we cut 10,000 people from the ranks of the agencies responsible for safety. And so, I welcome the interest in this topic. I'm honored that the governor of Hawai'i, Dr. Josh Green, has joined us today, to share his experiences addressing both measles and COVID-19. He is not only a dedicated public servant, but he's also a

physician who led his experience in his state of Hawai'i during the pandemic, and I'm thankful to him for being here today. And I look forward to the testimony. Thank you, Mr. Chairman.

# PLAINTIFFS' EXHIBIT 7

Case 3:26-cv-01193-SB    Document 1-2    Filed 06/12/26    Page 50 of 262

# U.S. RIGHT TO KNOW

Pursuing truth and transparency for public health

ABOUT        donate

Topics ▼

# Defense Intelligence Agency considered lab leak scenario in March 2020, new records show

Lewis Kamb | February 5, 2026



 

Defense Intelligence Agency considered lab leak scenario in
March 2020, new records show                                                1x

About 11 Minutes

More than six years after COVID-19 emerged in China and killed millions worldwide, newly released intelligence records show that the Defense Intelligence Agency (DIA) was evaluating a detailed lab-origin scenario as early as March 2020 — weeks into the pandemic and well before the issue became a subject of public debate.

Dated March 27, 2020 — just 16 days after COVID-19 was officially declared a pandemic — the DIA "Authoritative Assessment" appears as part of a slide deck and supporting material shared among analysts and senior officials within the Defense Department's intelligence arm. The assessment focuses heavily on the Wuhan Institute of Virology (WIV) and its leading coronavirus researcher, Zhengli Shi, whose laboratory for years conducted high-risk experiments on wild bat coronaviruses.

The never-before-published details were revealed in bits and pieces over the last three months in court-ordered productions of COVID origins intelligence records released by the agency in response to a Freedom of Information Act (FOIA) lawsuit filed by U.S. Right To Know more than a year and a half ago. The new details bring added context to slides that were previously released in early 2025, showing they were part of a broader, evolving assessment on the pandemic's roots that the DIA had been shaping for months.

On a previously published slide headed "Hypothetical Laboratory Origin of SARS-CoV-2," the assessment sketches a step-by-step timeline of real and speculative work at the WIV that explains the techniques for how the virus that caused the pandemic could plausibly have been created in a lab with insufficient biosecurity containment. It then posits that an uncharacterized virus escaped in mid-2019, sparking the outbreak, and that the Wuhan institute later published disinformation that analysts speculated helped to bolster a natural-origin narrative.

On a final slide titled "Concluding Points" — also previously released, but now shown to be part of the March 2020 assessment package — a comment bubble appended to a list of observations about WIV's capabilities reads: "The molecular biology capabilities of WIV and the genomic assessment are consistent with the hypothesis that SARS-CoV-2 was a lab-engineered virus that was part of a bank of chimeric viruses in Zhengli Shi's laboratory at WIV that escaped from containment."

The new material also shows the DIA's detailed early assessment circulated through the agency's top ranks just weeks into the pandemic, but the DIA's official position remained that the virus's origins were "unknown."

## FOIA lawsuit prompts disclosures

The latest records were released across multiple productions in November and December 2025, and January 2026, in response to the ongoing FOIA lawsuit filed against the agency in April 2024. While the few new details are revelatory, the productions in general remain shrouded in secrecy. The DIA has fully withheld hundreds of pages it deemed classified or otherwise exempt from disclosure, and many of the pages that were produced are nearly entirely blacked out, with heavy redactions

obscuring key context, sourcing and internal discussions.

Still, taken together, the disclosures represent one of the few instances in which any U.S. intelligence documents addressing the origins of COVID-19 have been made public. Intelligence agencies have largely resisted releasing such material despite repeated calls for transparency from lawmakers, watchdog groups and journalists.

The same lawsuit previously revealed a June 2020 genomic analysis by the National Center for Medical Intelligence (NCMI), a DIA component, which expressed that SARS-CoV-2 may have originated from a laboratory incident at the Wuhan Institute of Virology. In light of the new records, the genomic assessment – first reported on by U.S. Right To Know in April – now appears to be part of an ongoing evaluation of the DIA's broader assessment in the months after the pandemic erupted.

The newly released records show that even though the agency quickly outlined and seriously considered a detailed lab-origin hypothesis, the March 2020 authoritative assessment formally concluded that the virus's origins "remain unknown." To date, no direct progenitor virus that could have evolved into SARS-CoV-2 has been identified, and neither a natural-spillover origin nor a lab-associated origin has been proven.

The DIA's public affairs office declined comment, referring questions to the Office of the Director of National Intelligence. ODNI did not respond to several requests for comment this week.

## Leadership-level awareness and continued revisions

The latest releases also include heavily redacted emails exchanged from June through October 2020 showing that DIA analysts continued evaluating genomic similarities between SARS-CoV-2 and other coronaviruses while revising their internal briefing slides and graphics in the months after the pandemic was declared.

As early as March 4, 2020 — roughly three weeks before the agency's "authoritative assessment" was finalized — analysts circulated unclassified scientific articles, reflecting how quickly the agency began tracking emerging research.

The emails show that the agency's senior officials were directly messaged or copied on internal discussions, including then–DIA Director Lt. Gen. Robert Ashley, former Chief of Staff Johnny Sawyer, and former Deputy Director Suzanne L. White, indicating they were made aware in real time of the agency's ongoing evaluations of its origins assessment.

By October 2020, the agency initiated a formal re-evaluation using Analysis of Competing Hypotheses (ACH), a structured intelligence method designed to test multiple explanations against available evidence. While the emails reflect sustained internal scrutiny, redactions obscure which lines of evidence ultimately carried the most weight.

But at least some of the documents lay out the DIA's early lab-origin scenario in a chronological, step-by-step sequence based on what analysts describe as known activities and capabilities at the Wuhan lab.

The scenario begins with years of field sampling and laboratory work on bat coronaviruses, then moves into published research in which scientists used a technique called reverse genetics to create infectious clones — full-length genetic copies capable of producing live infectious virus — and chimeric viruses by swapping in different spike proteins, the features viruses use to infect human cells.

The hypothesis then draws on prior publicized experiments to make SARS-like and MERS-like viruses more infectious to argue that Chinese researchers could have added a furin cleavage site to a SARS-like virus, and tested such constructs under BSL-2 conditions – a biosafety level widely viewed as inadequate for work involving potential pandemic pathogens. The scenario describes the use of plasmids and cloning techniques that, in the analysts' view, could enable the assembly of hybrid viruses from modular genetic parts.

The scenario ends with a proposed mid-2019 escape infecting civilians in Wuhan, followed by the publication of data about related viruses — including RaTG13, the closest known relative to SARS-CoV-2 — which analysts characterize as part of a post-outbreak disinformation effort to steer attention toward a natural origin.

A separate flowchart titled "Hypothetical Origin of SARS-COV-2" visually maps this logic using laboratory shorthand, referencing reverse-genetics plasmids, receptor-binding domains, restriction enzyme digests and a step labeled "Synthesize RG plasmid with Spike RBD cassette and FCS."

The assessment also highlights observations and genomic features of SARS-CoV-2 that analysts view as notable, including the absence of a clearly identified progenitor virus and the presence of a furin cleavage site  – a feature that significantly boosts its ability to infect humans that has not been found in any of the virus' close relatives.

## Missed impact on public perception?

The March 2020 assessment was drafted just days after the publication of "The Proximal Origin of SARS-CoV-2" in Nature Medicine, a highly influential paper in which several prominent scientists concluded, "we do not believe that any type of laboratory-based scenario is plausible."

Emails later released under FOIA show that prior to the paper's publication, senior U.S. health officials, including Dr. Anthony Fauci, discussed the framing of the paper with its authors. Around the same time, The Lancet published a statement signed by dozens of scientists that praised Chinese researchers and condemned lab-origin claims as conspiracy theories. That effort was later revealed to have been orchestrated behind-the-scenes by Peter Daszak of EcoHealth Alliance – a collaborator with the WIV on high-risk coronavirus research funded by the U.S. government.

Critics have argued that these and other early interventions narrowed the range of acceptable views and contributed to the lab-origin hypothesis being widely dismissed.

In the years since, several major news organizations have revisited their early coverage. A former Washington Post fact-checker has expressed regret over debunking the lab-incident hypothesis, while a New York Times columnist acknowledged the possibility that it was sidelined too quickly. Last week, the Times published an interview with NIH Director Jay Bhattacharya in which he said

he believes a lab-leak origin of the pandemic is "pretty close to certain." ⋁

Details of the DIA's lab-origin scenario were not explicitly included in unclassified COVID origins summaries released by the ODNI in 2021 and 2023, which provided only high-level conclusions and showed agencies divided – often with low confidence – over competing explanations.

While a Newsweek report in April 2020 cited a DIA assessment from the prior month noting the possibility of an accidental lab release due to unsafe practices, it did not include the level of detail and specificity about the suspected engineering steps or post-outbreak obfuscation contained in the newly released records.

Earlier and full disclosure of intelligence analyses might have fostered a more balanced debate and prompted earlier scrutiny of biosafety practices at laboratories conducting high-risk virus research, some transparency advocates, politicians and proponents of the lab leak hypothesis have argued.

Categories: Covid-19 Origins Tags: biodefense, biosafety and biosecurity, COVID origins, risky research, SARS-CoV-2, Wuhan Institute of Virology

## Get our newsletter | Weekly updates in your inbox

Your email address

**Subscribe**

## U.S. RIGHT TO KNOW

### News

Academic Work

Bees

Covid-19 Origins

Factory Farming

Healthwire

Pesticides

Ultra-Processed Foods

All Topics

# PLAINTIFFS' EXHIBIT 8

# Congress of the United States

## Washington, DC 20515

February 11, 2026

The Honorable Mike Johnson
Speaker
U.S. House of Representatives
H-232, Capitol
Washington, DC 20515

The Honorable Hakeem Jeffries
Minority Leader
U.S. House of Representatives
H-204, Capitol
Washington, DC 20515

The Honorable Brett Guthrie
Chairman
U.S. House Committee on Energy and
Commerce
2124 Rayburn House Office Building
Washington, DC 20515

The Honorable Frank Pallone
Ranking Member
U.S. House Committee on Energy and
Commerce
2323 Rayburn House Office Building
Washington, DC 20515

Dear Speaker Johnson, Leader Jeffries, Chair Guthrie, and Ranking Member Pallone:

As you work to protect public health, strengthen our nation's biosecurity, we respectfully urge you to support a hearing and a subsequent markup in the House Committee on Energy and Commerce on H.R. 5747, the Preventing Illegal Laboratories and Protecting Public Health Act of 2025. Recent incidents have made clear that dangerous biological activity can fall into a real oversight gray zone. Congress has a clear opportunity to close those gaps and ensure first responders are not left to navigate high risk biological incidents without clear federal guardrails before the next incident puts another community at risk.

This legislation was developed in direct response to the illegal laboratory discovered in Reedley, California, where local officials uncovered a large volume of lab materials and biological samples and then faced a difficult, multi-agency scramble to determine what was present, what risks it posed, and what tools existed to respond.[1] A bipartisan investigation by the House Select Committee on the Chinese Communist Party documented serious concerns raised by the Reedley incident and highlighted clear gaps in oversight, visibility, and coordination that can allow dangerous biological activity to operate under the radar.

The active investigation by the Las Vegas Metropolitan Police Department and the Federal Bureau of Investigation involving suspected biological materials only reinforces the urgency of closing those gaps now rather than after the next incident. Taken along with continued public reporting about potential links back to the earlier Reedley operation and alleged foreign linked financing concerns, the need for practical federal safeguards and clearer coordination channels is hard to ignore.[2]

---

[1] The Associated Press, *An illicit, Chinese-owned lab fueled conspiracy theories. But officials say it posed no danger* (August 9, 2023) (accessed February 3, 2026) (online at https://apnews.com/article/chinese-lab-biological-weapons-fears-california-5ca5824b09ad5b8c2c65b639743e8507).

[2] The Associated Press, *Suspected biolab found at Las Vegas home: 1 person arrested* (February 2, 2026) (accessed February 3, 2026) (online at https://apnews.com/article/las-vegas-biolab-swat-arrest-2599fad2d8e92033829c47a3602e379b).

H.R. 5747, the Preventing Illegal Laboratories and Protecting Public Health Act of 2025 advances straightforward, commonsense guardrails built around the recommendations made in the bipartisan Select Committee on the CCP report on the Reedley lab incident.[3] The bill would strengthen federal visibility into transfers of highly pathogenic agents through federally reviewable logbook requirements for covered distributors, with identity and intended use verification and record retention. It also would improve the federal approach to high containment laboratory oversight by directing periodic strategic evaluations, updated national standards, and a single point of contact to coordinate with state, local, Tribal, and territorial partners when suspicious lab activity is identified, along with a feasibility study toward a centralized database of high containment laboratories for official use.

For these reasons, we respectfully request the Committee on Energy and Commerce schedule a hearing and a subsequent markup of H.R. 5747, the Preventing Illegal Laboratories and Protecting Public Health Act of 2025, as soon as possible. Congress must act without delay to advance this bipartisan solution and protect against biosecurity vulnerabilities caused foreign adversaries. Thank you for your attention and prompt response to this request.

Sincerely,

Jim Costa
Member of Congress

Kevin Kiley
Member of Congress

David G. Valadao
Member of Congress

Vince Fong
Member of Congress

Susie Lee
Member of Congress

Dina Titus
Member of Congress

---

[3] House Select Committee on the Chinese Communist Party, *Investigation into the Reedley Biolab: Findings* (November 15, 2023) (accessed February 3, 2026) (online at https://chinaselectcommittee.house.gov/media/investigations/investigation-reedley-biolab-findings).

# PLAINTIFFS' EXHIBIT 9

PHILLIP A. TALBERT
United States Attorney
JOSEPH D. BARTON
ARELIS M. CLEMENTE
HENRY Z. CARBAJAL III
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

**FILED**

**Aug 15, 2024**

CLERK, U S DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JIA BEI ZHU, <br> aka Jesse Zhu, Qiang He, and David He, and <br> ZHAOYAN WANG, <br><br> Defendants. | CASE NO. **1:23-cr-00219-NODJ-BAM** <br><br> 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1343 – Wire Fraud; 21 U.S.C. §§ 331(a) and 333(a)(2) – Distribution of Adulterated and Misbranded Medical Devices; 18 U.S.C. § 1001(a)(2) – False Statements; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture |

FIRST SUPERSEDING INDICTMENT

COUNT ONE: [18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud]

The Grand Jury charges:

JIA BEI ZHU, aka Jesse Zhu, Qiang He, and David He, and

ZHAOYAN WANG,

defendants herein, as follows:

## I.   INTRODUCTION

1.      At all relevant times, defendants ZHU and WANG owned and controlled Ai De Diagnostic Co. LTD ("Ai De"), which had its principal place of business in China, and Universal

FIRST SUPERSEDING INDICTMENT

1

Meditech Incorporated ("UMI") and Prestige Biotech Incorporated ("PBI"), which had their principal places of business in Fresno County, State and Eastern District of California.

2. At all relevant times, Ai De, UMI, and PBI were alter egos of one another.

## II. RELEVANT BACKGROUND ON THE FDA

3. The Food and Drug Administration ("FDA") is the federal agency that is responsible for protecting the health and safety of the American public by enforcing the federal Food, Drug, and Cosmetic Act ("FDCA"). Its responsibilities include regulating the distribution of medical devices in interstate commerce to ensure that the devices are safe and effective for human use.

4. COVID-19 in vitro diagnostic test kits ("COVID-19 test kits") collect, prepare, and examine samples taken from the human body to detect diseases or other conditions in humans. Therefore, COVID-19 test kits are medical devices under the FDCA.

5. Medical devices are classified into one of three categories: Class I, II, or III. Class III medical devices are the most highly regulated.

6. Generally speaking, for Class III medical devices, anyone who proposes to introduce, or deliver for introduction, such devices into interstate commerce for distribution is required to obtain pre-market approval, pre-market clearance, emergency use authorization, or other approval from the FDA.

7. At all relevant times, COVID-19 test kits were Class III medical devices. Therefore, obtaining pre-market approval, pre-market clearance, emergency use authorization, or other approval from the FDA was required before distributing such test kits in the United States.

8. At all relevant times, any COVID-19 test kits distributed in the United States without obtaining pre-market approval, pre-market clearance, emergency use authorization, or other applicable approval from the FDA were adulterated and misbranded medical devices under the FDCA.

9. At all relevant times, any COVID-19 test kits whose packaging did not bear labels containing the names and places of business of the actual manufacturers, packers, and distributors were also misbranded medical devices under the FDCA.

## III. CONSPIRACY

10. Beginning on a date unknown to the Grand Jury, but not later than in or around August 2020, and continuing at least until in or around March 2023, in Fresno and Tulare Counties, State and

FIRST SUPERSEDING INDICTMENT                    2

Eastern District of California, and elsewhere, defendants ZHU and WANG, and others known and unknown to the Grand Jury, did knowingly conspire, combine, and confederate with each other to cause writings, signs, signals, pictures, and sounds to be transmitted by means of wire and radio communications in interstate commerce, in furtherance of a material scheme and artifice to defraud buyers of UMI and PBI's COVID-19 test kits, and to obtain money and property from the buyers, by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1343.

## IV.    MANNER AND MEANS

11.    Defendants ZHU and WANG, and others known and unknown to the Grand Jury, carried out their scheme and artifice to defraud by using the following manner and means, among others:

12.    Defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused UMI and PBI to import COVID-19 test kits from Ai De that were manufactured in China. On forms used for evaluation or inspection by United States Customs and Border Protection, they caused the COVID-19 test kits to be falsely declared as pregnancy test kits. This was because Ai De was not authorized by any federal agency to import COVID-19 test kits into the United States, but it was authorized to import pregnancy test kits. Therefore, ZHU and WANG illegally imported COVID-19 test kits from China by falsely representing and declaring that the test kits were authorized pregnancy test kits.

13.    Defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused false and fraudulent representations to be made to the buyers of UMI and PBI's COVID-19 test kits, including but not limited to the following:

14.    Defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused false and fraudulent representations to be made to the buyers of UMI and PBI's COVID-19 test kits, to wit: that the test kits were manufactured in the United States. They knew, however, that the test kits were manufactured in China.

15.    Defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused false and fraudulent representations to be made to the buyers of UMI and PBI's COVID-19 test kits, to wit: that the test kits were manufactured by, or in connection with, laboratories certified by the United

FIRST SUPERSEDING INDICTMENT                3

States Centers for Disease Control and Prevention ("CDC"). They knew, however, that the test kits were not manufactured by, or in connection with, CDC-certified laboratories.

16.    Defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused false and fraudulent representations to be made to the buyers of UMI and PBI's COVID-19 test kits, to wit: that UMI and PBI could manufacture up to 100,000 test kits per week in the United States. They knew, however, that UMI did not have the capacity to make test kits at that rate and would have to import additional test kits manufactured in China.

17.    Defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused false and fraudulent representations to be made to the buyers of UMI and PBI's COVID-19 test kits, to wit: that UMI and PBI had obtained the required approvals from the FDA to distribute the test kits in the United States. They knew, however, that UMI and PBI had not obtained any such approvals.

18.    Defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused these false and fraudulent representations to be made to the buyers of UMI and PBI's COVID-19 test kits through various methods. Those methods included text messages, WeChat messages, WhatsApp messages, emails, calls, in-person meetings, UMI and PBI's websites, and contract documents.

19.    When certain buyers of UMI and PBI's COVID-19 test kits requested to inspect UMI and PBI's facilities in the United States pursuant to the terms of their contracts, defendants ZHU and WANG, and others known and unknown to the Grand Jury, denied them access and fabricated reasons for the denial. The fabricated reasons included that UMI and PBI's facilities were undergoing construction and renovation, and that the companies had proprietary and confidential information and technology inside their facilities that they could not allow anyone else to see. In reality, however, they did not want the buyers to know that UMI and PBI were obtaining the COVID-19 test kits from China.

20.    The false and fraudulent representations that defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused to be made to the buyers of UMI and PBI's COVID-19 test kits were important to the buyers. The buyers would not have made the purchases had they known that the test kits were not manufactured in the United States and were instead manufactured in China because this created quality and customs concerns for them. They also would not have made the purchases had they known that the test kits were not manufactured by, or in connection with, CDC-

FIRST SUPERSEDING INDICTMENT                    4

certified laboratories. Nor would they have made the purchases had they known that UMI and PBI could not manufacture the test kits at the promised rates. Finally, they would not have made the purchases had they known that the test kits were not approved by the FDA.

21.    As a result of the false and fraudulent representations that defendants ZHU and WANG, and others known and unknown to the Grand Jury, caused to be made to the buyers of UMI and PBI's COVID-19 test kits, UMI and PBI sold hundreds of thousands of the test kits and received over $1,700,000 in payments. Many payments were made by interstate wire transfers sent from outside California and deposited into UMI's bank accounts opened in Tulare County, State and Eastern District of California.

22.    At all relevant times, defendants ZHU and WANG, and others known and unknown to the Grand Jury, acted with the intent to defraud.

All in violation of 18 U.S.C. § 1349.

COUNTS TWO THROUGH NINE: [18 U.S.C. § 1343 –Wire Fraud]

The Grand Jury further charges:

JIA BEI ZHU, aka Jesse Zhu, Qiang He, and David He,

and ZHAOYAN WANG,

defendants herein, as follows:

23.    Paragraphs 1 through 9 and 11 through 22 are incorporated by reference as though fully set forth herein.

24.    Beginning on a date unknown to the Grand Jury, but not later than in or around August 2020, and continuing at least until in or around March 2023, in Fresno and Tulare Counties, State and Eastern District of California, and elsewhere, defendants ZHU and WANG, knowingly devised, intended to devise, participated in, and executed a material scheme and artifice to defraud the buyers of UMI and PBI's COVID-19 test kits, and to obtain money and property from the buyers, by means of materially false and fraudulent pretenses, representations, and promises.

25.    On or about the dates set forth below, in Fresno and Tulare Counties, State and Eastern District of California, and elsewhere, defendants ZHU and WANG, and others known and unknown to the Grand Jury, for the purpose of executing their scheme and artifice to defraud, caused to be

FIRST SUPERSEDING INDICTMENT                5

transmitted, by means of wire and radio communication in interstate commerce, writings, signs, signals, pictures, and sounds as follows:

| Count | Date | Description |
|-------|------|-------------|
| TWO | 08/11/2020 | Wire transmission of monies in the amount of $12,000, originating from COMPANY ONE's bank account opened outside California, and sent to UMI's bank account ending – 9664 opened in Tulare County, State and Eastern District of California, that was processed on computers located outside of California through the Federal Reserve Bank's Wire Transfer Network ("Fedwire") |
| THREE | 12/15/2020 | Wire transmission of monies in the amount of $100,000, originating from COMPANY TWO's bank account opened outside California, and sent to UMI's bank account ending – 9664 opened in Tulare County, State and Eastern District of California, that was processed on computers located outside of California through Fedwire |
| FOUR | 12/24/2020 | Wire transmission of monies in the amount of $275,000, originating from COMPANY TWO's bank account opened outside California, and sent to UMI's bank account ending in – 9664 opened in Tulare County, State and Eastern District of California, that was processed on computers located outside of California through Fedwire |
| FIVE | 01/13/2022 | Wire transmission of monies in the amount of $49,000, originating from COMPANY FOUR's bank account opened outside of California, and sent to UMI's bank account ending in – 9345 opened in Tulare County, State and Eastern District of California, that was processed on computers located outside of California through Fedwire |
| SIX | 01/14/2022 | Wire transmission of monies in the amount of $24,500, originating from COMPANY FOUR's bank account opened outside of California, and sent to UMI's bank account ending in – 9345 opened in Tulare County, State and Eastern District of California, that was processed on computers located outside of California through Fedwire |
| SEVEN | 01/14/2022 | Wire transmission of monies in the amount of $24,500, originating from COMPANY FOUR's bank account opened outside of California, and sent to UMI's bank account ending in – 9345 opened in Tulare County, State and Eastern District of California, that was processed on computers located outside of California through Fedwire |
| EIGHT | 01/19/2022 | Wire transmission of monies in the amount of $43,000, originating from COMPANY FOUR's bank account opened outside of California, and sent to UMI's bank account ending in – 9345 opened in Tulare County, State and Eastern District of California, that was processed on computers located outside of California through Fedwire |

| NINE | 01/26/2022 | Wire transmission of monies in the amount of $36,000, originating from COMPANY THREE's bank account opened outside of California, and sent to UMI's bank account ending in – 9345 opened at the same bank in Tulare County, State and Eastern District of California, that was processed internally by the bank. |
| --- | --- | --- |

All in violation of 18 U.S.C. § 1343.

COUNTS TEN AND ELEVEN: [21 U.S.C. §§ 331(a) and 333(a)(2) – Distribution of Adulterated and

Misbranded Medical Devices]

The Grand Jury further charges:

JIA BEI ZHU, aka Jesse Zhu, Qiang He, and David He, and

ZHAOYAN WANG,

defendants herein, as follows:

27.    Paragraphs 1 through 9, 14, 15, and 17 are incorporated by reference as though fully set forth herein.

28.    On or about the dates set forth below, in Fresno and Tulare Counties, State and Eastern District of California, and elsewhere, defendants ZHU and WANG, with the intent to defraud and mislead, caused to be introduced and delivered for introduction into interstate commerce, medical devices that were adulterated and misbranded as follows:

| Count | Date | From | Sent To | Medical Devices |
| --- | --- | --- | --- | --- |
| TEN | 01/15/22 | UMI in Fresno | COMPANY FIVE in Southern California and then to COMPANY FOUR in Texas | Approximately 10,000 COVID-19 test kits |
| ELEVEN | 01/26/22 | UMI in Fresno | COMPANY THREE in Texas | Approximately 10,000 COVID-19 test kits |

All in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

FIRST SUPERSEDING INDICTMENT

7

COUNT TWELVE: [18 U.S.C. § 1001(a)(2) – False Statements]

The Grand Jury further charges:

JIA BEI ZHU, aka Jesse Zhu, Qiang He, and David He,

defendant herein, as follows:

29.    On or about May 2, 2023, and May 3, 2023, in Fresno County, State and Eastern District of California, defendant ZHU did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the government of the United States, to wit: defendant ZHU made materially false, fictitious, and fraudulent statements and representations to FDA officials, including that:

a. He was not defendant ZHU aka Jesse Zhu and was instead Qiang He aka David He;

b. He was hired by UMI as a COVID-19 consultant in 2021;

c. He was hired by PBI just a couple of weeks prior to speaking with the FDA officials to coordinate the company's interactions with government agencies;

d. He did not know the manufacturing and distribution histories for UMI or PBI; and

e. He did not have access to UMI or PBI's distribution records, financial records, or ownership records.

All in violation of 18 U.S.C. § 1001(a)(2).

FORFEITURE ALLEGATION: 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

30.    Upon conviction of one or more of the offenses alleged in Counts One through Nine of this First Superseding Indictment, defendants ZHU and WANG shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including, but not limited to, a sum of money equal to the amount of money that constitutes or is derived from proceeds traceable to the offenses for which the defendants are convicted.

31.    If any property subject to forfeiture as a result of the offenses alleged in Counts One through Nine of this First Superseding Indictment for which the defendants are convicted:

a.    cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property that cannot be divided without difficulty;

the United States intends, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendants, up to the value of the property subject to forfeiture

A TRUE BILL.

/s/ Signature on file w/AUSA

FOREPERSON

PHILLIP A. TALBERT
United States Attorney

HENRY Z. CARBAJAL for

KIMBERLY A. SANCHEZ,
Assistant United States Attorney
Chief, Fresno Office

FIRST SUPERSEDING INDICTMENT                9

# PLAINTIFFS' EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DSCC, *et al.*, | )**Case Nos.:** |
| | )**26-cv-01114-CJN and 26-cv-01132-CJN** |
| Plaintiffs,) | |
| v. | **MOTIONS TO INTERVENE** |
| | **AND DISMISS** |
| DONALD J. TRUMP, *in his official* | ) |
| *capacity as President of the United States,* ) | |
| *et al.*, | ) |
| Defendants,) | |
| | ) |
| LEAGUE OF UNITED LATIN | ) |
| AMERICAN CITIZENS, *et al.*, | ) |
| Plaintiffs,) | |
| v. | ) |
| | ) |
| EXECUTIVE OFFICE OF THE | ) |
| PRESIDENT, *et al.*, | ) |
| Defendants,) | |
| | ) |
| STATE OF MISSOURI, STATE OF | ) |
| ALABAMA, STATE OF FLORIDA, | ) |
| STATE OF INDIANA, STATE OF | ) |
| KANSAS, STATE OF LOUISIANA, | ) |
| STATE OF MONTANA, STATE OF | ) |
| NEBRASKA, STATE OF OKLAHOMA,) | |
| STATE OF SOUTH CAROLINA, | ) |
| STATE OF SOUTH DAKOTA, and | ) |
| STATE OF TEXAS, | ) |

1

Intervener Defendants.)
)
EMANUEL MCCRAY,                        )
*Also Known As "Trump Genius," On*      )
*Behalf of Himself and All Other American* )
*Citizens Similarly Situated,*           )
)
Intervenor-Defendants.)
)

## INTRODUCTION

In Star Trek, members of Starfleet must observe the Prime Directive, even as they jump into or come out of warp speed. The Plaintiffs and their cases are riding aboard the same slave ships the Prime Directives of the Constitution and laws of the United States sent permanently to the bottom of the Atlantic and Pacific Oceans.

The Constitutional vote and voting in Federal elections are individual rights. The Plaintiffs' carefully, cleverly and beautifully worded complaints, on their faces, are diametrically opposed to the right that all American voters be citizens of the United States.

Perry Mason ("Mason") once said: "Murder is usually very simple. It's the getting away with it that's real complicated and tricky."[1]

## STATEMENT UNDER LOCAL RULE 7(I)

---

[1] Perry Mason. *The Case of the Frantic Flyer.* Season 3, Episode 12. @ 50:36. Available from https://www.amazon.com/gp/video/detail/B077LXZRSX/ref=atv_dp_season_select_s3.

2

Intervenors' dispositive motion to dismiss is timely because it is filed sufficiently in advance of the pretrial conference that it may be fully briefed and ruled on before the conference."

## INTERVENORS' MOTIONS TO INTERVENE AND DISMISS

Emanuel McCray ("McCray"), also known as "Trump Genius," and other American citizens similarly situated, respectfully move to intervene as Defendants in this action pursuant to Fed. R. Civ. P. 24.

The Court ought to grant intervention as of right, or permissive intervention pursuant to Fed. R. Civ. P. 24(a) and (b).

The Court ought to dismiss with prejudice, Plaintiffs actions in their entirety pursuant to Fed. R. Civ. P. 12(b)(1), (2) and (6).

## MEMORANDUM IN SUPPORT OF MOTIONS TO INTERVENE AND DISMISS

## ARGUMENT

**Plaintiffs Lack Standing to Oppose the Constitutional Requirement that Voters In Elections Be Citizens of the United States**

President Trump promulgated Executive Order No. 14399 on March 31, 2026. As promulgated, the Executive Order listed the following constitutional and statutory provisions in support of the exercise of this Executive Authority:

U.S. Const. Articles II and IV, Sec. 4;
18 U.S.C. §§ 2(a), 241, 371, 611(a). 1001, 1015, 1341, 1708;
39 U.S.C. §401;
42 U.S.C. §1320b-7;

3

52 U.S.C. §§10307, 20501 *et seq.;* and 20901 *et seq.*

Under 52 U.S.C. §20501, Congress expressly found, in pertinent part, that the right to vote in the United States is a "fundamental right" exclusively reserved to the individual "citizen[]" of the United States:

> "(a) Findings
> The Congress finds that—
> (1) the right of citizens of the United States to vote is a fundamental right;
> (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and
> (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

## I.    The Intervenor Citizens Are Entitled to Intervention As of Right Under Rule 24(a).

The Citizens of the United States are the real parties in interest. In response to a query filed with the Clark County Washington Elections Office, Cathie Garber, Clark County Elections, in a letter dated December 4, 2024, informed McCray that his request regarding Center for Voter Information ("CVI") could not be processed because all mail-in ballots in the State of Washington are "anonymous," in that the ballot itself does not contain the name, address, signature, citizenship or date of birth of the voter and cannot be retrieved for review by the voter as part of a fraudulent scheme to protect the fake ballot secrecy. See Intervenors' Exhibit A.

4

Here, a forensic audit of the ballots ends with the investigator being unable to ascertain to whom the ballot belongs and whether the ballot was cast by a valid citizen of the United States. This is just one of many problems President Trump seeks to correct through the Executive Order. None of the parties before the Court has addressed this substantial constitutional and statutory issue.

In a letter dated October 16, 2024, McCray, a/k/a Trump Genius, asked Plaintiff Democratic Congressional Campaign Committee ("DCCC") for a response regarding CVI interpretating the "anonymous" mail-in ballots in the State of Washington to derive at the voting histories of individuals. See Intervenors' Exhibit B. No response from Plaintiff DCCC has ever been received, nor has Congress opened an investigation into the use of "anonymous" mail-in ballots as part of a scheme to steal and rig Federal elections.

None of the parties before the Court are capable of protecting the citizenship right of voters in Federal elections. The Executive Branch has never brought civil or criminal prosecutions for "anonymous" mail-in ballots in any State. President Trump's Executive Order is a step in the right direction, but it also fails to address the States' use of "anonymous" mail-in ballots.

On its face, and on the face of the statutes and constitutional and statutory provisions, President Trump Executive Order seeks to ensure and enforce the commands that U.S. voters are citizens of the United States.

*A fortiori,* none of the named Plaintiffs representatives, particularly those Plaintiffs who are of slave, African or Black race or descent, and including Members of Congress, have standing to challenge the Executive Order and enjoin its objectives to secure and limit the right to vote to U.S. citizens only.

A movant is entitled to intervene as of right if the movant meets four conditions; (1) files a "timely motion," (2) "claims an interest" in the litigation, (3) "may as a practical matter" be "impair[ed] or impede[d]" by the disposition of the suit, and (4) is not "adequately represent[ed]" by the parties in the case. Fed. R. Civ. P. 24(a).

The Intervenor Citizens meet all four requirements, and thus have a right to intervene. *Amador Cnty. v. U.S. Dep't of the Interior,* 772 F.3d 901, 903 (D.C. Cir. 2014) (timeliness, prejudice). See also *Campaign Legal Ctr. v. FEC,* 68 F. 4th 607, 610 (D.C. Cir. 2023). See also *Cameron v. EMW Women's Surgical Center,* P. S. C., 595 U.S. 267, 142 S. Ct. 1002, 1010 (2022) and *Karsner v. Lothian,* 532 F.3d 876, 885 (D.C. Cir. 2008) (applying FRCP 24 to intervention on appeal).

Plaintiffs commenced their actions on April 1, 2026. On April 24, 2026, ECF 88, the Defendants requested the Court deny the States' motion for intervention as of right under Fed. R. Civ. P. 24(a). On April 24, 2026, the Court granted Defendant's motion for leave to file one combined brief.

6

A party must move to intervene "as soon as it bec[omes] clear that its interests would no longer be protected" by the existing parties, as highlighted in *Campaign Legal Ctr. v. FEC*, 68 F. 4th 607, 610 (D.C. Cir. 2023).

## II.    The Plaintiffs' Cases Must Be Dismissed With Prejudice.

President Trump issued an Executive Order that operates nationwide. The Plaintiffs' opposition to the Order is directly inconsistent with the individual's voting rights President Trump seeks to enforce and protect.

The Plaintiffs seek to protect their right to manufacture ballots on a whim and whenever necessary to win a Federal election. This is a modern version of the slave trade that the Constitution sent to the bottom of the Atlantic and Pacific Oceans.

On April 9, 2026, in an epistemic speech from the White House,[2] First Lady Melania Trump urged the public to "[b]e cautious about what you believe" and called on Congress to discover the "truth" about deceased convicted sex offender Jeffrey Edward Epstein ("JEE") by allowing his victims to speak.

On April 21, 2026, a Grand Jury in Montgomery, Alabama returned an epistemic-significant indictment charging the Southern Poverty Law Center ("SPLC") with what Acting Attorney General Todd Blanche described as "manufacturing racism to justify its existence," which SPLC accomplished by secretly funneling more than $3 million in donated funds to individuals who were

---

[2] First Lady Melania Trump's Statement. The White House. April 9, 2026. Available from https://www.whitehouse.gov/briefings-statements/2026/04/first-lady-melania-trump-statement/.

7

associated with various "white" "violent extremist groups including the Ku Klux Klan, Aryan Nations, and National Socialist Party of America." This is another example of a modern version of the slave trade that the Constitution sent to the bottom of the Atlantic and Pacific Oceans.

By opposing President Trump's Executive Order, the Plaintiffs are seeking to continue the manufacture of slavery and badges of slavery, in association with and in a manner similar to the SPLC's enduring financing and manufacturing of hate crimes, racism and badges of slavery.

## CONCLUSION

For the reasons set forth above, the proposed Intervenors-Defendants respectfully request that the Court grant their motions to intervene and dismiss.

Submitted Respectfully this 26th day of April 2026.

Emanuel McCray
400 W. McLoughlin Blvd Apt 5
(564) 208-7576
emanuel.mccray@hotmail.com

8

# CERTIFICATE OF SERVICE

I certify that on April 26, 2026, the above Motion to Intervene and Dismiss were mailed as addressed below:

| | |
|---|---|
| ELIAS LAW GROUP LLP<br>250 Massachusetts Avenue NW, Suite 400<br>Washington, DC 20001<br>*Attorneys for Plaintiffs DSCC, DCCC,<br>Democratic National Committee, Democratic<br>Governors Association, Charles E. Schumer<br>and Hakeem S. Jeffries* | CAMPAIGN LEGAL CENTER<br>1101 14th St. NW, Suite 400<br>Washington, DC 20005<br><br>Robert Brent Ferguson<br>3465 Holmead Place NW<br>Washington, DC 20010 |
| John Arak Freedman<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Ave, NW<br>Washington, DC 20001<br>*Attorneys for Plaintiffs National Association for<br>the Advancement of Colored People, Common<br>Cause Common Cause Education Fund, Black<br>Voters Matter Fund, Inc., and BVM Capacity<br>Building Institute, Inc.* | Norman Larry Eisen<br>DEMOCRACY DEFENDERS FUND<br>600 Pennsylvania Ave SE, Unit 15180<br>Washington, DC 20003<br>*Attorneys' for League of United Latin American<br>Citizens, Secure Families Initiative, and<br>Arizona Students' Association* |
| John Michael Patton<br>Office of the Missouri Attorney General<br>615 E. 13th Street, Suite 401<br>Kansas City, MO 64106 | Esam Al-Shareffi<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division<br>1100 L Street, Room 12520<br>Washington, DC 20005 |
| Missouri Attorney General's Office<br>Solicitor General<br>815 Olive Street, Suite 200<br>St. Louis, MO 63101 | *Attorneys for Donald J. Trump, Executive<br>Office of the President, United States<br>Department of Justice, United States Postal<br>Service, U.S. Department of Homeland<br>Security, U.S. Citizenship and Immigration<br>Services, Social Security Administration, U.S.<br>Department of Commerce, Pamela Bondi,<br>David Steiner, Markwayne Mullin, Joseph B.<br>Edlow, Frank J. Bisignano, Howard Lutnick,<br>Amber F. McReynolds, Board of Governors of<br>the United States Postal Service, Daniel M.<br>Tangherlini, Derek Kan, and Ronald A.<br>Stroman* |
| Alexander Barrett Bowdre<br>State of Alabama<br>Office of The Attorney General<br>501 Washington Ave.<br>PO Box 300152<br>Montgomery, AL 36130-0152 | |
| James Allen Barta<br>Office of the Indiana Attorney General<br>302 West Washington Street<br>IGCS-5th Floor | Jeffrey A. Mandell<br>LAW FORWARD, INC.<br>222 West Washington Avenue<br>Suite 250 |

9

| Indianapolis, IN 46204 | Madison, WI 53703 |
|---|---|
| | *Attorneys for Movants Wisconsin Democracy* |
| James Rodriguez | *Campaign, Inc., EXPO of Wisconsin, Inc.,* |
| Kansas Attorney General's Office | *Jaleyce Oraedu, and Jasmine Oraedu and* |
| 120 SW 10th Ave, 2d Fl | *Amicus Aharon Shelef, Wisconsin Democracy* |
| Topeka, KS 66612 | *Campaign, Inc., EXPO of Wisconsin, Inc.,* |
| | *Jaleyce Oraedu, Jasmine Oraedu and Aharon* |
| Cody S. Barnett | *Shelef* |
| Nebraska Attorney General's Office | |
| 1445 K Street, Suite 2115 | Nancy A. Temple |
| Lincoln, NE 68508 | KATTEN & TEMPLE LLP |
| *Attorneys for Movants States of Missouri,* | 209 S. LaSalle Street, Suite 950 |
| *Alabama, Florida, Indiana, Kansas, Louisiana,* | Chicago, IL 60604 |
| *Montana, Nebraska, Oklahoma, South* | |
| *Carolina, and South Dakota* | Richard D. Bernstein |
| | 1875 K Street N.W. |
| | Washington, DC 20006 |
| | *Attorneys for Amicus Society for the Rule of* |
| | *Law* |

Emanuel McCray

10

# INTERVENORS' EXHIBIT A



proud past, promising future

**CLARK COUNTY**
WASHINGTON

**AUDITOR**
GREG KIMSEY

December 4, 2024

Emanual McCray
400 W McLoughlin Blvd. Apt. 5
Vancouver, WA 98660

Dear Mr. McCray:

This letter is in response to your letter dated October 30, 2024.

In this letter, you expressed concern that the mailer you received from CVI indicating "No Vote" for you in the 2016, 2018, 2020 and 2022 General elections. They are indicating "No Vote" for those dates, because you did not participate in those elections.

Public Records law requires voting history to be public record. As soon as a ballot is received in our office, it is noted in the voter's record as the ballot being "received". Signature verification comes next, with the voter's record marked as either accepted and ready for processing or rejected with a signature challenge that may be cured. Until the ballot has been marked as accepted, it remains inside the return envelope until it is ready for processing and counting.

The public is able to get downloads from the State of voters who have their ballot marked received, accepted or rejected, along with all past voting participation history. There is no ability for anyone to know who a person voted for. That information is anonymous. But they are able to find out if you voted, when you voted and if your ballot was counted or not.

If you have any further questions, please feel free to contact me at the Elections Department at (564) 397-2345.

Sincerely,

Cathie Garber
Clark County Elections Director



**GREG KIMSEY**, AUDITOR
ELECTIONS OFFICE
P.O. Box 8815
Vancouver, WA 98666-8815
proud past, promising future

CLARK COUNTY
WASHINGTON



US POSTAGE

FIRST-CLASS

$ 000.59

Rec'd 12/7/24

MR EMANUEL McCRAY
400 W McLOUGLIN BLVD APT 5
VANCOUVER WA 98660

98660 32557 C005

# INTERVENORS' EXHIBIT B

**EMANUEL MCCRAY**
**a/k/a "TRUMP GENIUS"**
400 W McLoughlin Blvd Apt 5
Vancouver, WA 98660
(564) 208-7576
emanuel.mccray@hotmail.com
USPS Certified Mail Receipt No. 7020 1810 0000 9673 3782

### NOTICE OF MAIL FRAUD "DEMOCRACY" CONSPIRACY

**Re:    "Vote-By-Mail Ballots Arriving Soon" Direct Mail Fraud**

October 16, 2024

Democratic Congressional Campaign Committee (DCCC)
430 S. Capitol Street SE
Washington, DC 20003

Dear Democratic Congressional Campaign Committee ("DCCC"):

On October 16, 2024, I received the referenced direct mail which suggested that I **"fill it out completely and return it immediately."**

I'm confused because **Republican White biological female Elizabeth Lynne Cheney** says she is voting for **Kamala**, who is not a **BLACK biological female** and cannot seem to find a **COLOR** that will help her win on November 5th.

So, are you guys trying to steal my vote like you all did in 2020? I ask this question because: **I HAVE A PERFECT VOTING RECORD!**

*Emanuel McCray*
**Emanuel McCray**
**a/k/a "TRUMP GENIUS"**

Cc: **Cody Philpot**

**U.S. DISTRICT COURT**

## DISTRICT OF COLUMBIA

### PRO SE CONSENT TO RECEIVE NOTICES OF ELECTRONIC FILING

CHECK ONLY ONE BOX FOR THE APPLICABLE SECTION BELOW:

---

☑ **INITIAL REQUEST:** (Check this box to begin receiving notices of electronic filing)

I understand that I waive my right to receive service of documents by first class mail pursuant to Federal Rule of Civil Procedure 5(b)(2)(E).

I understand that I will be sent notices of electronic filing via e-mail and upon receipt of a notice, I will be permitted **ONE** "free look" at the document by clicking on the hyperlinked document number, at which time I should print or save the document to avoid further charges. The **ONE** "free look" will expire in 15 days from the date the notice was sent. After the **ONE** "free look" is used or expired, the document can be accessed by me through PACER (Public Access to Court Electronic Records) and I may be charged to view the document or for FREE by using the public terminals at the Clerk's Office.

I understand that it is strongly recommended that I establish a PACER account by visiting the PACER website at www.pacer.gov, which will allow me to view, print, and download documents at any time for a nominal fee.

I understand that I must provide a valid e-mail address which **will appear on the public docket.** I also understand I am responsible for checking it on a regular basis. I will promptly notify the Court if there is any change in my personal data, such as name, address, or e-mail address.

I understand that electronic service does not allow me to file documents electronically and does not mean that I can serve documents by e-mail. I must continue to file all communications regarding my case in paper copy with the Court and serve the opposing party.

I understand that I must file a consent in each case I wish to receive electronic service and that electronic service is not available in **social security, immigration, or sealed cases, nor for incarcerated litigants.**

---

☐ **UPDATE TO INFORMATION:** (Check this box to make changes to your email address)

I have a new email address as indicated below.

---

☐ **REQUEST TO DEACTIVATE ELECTRONIC NOTICING:** (Check this box to deactivate electronic noticing)

I request deactivation of electronic noticing. I understand that by deactivating my account, I will begin receiving all filings via U.S. mail instead of email.

I understand that I will continue to receive electronic notices until such time as the Court has deactivated my account.

---

*I am a pro se party and I have read the applicable section check-marked above and understand and agree to the terms and conditions set forth therein. The U.S. District Court bears no liability for errors resulting from the information I have submitted on this form.*

Signature: *Emanuel McCray*          Date: APRIL 26, 2026

Printed Name: EMANUEL MCCRAY          Case No: 1:26-cv-01114

Home Address: 400 W MCLOUGHLIN BLVD APT 5, VANCOUVER, WA 98660

| My Email Address is: | emanuel.mccray@hotmail.com |
| --- | --- |

RETURN THE FORM VIA MAIL OR IN PERSON TO:
The Clerk's Office
U.S. District Court
333 Constitution Ave. NW, Room 1225
Washington, DC 20001

# EXHIBIT 11

UNCLASSIFIED

 Office of the Director of National Intelligence

22 May 2026

Mr. Emanuel McCray
400 W Mcloughlin Blvd
Apt 5
Vancouver, WA 98660
emanuel.mccray@hotmail.com

Dear Mr. McCray:

This letter acknowledges that the Office of the Director of National Intelligence (ODNI) received your Freedom of Information Act (FOIA) submission on 14 May 2026, requesting the following information:

- *"...a copy of the declassified information report directed by Pub. L. 119–60, div. F, title LXVIII, §6803, Dec. 18, 2025: Declassification of Intelligence and Additional Transparency Measures Relating to the COVID–19 Pandemic Pub. L. 119–60, div. F, title LXVIII, §6803, Dec. 18, 2025, 139 Stat. 1654..."*

**The request has been assigned ODNI tracking number DF-2026-00432.** ODNI will begin processing this case in accordance with when it was received.

The request for expedited processing has been denied as the ODNI standards for expedited processing established in 32 CFR 1700.12 have not been met. A written appeal may be submitted to the Chief FOIA Officer, c/o Chief, Information Management Office, Office of the Director of National Intelligence, Washington, DC 20511 or emailed to ODNI_FOIA@odni.gov. The request letter and the subject line of the email should be marked "Freedom of Information Act Appeal of Adverse Determination of DF-2026-00432." The appeal must be postmarked or electronically transmitted within 90 days of the date of this letter.

If you need assistance with this request, please contact the ODNI FOIA Office at ODNI_FOIA@odni.gov or (703) 275-1313. For additional support, you may reach out to the FOIA Public Liaison at ODNI_FOIA_Liaison@odni.gov or the Office of Government Information Services (OGIS) at the National Archives, which offers

UNCLASSIFIED

UNCLASSIFIED

Mr. Emanuel McCray

mediation services for FOIA requests. OGIS can be contacted by mail at 8601 Adelphi Road, Room 2510, College Park, MD 20740-6001; phone at (202) 741-5770 or toll-free at (877) 684-6448; or email at ogis@nara.gov.

Sincerely,

Bonnie Calabria
Chief, Information Review and Release Group
Information Management Office

2

UNCLASSIFIED

 Outlook

---

**Re: New FOIA request received for Office of the Director of National Intelligence**

---

**From** ODNI_FOIA <ODNI_FOIA@odni.gov>

**Date** Thu 5/14/2026 10:41 AM

**To** emanuel.mccray@hotmail.com <emanuel.mccray@hotmail.com>

**Cc** ODNI_FOIA <ODNI_FOIA@odni.gov>


UNCLASSIFIED

Good afternoon, Mr. McCray,

Thank you for your Freedom of Information Act (FOIA) request, we confirm receipt. Your tracking number is **DF-2026-00432**. A formal acknowledgement letter will be sent within 20 business days.

Please note, due to a backlog of cases and staffing shortages, processing timelines have been extended. Thank you for your patience while we work diligently to complete your requests as promptly as possible.

Kind regards,

ODNI-FOIA
Visit FOIA.gov-Freedom of Information Act to learn more!

ODNI's New FOIA address: ODNI_FOIA@odni.gov


 **Office of the Director of National Intelligence (ODNI)**
Freedom of Information Act / Privacy Act
ODNI_FOIA@odni.gov

---

**From:** National FOIA Portal <National.FOIAPortal@usdoj.gov>
**Sent:** Wednesday, May 13, 2026 9:50 PM
**To:** ODNI_FOIA <ODNI_FOIA@odni.gov>
**Subject:** New FOIA request received for Office of the Director of National Intelligence

Hello,

A new FOIA request was submitted to your agency component:

The following list contains the entire submission submitted May 13, 2026 09:50:42pm ET, and is formatted for ease of viewing and p

---

## Contact information

| | |
|---|---|
| **First name** | EMANUEL |
| **Last name** | MCCRAY |
| **Mailing Address** | 400 W MCLOUGHLIN BLVD APT 5 |
| **City** | VANCOUVER |
| **State/Province** | Washington |

| | |
|---|---|
| **Postal Code** | 98660 |
| **Country** | United States |
| **Phone** | 5642087576 |
| **Email** | emanuel.mccray@hotmail.com |

## Request

| | |
|---|---|
| **Request ID** | 2909406 |
| **Confirmation ID** | 2912821 |
| **Request description** | Provide a copy of the declassified information report directed by Pub. L. 119–60, div. F, title LXVIII, §6803, Dec. 18, 2025: Declassification of Intelligence and Additional Transparency Measures Relating to the COVID–19 Pandemic Pub. L. 119–60, div. F, title LXVIII, §6803, Dec. 18, 2025, 139 Stat. 1654, provided that: "Not later than 180 days after the date of the enactment of this Act [Dec. 18, 2025], the Director of National Intelligence shall, jointly with the head of each element of the intelligence community— "(1) perform a declassification review of intelligence relating to the origins of Coronavirus Disease 2019 (COVID–19), including— "(A) research conducted at the Wuhan Institute of Virology or any other medical or scientific research center within the People's Republic of China; "(B) information relating to Gain of Function research and the intention of this research; "(C) information relating to sources of funding or direction for research on coronaviruses, including both sources within the People's Republic of China and foreign sources; and "(D) the possibility of zoonotic origins of COVID–19; "(2) perform a declassification review of intelligence relating to efforts by government officials of entities of the People's Republic of China— "(A) to disrupt or obstruct information sharing or investigations into the origins of the coronavirus disease 2019 (COVID–19) pandemic; "(B) to disrupt the sharing of medically significant information relating to the transmissibility and potential harm of SARS–CoV–2 to humans, including— "(i) efforts to limit the sharing of information with the United States Government; "(ii) efforts to limit the sharing of information with the governments of allies and partners of the United States; and "(iii) efforts to limit the sharing of information with the United Nations and World Health Organization; "(C) to obstruct or otherwise limit the sharing of information between national, provincial, and city governments within the People's Republic of China and between subnational entities within the People's Republic of China and external researchers; "(D) to deny the sharing of information with the United States, allies and partners of the United States, or multilateral organizations, including the United Nations and the World Health Organization; "(E) to pressure or lobby foreign governments, journalists, medical researchers, officials of the United States Government, or officials of multilateral organizations (including the United Nations and the World Health Organization) with respect to the source, scientific origins, transmissibility, or other attributes of the SARS–CoV–2 virus or the COVID–19 pandemic; "(F) to disrupt government or private-sector |

efforts to conduct research and development of medical interventions or countermeasures for the COVID–19 pandemic, including vaccines; and "(G) to promote alternative narratives regarding the origins of COVID–19 as well as the domestic Chinese and international response to the COVID–19 pandemic; "(3) release publicly the intelligence products described in paragraphs (1) and (2) including such redactions as the Director, with the concurrence of the head of the originating intelligence community element, determines necessary to protect sources and methods and information concerning United States persons; and "(4) submit to the congressional intelligence committees an unredacted version of the declassified intelligence products described in paragraph (3)." [For definitions of "intelligence community" and "congressional intelligence committees" as used in section 6803 of Pub. L. 119–60, set out above, see section 6002 of Pub. L. 119–60, set out as a note under section 3003 of this title.]

## Supporting documentation

| | |
|---|---|
| **Additional Information** | PLAW-119-60. Declassification of Intelligence and Additional Transparency Measures Relating to the COVID–19 Pandemic.pdf |

## Fees

| | |
|---|---|
| **Request category ID** | other |
| **Fee waiver** | no |
| **Willing to pay** | $100.00 |

## Expedited processing

| | |
|---|---|
| **Expedited Processing** | yes |
| **Explanation** | The virus named "SARS-COV-2" has caused this FOIA Requestor to test positive for antibodies to this virus for at least the past three years (last detected/reported on April 9, 2026). (U/OSINT) In the context of SARS-CoV-2, "hiding" refers to viral persistence, i..e., the continued presence of viral genetic material or proteins in the body long after a person tests negative on a standard nasal swab. This type of "persistence" is a leading theory behind "Long COVID." (U/OSINT) SARS-CoV-2 is not just a respiratory virus. This virus hides, disseminates and or lingers in anatomical reservoirs/ multiple "sanctuary sites" throughout the body: (1) Gastrointestinal (GI) Tract. The gut is a major reservoir due to its high density of ACE2 receptors. Viral RNA and proteins have been detected in the colon, appendix, and small intestine for up to 7 months; (2) The Brain and Nervous System. Autopsy studies have found viral RNA throughout the brain, including the brainstem, as late as 230 days after symptoms began; (3) Lymphatic Tissues. Tonsils and adenoids are significant sites where the virus can remain active, especially in children; and (4) Connective Tissue and Blood. Viral fragments have been found in connective tissue for over |

2 years and circulating in blood plasma for more than a year. (U/OSINT) SARS-CoV-2 uses several strategies or biological mechanisms to evade the immune system and persist: (1) Extracellular Vesicles (EVs). The virus may hide inside tiny cellular packages called extracellular vesicles, allowing it to travel and infect new cells while remaining "invisible" to standard immune detection. (2) Cell-to-Cell Spread. Evidence suggests the virus can move directly between cells, potentially bypassing the neutralizing antibodies that patrol the bloodstream. (3) Incomplete Clearance. In some individuals, particularly those who were severely ill or are immunocompromised, the immune system simply fails to fully eliminate the virus, leaving behind small "pools" of infected cells; and (4) Antigen "Afterlife." Even when the virus is not fully replicating, persistent pieces like the Spike protein can stay stuck in tissues, causing a "chronic threat" by constantly triggering inflammation and immune exhaustion. (U/OSINT) The persistent nature of SARS-CoV-2 causes several symptoms that develop into chronic threats, such as brain fog, low blood oxygen, sore throat, chest pain, inflammation, cognitive dysfunction, diarrhea, hair loss, rashes, blood clots, and acute kidney injury, among others. (U/OSINT) SARS-COV-2 was designed to infect, wound or maim and evade the immune system and remain persistent in the human body, by hiding in extracellular vesicles, moving directly between cells, potentially bypassing the neutralizing antibodies that patrol the bloodstream, leaving behind small "pools" of infected cells, and when not fully replicating, leaving behind persistent pieces like the Spike protein which can stay stuck in tissues, causing a "chronic threat" by constantly triggering inflammation and immune exhaustion. (U/OSINT) SARS-COV-2 was designed, from the beginning, to be a chronic health threat because the virus infects, wounds or maims and can evade the immune system and remain persistent in the human body, by hiding in extracellular vesicles, moving directly between cells, potentially bypassing the neutralizing antibodies that patrol the bloodstream, leaving behind small "pools" of infected cells, and when not fully replicating, leaving behind persistent pieces like the Spike protein which can stay stuck in tissues, and causing a "chronic threat" by constantly triggering inflammation and immune exhaustion. (U/OSINT) The SARS-COV-2 chronic and persistent infection became extremely aggravated and complex when President Biden and other vaccine-mandate aligned actors compelled vaccination, while at the same time clinical trials were underway to find a remedy for the chronic and persistent nature of SARS-COV-2, which is an "agent of war" deadly and dangerous weapon. (U/OSINT) In contrast, SARS-CoV-2 is not just a respiratory virus. This virus, and others similar to it, is designed to persist, by hiding, disseminating and or lingering in anatomical reservoirs or multiple "sanctuary sites" throughout the body. This type of "persistence" is a leading theory behind the current "Long COVID" clinical trials.

The following table contains the entire submission, and is formatted for ease of copy/pasting into a spreadsheet.

5/16/2026, 10:45 AM

| request_id | confirmation_id | attachments_supporting_documentation | address_city | address_country | address_line1 | address_st |
|---|---|---|---|---|---|---|
| 2909406 | 2912821 | PLAW-119-60. Declassification of Intelligence and Additional Transparency Measures Relating to the COVID–19 Pandemic.pdf | VANCOUVER | United States | 400 W MCLOUGHLIN BLVD APT 5 | Washington |

# U.S. RIGHT TO KNOW

Pursuing truth and transparency for public health          ABOUT          **donate**

Topics ▼

# Congress orders spy agencies to consider declassifying evidence on COVID origins

Lewis Kamb | December 18, 2025



Congress orders spy agencies to consider declassifying evidence on COVID origins

About 8 Minutes                                                                1x

UPDATE: On Dec. 18, President Donald Trump signed into law the National Defense Authorization Act of 2026, which includes a provision instructing to the Director of National Intelligence, in coordination with the heads of intelligence agencies, to conduct a declassification review of COVID origins intelligence and to publicly release intelligence information.

*Original story:*

For nearly six years, the fight to see what U.S. spy agencies really know about COVID-19's origins has played out in courtrooms, long FOIA queues and heavily redacted PDFs.

Now, it's written into a defense bill.

Tucked deep inside the sprawling National Defense Authorization Act for Fiscal Year 2026 is a short, but charged provision: "Declassification of intelligence and additional transparency measures relating to the COVID–19 pandemic."

The key language of the bill – which is set for votes in the House and Senate this week – mandates the Director of National Intelligence (DNI) jointly to conduct a declassification review with the heads of federal intelligence agencies on two main fronts: intelligence about coronavirus research in Chinese labs, including information about those who funded it and what's known about risky "gain-of-function" work performed at the Wuhan Institute of Virology (WIV), and intelligence on Beijing's control of information about the pandemic, including how Chinese officials may have blocked, delayed or shaped early narratives about the pandemic's origins and early spread.

The declassification review must be performed within 180 days of the bill's passage. Afterward, the DNI must "release publicly the intelligence products" identified for disclosure, with only those

redactions needed to protect intelligence sources and methods – and that are agreed upon by the agency where the intelligence originated. The DNI also must submit an unredacted version of the declassified intelligence products to congressional intelligence committees.

Finding out what the Intelligence Community knows about how the pandemic started could help shape everything from how laboratories are regulated to how risky virology research is overseen – and how seriously governments take the possibility that the next outbreak might start behind the locked doors of a research lab. Disclosing such information publicly could help policymakers determine what guardrails should be built to stop the next pandemic from happening, some biosecurity experts have said.

For years, watchdogs and newsrooms have chased the intelligence community's paper trail on the pandemic, seeking cables, genomic analyses, early-warning reports and internal deliberations among a wish-list of secret documents. They've submitted FOIA requests with nearly every major intelligence agency, then followed those requests into federal court when agencies responded with delays, denials or pages full of redactions.

**Don't miss another story.**
Get the Right to Know newsletter in your inbox.

Your email address

**Subscribe**

Even when Congress approved the COVID-19 Origin Act of 2023 – ordering the DNI to declassify information about possible links between the WIV and the start of the pandemic – the public got little more than a thin ODNI summary outlining where each intelligence agency stood on the issue. The report had them falling into two camps, with most agencies backing a natural origins hypothesis and others favoring a scenario that SARS-CoV-2 – the virus that caused the pandemic – escaped from a lab. But the underlying evidence, assessments, analysts' emails and technical analyses have mostly remained hidden from the public.

Now, with the pending defense authorization bill, Congress is poised to try a second time, demanding that intelligence agencies come clean to the public on what they know about the beginnings of a pandemic that killed more than 20 million people worldwide, according to some estimates.

## Declassifying the raw record

The operative language on declassifying COVID origins intelligence is contained more than 2,200-pages into the bill, within the section that sets the rules and marching orders for the U.S. Intelligence Community, and where Congress signs off on spy budgets, artificial intelligence policies and whistleblower protections.

This fall, intelligence committees in both the House and the Senate produced respective intelligence authorization bills that hammered out much of the language that now populates that section tucked deep into the defense bill. One of the main differences between the two initial versions was the House proposal contained a provision to ensure that the scope of declassified intelligence included "the possibility of zoonotic origins of COVID-19" – a clause that survived in the final compromised language heading to floor votes.

What didn't survive was a requirement in the Senate version for the DNI to declassify "the names of researchers who conducted research into coronaviruses, as well as their current locations of employment."

The compromise version that's now set for adoption also tightens the requirement to publicly release intelligence agencies' classified products, rather than a report about them, as was initially called for by the Senate bill. That means that Congress is no longer asking for another polished summary, but telling the intelligence community to go back to the raw record and decide what can be declassified.

To date, the only full-blown assessment by a U.S. intelligence element to surface publicly came earlier this year, when U.S. Right To Know pried loose a five-year-old genomic assessment of SARS-CoV-2 prepared by the Defense Intelligence Agency's National Center for Medical Intelligence.

Obtained through a FOIA lawsuit, the June 2020 analysis took the form of a technical slide presentation prepared by three government scientists who walked through the virus' genetic characteristics and laid out the WIV's research capabilities to conclude it was plausible that SARS-CoV-2 was "a lab-engineered virus" that "escaped from containment."

That view never appeared in the ODNI's public report under the 2023 law, which leaned on agency confidence levels and downplayed the idea that SARS-CoV-2 might have been engineered. It lived instead in a classified channel, seen by some policymakers but not by the public whose lives were upended by the virus.

The latest declassification requirement is, in many ways, a response to that gap between what exists on paper and what people outside the system are allowed to see.

It's also not the only part of the bill that looks ahead to lessons from the pandemic. Another provision instructs the national intelligence director to establish a policy to "streamlin(e) the declassification or downgrading and sharing of intelligence information relating to biotechnological developments and threats," including efforts by foreign adversaries to weaponize biological research. Aimed at future pandemics and bio-threats, it echoes the COVID clause – that Congress wants less of this intelligence kept secret from policymakers and the public.

## Getting to see the evidence

Six years after the first cases in Wuhan, the origins of COVID remain unconfirmed. Although the Trump administration created a flashy webpage on the White House website earlier this year titled, "Lab Leak: The True Origins of COVID," it has released no substantial new evidence proving that the virus emerged from a laboratory, and the official position from the Intelligence Community remains that COVID-19's origin is uncertain and contested. Some agencies still lean toward a natural spillover, others toward a lab incident, and several sit in the middle by expressing low confidence in their own assessments.

But the question is no longer just which hypothesis wins. It's whether the public ever gets to see the evidence and debates that shaped those internal judgments. Such information could be helpful to form new policies that could prevent the next pandemic, some experts say.

Of the more than 200 public-records requests U.S. Right to Know has filed over the past six years on this subject, dozens remain open with U.S. intelligence agencies. Several requests have resulted in lawsuits against the FBI, CIA, DIA, ODNI and the Department of Energy. Even when judges order those agencies to hand over documents, many of the records arrive buried under redactions.

As of last week — seven months after requesting the DIA's "latest assessment" on the origins of COVID — the agency has coughed up just 12 pages. It first claimed no such records existed. Only after a lawsuit did it turn over those 12 pages, 11 of which are so heavily redacted that almost nothing of substance can be read.

Categories: Covid-19 Origins Tags: Congress, COVID, COVID origins, Covid-19, risky research, Wuhan Institute of Virology

## Get our newsletter | Weekly updates in your inbox

Your email address                                                              **Subscribe**

# U.S. RIGHT TO KNOW

**News**

Academic Work

Bees

Covid-19 Origins

Factory Farming

Healthwire

Pesticides

Ultra-Processed Foods

All Topics

**Connect**

Donate

Subscribe

Contact

# EXHIBIT 12

## IN THE UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF DELAWARE

| | |
|---|---|
| ARBUTUS BIOPHARMA CORPORATION AND GENEVANT SCIENCES GMBH, <br><br> Plaintiffs, <br><br> v. <br><br> MODERNA, INC. and MODERNATX, INC. <br><br> Defendants. | C.A. No. 22-252 (MSG) |

## STATEMENT OF INTEREST OF THE UNITED STATES

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

PHILIP CHARLES STERNHELL
Assistant Director

February 14, 2023

HAYLEY A. DUNN
KAVYASRI NAGUMOTU
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345
Email: Gary.L.Hausken@usdoj.gov
Philip.C.Sternhell@usdoj.gov
Hayley.A.Dunn@usdoj.gov
Kavyasri.Nagumotu@usdoj.gov

## TABLE OF CONTENTS

I.    THE INTEREST OF THE UNITED STATES ....................................................................... 1

II.   BACKGROUND ................................................................................................................ 3

III. ANALYSIS ...................................................................................................................... 5

Case 1:22-cv-00052-MSG Document 91-2 Filed 02/14/23 Page 3 of 18 PageID # 906

## TABLE OF AUTHORITIES

**Cases**

*Adv. Software Design Corp. v. Fed. Rsrv. Bank of St. Louis,*
583 F.3d 1371 (Fed. Cir. 2009) ......................................................................*passim*

*Bereslavsky v. Esso Stand. Oil Co.,*
175 F.2d 148 (4th Cir. 1949) ................................................................................ 7

*Carrier Corp. v. United States,*
534 F.2d 244 (Ct. Cl. 1976) ............................................................................... 8, 9

*Cramp & Sons Ship & Engine Bldg. Co. v. Int'l Curtis Marine Turbine Co.,*
246 U.S. 28 (1918) .............................................................................................. 5

*Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell,*
399 F.2d 913 (5th Cir. 1968) ............................................................................... 9

*Hughes Aircraft Co. v. United States,*
534 F.2d 889 (Ct. Cl. 1976) ........................................................................ 7, 8, 10

*IRIS Corp. v. Japan Airlines Corp.,*
769 F.3d 1359 (Fed. Cir. 2014) ....................................................................... 7, 11

*Larson v. United States,*
26 Cl. Ct. 365 (1992) ...................................................................................... 11, 12

*Leesona Corp. v. United States,*
599 F.2d 958 (Ct. Cl. 1979) ................................................................................. 6

*Madey v. Duke Univ.,*
307 F.3d 1351 (Fed. Cir. 2002) ............................................................................ 5

*Madey v. Duke Univ.,*
413 F. Supp. 2d 601 (M.D.N.C. 2006) ................................................................. 8

*Manville Sales Corp. v. Paramount Sys., Inc.,*
917 F.2d 544 (Fed. Cir. 1990) ............................................................................. 5

*Richmond Screw Anchor Co. v. United States,*
275 U.S. 331 (1928) ............................................................................................ 6

*Riles v. Amerada Hess Corp.,*
999 F. Supp. 938 (S.D. Tex. 1998) ...................................................................... 8

i

*S.Corp. v. United States*,
690 F.2d 1368 (Fed. Cir. 1982) .......................................................................................... 6

*Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*,
369 F. Supp. 3d 963 (C.D. Cal. 2019) .......................................................................... 9, 10, 11

*Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*,
477 F.3d 1361 (Fed. Cir. 2007) ....................................................................................... 7, 9

*Sperry Gyroscope Co. v. Arma Eng'g Co.*,
271 U.S. 232 (1926) ......................................................................................................... 5

*TVI Energy Corp. v. Blane*,
806 F.2d 1057 (Fed. Cir. 1986) ....................................................................................... 7, 8

## Statutes & Regulations

28 U.S.C. § 1498 ..................................................................................................... *passim*

28 U.S.C. § 517 ............................................................................................................... 1

48 C.F.R § 52.227-1, Alternate I ............................................................................... *passim*

48 C.F.R. § 52.227-1 ............................................................................................... *passim*

Act of June 25, 1910, 61st Cong., 2d Sess., 36 Stat. 851–52 ...................................... 5, 6

Act of October 31, 1942, Pub. L. 768, § 6, 77th Cong. 2d Sess., 56 Stat. 1013, 1014 ................... 6

Naval Appropriations Act of July 1, 1918, 65 Cong. 2d Sess., 40 Stat. 704, 705 ....................... 6

## Other Authorities

2 Bulletin of the Judge Advocate General of the Army, 75–76 (1943) ........................................ 7

5 *Chisum on Patents* § 16.06 (2019) ............................................................................... 9

The United States (the Government) appears on behalf of its Department of Health and Human Services and Department of Defense pursuant to 28 U.S.C. § 517[1] to inform the Court of its interest in this litigation. The Government is aware of the Court's resolution of Moderna's motion to dismiss, D.I. 31 at 15–16, where the Court noted that the Government had not provided a statement of interest. In light of the Court's hesitance to find authorization and consent absent a statement of interest from the United States, the United States appears to present its position.[2]

## I. THE INTEREST OF THE UNITED STATES

In accordance with 28 U.S.C. § 1498, the United States granted Moderna, Inc. and ModernaTX, Inc. ("Moderna")[3] its "authorization and consent" to manufacture and use inventions covered by United States patents under Contract No. W911QY-20-C-0100 (the '-0100 Contract), which is at issue in this litigation. The Government granted its authorization and consent by inserting the Federal Acquisition Regulation (FAR) clauses 52.227-1 and 52.227-1, Alternate I, in the contract. The Government's acceptance of liability in this instance is limited to the '-0100 Contract and does not extend to all of Moderna's allegedly infringing activity as described in the Complaint.

In pertinent part, section 1498 provides:

---

[1] Section 517 provides, in pertinent part, that "any officer of the Department of Justice[] may be sent by the Attorney General to any … district to attend to the interests of the United States in a suit pending in a court of the United States…or to attend to any other interest of the United States."

[2] The United States is prepared to appear, should the Court have questions regarding this statement of interest or require other assistance with respect to this statement.

[3] For the purposes of this statement of interest, the Government refers to Moderna, Inc. and ModernaTX, Inc. collectively as "Moderna."

1

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . .
>
> . . . .
>
> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States *by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government*, shall be construed as use or manufacture for the United States. . . .

(emphasis added). As explained below, the effect of the Government's "authorization and consent" is to relieve Moderna of any liability for patent infringement resulting in performance of the '-0100 Contract and to transfer to the United States any liability for the manufacture or use of the inventions claimed in the Patents-in-Suit resulting from the authorized and consented acts.[4] Accordingly, and to the extent that liability exists for such acts, the patentee is limited to pursuing a claim against the United States in the Court of Federal Claims pursuant to 28 U.S.C. § 1498.

The inclusion of FAR clauses 52.227-1 and 52.227-1, Alternate I in the '-0100 Contract constitutes the Government's express authorization and consent. Section 1498(a), therefore, provides the exclusive remedy for any infringement occurring in the course of Moderna's performance of the '-0100 Contract. The Government is not aware of any other contract at issue in this litigation where it granted authorization and consent, and therefore its authorization and consent does not extend to any other procurement of vaccine in this litigation beyond what has

---

[4] As used in this Statement, "liability" is defined as having legal responsibility for any acts that may constitute the alleged infringement; it is not an admission that the vaccine infringes. All issues relating to the merits of Arbutus's claim and the Government's defenses must be presented to, and addressed by, the Court of Federal Claims.

2

been procured under the '-0100 Contract. Accordingly, claims for infringement in the course of performance of the '-0100 Contract should be dismissed.

## II.    BACKGROUND

In response to the SARS-CoV-2 (COVID-19) pandemic, the United States engaged in a multi-agency effort to ensure the availability of medical supplies needed to alleviate shortages and to counteract the contagion; that effort was known as "Operation Warp Speed" (OWS). As part of OWS, the Department of Health and Human Services (HHS) and the Department of Defense (DOD) collaborated to coordinate the nation's efforts to accelerate the development, acquisition, and distribution of COVID-19 vaccines. Pursuant to a memorandum of understanding between HHS and DOD, COVID-19 vaccines were to be procured through contracts issued by DOD, with HHS providing subject-matter expertise and support in inspecting and accepting vaccine deliveries.

On August 11, 2020, the U.S. Army, on behalf of HHS and DOD, executed the '-0100 Contract[5] with ModernaTX, Inc. to purchase production quantities of Moderna's mRNA-1273 vaccine for prevention of COVID-19, which was then under development. *See* D.I. 17-1 at 2. The '-0100 Contract incorporates by reference standardized "authorization and consent" clauses: FAR clauses 52.227-1 (also referred to as the base or "narrow" clause) and 52.227-1, Alternate I (the Alternate I or "broad" clause). D.I. 17-1 at 47. Although there were multiple modifications to that contract, none removed or revised these FAR clauses.

---

[5] The '-0100 Contract contains information that Moderna considers proprietary and other information that may be sensitive government information. We understand that the Court has not issued a protective order in this case. The United States, however, is prepared to produce an unredacted copy of the '-0100 Contract either for the Court's inspection *in camera* or under a suitable protective order, should the Court find it useful.

3

The base version of FAR clause 52.227-1, 48 C.F.R. § 52.227-1, in pertinent part, provides that "(a) [t]he Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent – (1) [e]mbodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract; . . . ." The Alternate I version of FAR clause 52.227-1 is broader in scope than the base version by omitting the requirement that the patented invention be "embodied" in the structure or composition of a delivered article. The Alternate I version provides, in pertinent part: "(a) [t]he Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier."

The U.S. Army also entered into Contract No. W58P05-22-C-0017[6] (the '-0017 Contract) on July 28, 2022. This contract procures additional quantities of Moderna's COVID-19 vaccine. The '-0017 Contract contains neither FAR clause 52.227-1 nor FAR clause 52.227-1, Alternate I. The United States has not granted its authorization and consent, either explicitly or by implication, for use of patented inventions in the performance of the '-0017 Contract. To the contrary, the '-0017 Contract contains a special provision, H.14, that states the contracting parties' express agreement that the terms of the contract do not constitute express or implied Government authorization or consent under section 1498.

At this time, the Government is only aware of these two procurement contracts between the Government and Moderna that relate to the purchase of Moderna's mRNA-1273 vaccine at

---

[6] The '-0017 Contract will be administered by HHS pursuant to a modification recently executed by the parties.

issue here.  And, as stated, only the '-0100 Contract grants the Government's authorization and consent.

## III.   ANALYSIS

In a suit between private parties, the invocation of 28 U.S.C. § 1498 is an affirmative defense. *Sperry Gyroscope Co. v. Arma Eng'g Co.*, 271 U.S. 232, 235–36 (1926); *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554–55 (Fed. Cir. 1990).  However, the Federal Circuit has also recognized that section 1498 "relieves a third party from patent infringement liability, and acts as a waiver of sovereign immunity and consent to liability" by the United States. *Madey v. Duke Univ.*, 307 F.3d 1351, 1359 (Fed. Cir. 2002).  The Federal Circuit has noted that these two views of the statute are not inconsistent:

> Without deciding, we see no inconsistency between interpreting section 1498(a) as a jurisdictional statute (waiving sovereign immunity) in suits against the United States and as merely codifying a defense that private parties who are alleged infringers may raise on the merits.  That two different effects occur depending on the party raising section 1498(a) is the clear implication of *Sperry* [271 U.S. 232], and the other cases [*Trojan, Inc. v. Shat–R–Shield, Inc.*, 885 F.2d 854 (Fed.Cir.1989), and *W.L. Gore & Associates v. Garlock, Inc.*, 842 F.2d 1275, (Fed.Cir.1988)], read together.

*Manville Sales*, 917 F.2d at 555 n.6.  In providing this statement of interest, the United States defines the parameters of its waiver of sovereign immunity with respect to this litigation and the liability that, if proven, the Government has consented to accept.

The origins of section 1498 began with the Act of June 25, 1910, 61st Cong., 2d Sess., 36 Stat. 851–52, which permitted a suit in the Court of Claims to recover for uses of the owner's patent by the Government.  That statute was subsequently found to be limited to use of the invention by the Government, but not government contractors. *See Cramp & Sons Ship & Engine Bldg. Co. v. Int'l Curtis Marine Turbine Co.*, 246 U.S. 28. 42, 45 (1918).

5

Faced with the prospect that patent suits against government contractors may prevent the Government from procuring necessary war materials at the advent of this country's entry into World War I, Congress amended the 1910 Act to provide that the owner could sue to recover for "use or manufacture by or for the United States without license of the owner." Naval Appropriations Act of July 1, 1918, 65 Cong. 2d Sess., 40 Stat. 704, 705. In reviewing the statutory history, the Supreme Court concluded that,

> [t]he purpose of the amendment was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government, and to limit the owner of the patent and his assigns and all claiming through or under him to suit against the United States in the Court of Claims[7] for the recovery of his reasonable and entire compensation for such use and manufacture.

*Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 345 (1928); *Leesona Corp. v. United States*, 599 F.2d 958, 967 (Ct. Cl. 1979) (en banc).[8]

The statute was further amended at the beginning of World War II by the Act of October 31, 1942, Pub. L. 768, § 6, 77th Cong. 2d Sess., 56 Stat. 1013, 1014 (The Royalty Renegotiation Act). That Act provided, in pertinent part, that,

> for the purposes of the Act of June 25, 1910, as amended [now section 1498] . . ., the use or manufacture of an invention described in or covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

The purpose of the "authorization and consent" provision "was to broaden the scope of the act of June 25, 1910, as amended, so to remove any further doubt that subcontractors and other suppliers

---

[7] The trial division of the Court of Claims became the Court of Federal Claims.

[8] Upon its creation, the Court of Appeals for the Federal Circuit adopted "the holdings of the Court of Claims and the Court of Customs and Patent Appeals announced before the close of business on September 30, 1982 . . . within the substantive jurisdiction" of the court as its precedent. *S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982).

of goods and materials to the government were included within the terms of that act to the same extent as prime contractors to the government were . . . ." *Bereslavsky v. Esso Stand. Oil Co.*, 175 F.2d 148, 150–51 (4th Cir. 1949) (quoting 2 Bulletin of the Judge Advocate General of the Army, 75–76 (1943) (internal quotation marks omitted)).

The Federal Circuit reads section 1498 broadly "so as not to limit the Government's freedom in procurement by considerations of private patent infringement." *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986). The structure of the statute describes the conditions that must be met for its invocation. Where the use or manufacture of the invention is "by the Government"—which is not the case here—the application of the statute is automatic and no further inquiry is required. *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 902 (Ct. Cl. 1976) (direct and exclusive control of British satellite for launch in Florida was sufficient to meet "use by the Government").

Where the use or manufacture is "by a contractor, a subcontractor, or any person, firm, or corporation for the Government," a two-part inquiry is employed: whether "(1) the [allegedly infringing] use is 'for the Government' and (2) the [allegedly infringing] use is 'with the authorization and consent of the Government.'" *Sevenson Env't Servs., Inc. v. Shaw Env't Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007).

The "for the Government" requirement is met if the allegedly infringing manufacture or use is "for the benefit of the Government," and not merely an incidental benefit from private activity. *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1362 (Fed. Cir. 2014); *see also Hughes Aircraft*, 534 F.2d at 897 (equating "for the Government" with "for the Government's benefit"). The Federal Circuit has cautioned against attempting to fathom the "primary purpose" of a contract. *Sevenson Env't*, 477 F.3d at 1365. Rather, the inquiry is focused on whether the

7

alleged infringing activity is addressed to a policy interest or objective of the United States. *See generally Adv. Software Design Corp. v. Fed. Rsrv. Bank of St. Louis*, 583 F.3d 1371, 1379 (Fed. Cir. 2009) ("benefits to the government of using the seal encoding technology on Treasury checks are not incidental effects" of private activity where the Government participated in providing the Treasury checks with the required technology); *Hughes Aircraft*, 534 F.2d at 898–99, 901 (stating the broad policy objectives of interoperability and common defense of Great Britain and United States were sufficient to meet "for the Government" standard); *cf. Riles v. Amerada Hess Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998) (finding that, while the oil lease may have satisfied "Congressional statements of national policy" of making the offshore oil field available for public use, the oil drilling activities carried out under the lease served only the interests of the lessee).

Under section 1498(a), authorization and consent may be either express or implied. *TVI Energy Corp.*, 806 F.2d at 1060. And "it is plain that the Government can limit its authorization and consent" in its contracts. *Carrier Corp. v. United States*, 534 F.2d 244, 249 (Ct. Cl. 1976). Thus, where the Government expressly states the limits of its authorization and consent in the contract, those limits will generally control. *Id.*; *see also Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 608 (M.D.N.C. 2006) ("When the Government provides express consent, that consent may be very broad, extending to any patented invention and any infringing use, or may be limited to only certain patented inventions or to only those uses that are necessary or are specifically consented to by the Government.").

The '-0100 Contract contains express "authorization and consent" in the form of the well-established FAR clauses 52.227-1 and 52.227-1, Alternate I. Where, pursuant to a contract containing these FAR clauses, the Government accepts goods that allegedly infringe on a patent, those clauses typically "bring[ ] the matter within Section 1498 even if the contract could be

8

fulfilled with other noninfringing products." *Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.,* 369 F. Supp. 3d 963, 980 (C.D. Cal. 2019) (quoting 5 *Chisum on Patents* § 16.06 (2019)).[9]

As *Sevenson Environmental* further explains, the "for the Government" inquiry collapses into the "authorization and consent" inquiry where the Government directly contracts for goods or services and that contract provides the Government's authorization and consent. 477 F.3d at 1365 ("where infringing activity has been performed by a government contractor pursuant to a government contract and for the benefit of the government, courts have all but bypassed a separate inquiry into whether infringing activity was performed 'for the Government.'"). Accordingly, where the Government elects to include a contract provision expressly providing its authorization and consent, as it has done here, that decision is appropriately viewed as reflecting the Government's determination that the contract is for the Government's benefit.

In this instance, the United States submits that the truncated inquiry is appropriate. The Army procured substantial quantities of mRNA-1273 vaccine during the COVID-19 pandemic. The vehicle for purchasing that vaccine was the '-0100 Contract which contains the broad FAR clause 52.227-1, Alternate I, as well as the narrower base clause 52.227-1. And there is no question here that the Government paid for the vaccine as required by the contract and that the vaccine was delivered in accordance with the contract (indeed, Arbutus's claim of patent infringement presumes that vaccine was manufactured and distributed, and therefore it claims to be damaged). No further "for the Government" inquiry is required under these circumstances: the contract's

_____

[9] Where the Government has granted express authorization and consent, the limits of that grant will generally control. *Carrier*, 534 F.2d at 249. To the extent that implied authorization and consent could be found, it would generally act to broaden the scope of the Government's liability, not to restrict it. *See id.* (discussing how the decision in *Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell*, 399 F.2d 913 (5th Cir. 1968), could be read to expand a "narrow" express authorization and consent clause through implied consent where equipment was specially assembled to comply with contractual provision to cool concrete).

9

provisions demonstrate that the contract was "for the Government" and therefore "for the benefit of the Government."

Where, as here, the Government directly contracts to procure the allegedly infringing goods or services in a contract that grants authorization and consent, the "benefit to the Government" is inherent. Indeed, the contractor's compliance with the contract's obligations alone demonstrate the benefit: that the Government obtains goods and services for which it pays is alone sufficient to demonstrate the procurement is "for the Government" and "for the benefit of the Government." Consequently, even if the Court chooses to examine the "benefit to the Government" prong, the Government has received the benefit of its contract, namely, procuring the vaccine that it then offered for free public distribution in an effort to thwart the COVID-19 pandemic. *See Hughes Aircraft*, 534 F.2d at 901 (finding benefit in meeting governmental objectives or interests).

Finally, we turn to the authorities and argument presented by the parties and addressed by the Court in its Order, D.I. 31. The Court noted that, given the early stage of this litigation and based on the allegations in the Complaint (which must be taken as true at the motion to dismiss stage), the case before it was more akin to *Larson*, where no authorization and consent was found and any benefit to the Government was merely incidental, rather than *Advanced Software Design* or *Saint-Gobain*, where the Government's authorization and consent was found to be implied or express, and the Government received a benefit. D.I. 31 at 12–13. As explained below, the Government submits that of the three cases discussed, *Saint-Gobain* is on point here and *Advanced Software Design*'s discussion of authorization and consent guides the present inquiry.

Like the present case, *Saint-Gobain* involved express contractual authorization and consent. 369 F. Supp. 3d at 969–70 (stating that contracts by which II-VI Inc. sold products to Lockheed contained an authorization and consent clause, and that Lockheed's prime contracts also

10

contained an authorization and consent clause). The court found the benefit to the Government was clear because the Government contracted with Lockheed for aircraft, while granting its authorization to Lockheed and its subcontractors. *Id.* The benefit in *Saint-Gobain* was the production of the aircraft that the Government contracted to buy. Indeed, the present case is even clearer in that the Government directly contracted with Moderna to procure a specific vaccine, and there is no intermediate contractor.

On the other hand, in both *Advanced Software Design* and *Larson*, the party claiming the benefit of section 1498 could not point to a contract with the Government. *Adv. Software Design Corp.*, 583 F.3d at 1374 (no contract between Government and Federal Reserve Bank); *Larson v. United States*, 26 Cl. Ct. 365, 367–68 (1992) (government contracts were with carriers and fiscal intermediaries, not doctors). As a result, the courts in those cases had to engage in a more detailed inquiry into whether the Government had granted authorization and consent. *Cf. IRIS Corp*, 769 F.3d at 1362 (providing that "a governmental grant of authorization or consent does not mean that the alleged use or manufacture is done 'for the United States' under § 1498(a)" where the court determined that a *regulatory statute*, rather than a *direct procurement contract*, provided authorization and consent).

In *Larson*, plaintiff owned patents for plastic medical splints. 26 Cl. Ct. at 367. Health care providers participating in government programs including Medicare, Medicaid, and the medical health plan for military families provided medical treatment to patients using splints that allegedly infringed plaintiffs' patents. *Id.* The healthcare providers submitted claims for reimbursement, and the programs "through their carriers and fiscal intermediaries, determine the rates and amounts of payments to providers, and reimburse health care providers for the procedure rendered to the patient." *Id.*

11

The *Larson* court began by addressing the "authorization and consent" prong. *Id.* at 369. Plaintiffs conceded that the Government had not expressly granted authorization and consent, but asserted implied authorization and consent based on the provision of "reasonable and necessary" medical services to patients that government health plans reimbursed. *Id.* at 370. Based on that record, the trial court found that the Government did not grant its authorization and consent by implication. *Id.* at 371. While the health plans reimbursed "reasonable and necessary" medical services, only "code numbers" were provided to the government programs, the "details of the treatment . . . remain[ed] with the patient and his or her provider." *Id.* In rejecting Larson's argument that the reimbursement of these medical devices was "for the Government" under section 1498, the court noted that the Government "has no interest in the particular medical products used in treatment . . . [and] [t]he fact that the Government has an interest in the program generally, or funds or reimburses all or part of its costs, is too remote to make the Government the program's beneficiary for the purposes underlying § 1498." *Id.* at 369. Moreover, the court noted that "mere reimbursement is not authorization to infringe on patent rights." *Id.* Nor could such authorization to infringe "be reasonably inferred" from the public health statutes at issue in that case. *Id.* at 370. Further, the facts demonstrated that the doctor—not the Government—determined the type of splinting material to be used from a variety of available types. *Id.* at 370–71 (stating that 16 types of splints and casts were available and describing reimbursement of medical expenses as a "billing arrangement"). And, importantly, in *Larson* the Government affirmatively denied the existence of authorization and consent in the litigation.

*Advanced Software Design* also presents a factually different scenario because no contract existed between the Federal Reserve Bank or its supplier and the United States. 583 F.3d at 1376. Nonetheless, the trial court found, and the Federal Circuit affirmed, that the Bank had been granted

the Government's authorization and consent by means of correspondence between the Treasury and the Bank, both before and after the infringement claim arose. *Id.* at 1377. Importantly, in *Advanced Software Design*, the Federal Circuit also recognized that, to the extent that the Government's earlier statements were ambiguous, the Government's appearance and assertion of authorization and consent before that court resolved the issue. *Id.* at 1378.

Under the facts of this case, the sales of the vaccine to the Government pursuant to the terms of the '-0100 Contract, which expressly includes the FAR clauses granting the Government's authorization and consent, satisfy the requirements of 28 U.S.C. § 1498(a) that the procurement was "for the Government" and with its authorization and consent. And to the extent that any doubt otherwise existed, the Government's filing of this statement of interest and confirmation of its authorization and consent should resolve the issue. Accordingly, to the extent that any liability exists for infringement of the Patents-in-Suit by the manufacture or use of vaccine procured under the '-0100 Contract, the patentee is limited to pursuing a claim against the United States in the Court of Federal Claims under 28 U.S.C. § 1498(a).

13

Respectfully submitted,

DAVID C. WEISS
United States Attorney

MICHAEL GRANSTON
Deputy Assistant Attorney General

GARY L. HAUSKEN
Director

*/s/ Philip Charles Sternhell*
PHILIP CHARLES STERNHELL
Assistant Director

February 14, 2023

HAYLEY A. DUNN
KAVYASRI NAGUMOTU
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
Telephone:   (202) 307-0342
Facsimile:    (202) 307-0345
Email:       Gary.L.Hausken@usdoj.gov
             Philip.C.Sternhell@usdoj.gov
             Hayley.A.Dunn@usdoj.gov
             Kavyasri.Nagumotou@usdoj.gov

14

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ARBUTUS BIOPHARMA CORPORATION    :
and GENEVANT SCIENCES GMBH,           :

                                   :     CIVIL ACTION

            Plaintiffs,        :

                                   :

      v.                            :

                                   :     NO. 22-252

MODERNA, INC. and MODERNATX, INC.,    :

**MEMORANDUM OPINION**

**Goldberg, J.**                                             **March 10, 2023**

Context is important. This is particularly so in litigation and in considering the stage of a proceeding. In the patent infringement matter before me, which is at the pleading stage, the parties, now joined by the United States and several *Amici Curiae*, hotly contest the application of 28 U.S.C. § 1498(a). This statute instructs that whenever it is alleged that a patent has been used by the United States in an infringing manner, litigation shall occur in the United States Court of Federal Claims, which is where Defendants Moderna, Inc. and Modernatx, Inc. (collectively, "Moderna") urge that a majority of this case must be decided.

It is well settled that an accused infringer, such as Moderna, bears the burden of establishing under § 1498(a) that the infringing use is "for the Government" and "with authorization and consent of the Government." Sevenson Envt'l Servs., Inc. v. Shaw Envt'l, Inc., 477 F.3d 1361, 1365 (Fed. Cir. 2007). These standards clearly implicate factual considerations, and in the context of the pleading stage of this case, where I am obligated to assume the veracity of the facts pled in the Complaint, weighing facts is inappropriate. Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011). Consequently, the Government's recently filed Statement of Interest does not change

Case 1:22-cv-00252-MSG    Document 64    Filed 03/10/23    Page 2 of 4 PageID #: 1321

my view that Moderna's request to transfer a portion of this matter to the Federal Claims Court is premature and must be denied at this time. My brief reasoning follows.

Most of the necessary background regarding § 1498(a) is set forth in my November 2, 2022 Opinion that addressed Moderna's partial motion to dismiss. That motion asserted that some of Plaintiff's patent infringement claims should proceed in the Court of Federal Claims pursuant to 28 U.S.C. § 1498(a). I denied that request on November 2, 2022, finding that Moderna's Rule 12(b)(6) motion was not an appropriate vehicle to resolve the § 1498(a) issue. Arbutus Biopharma Corp. v. Moderna, Inc., No. 22-cv-252, 2022 WL 16635341, at *7–8 (D. Del. Nov. 2, 2022). Following submission of the parties' Answers and Counterclaims, I set a Rule 16 scheduling conference to be held on February 16, 2023.

Two days prior to that conference, the United States Government filed a Statement of Interest, asserting that any doses of the vaccine produced by Moderna pursuant to the terms of Contract No. W911QY-20-0100 (the '-0100 Contract) were "for the Government" and "with the authorization and consent of the Government." During the Rule 16 conference, counsel for the parties and the Government (who I invited to participate) addressed the import of this Statement of Interest. Letter briefs, including those of *Amici*, have subsequently been submitted and considered.

As set out in my November 2, 2022 Opinion, § 1498(a) establishes an affirmative defense, not a jurisdictional bar. Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 554 (Fed. Cir. 1990). Importantly, I also noted that a § 1498(a) affirmative defense presents a highly factual determination. Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1382–83 (Fed. Cir. 2002). Viewing as true the well-pled facts in the Complaint, I found that Moderna had not established as a matter of law that § 1498(a) applied, and that the issue was best resolved after discovery.

Moderna continues to press its point that § 1498(a) requires transfer of part of this case to the Court of Federal Claims. Now, heavily relying on the recently filed Statement of Interest,

2

Case 1:22-cv-00852-MSG Document 61-1 Filed 09/10/22 Page 3 of 4 PageID #: 1322

Moderna urges that, "the Government is in the best position to decide what is for its benefit." (Moderna Letter brief, p. 2.) But neither the Government nor Moderna have provided any authority suggesting that the Government's interpretation of § 1498(a) trumps a court's analysis of this issue. And I note that the very contract that Moderna relies upon also states that vaccine was to be developed to "improve *patient care*," thereby "mitigating the impact of COVID-19 on the nation and *its people*." (D.I. 17-1, Ex. A (emphasis added)); see Larson v. United States, 26 Cl. Ct. 365 (Cl. Ct. 1992) ("[M]edical care is provided for the benefit of the patient, not the government.").

While the Statement of Interest does point to certain evidence that Moderna's sales under the '-0100 Contract may have been with the "authorization and consent" of the Government, Moderna offers no evidence that sales were "for the Government" which is also a necessary factor under §1498(a). But in any event, examination of evidence in the context of Fed. R. Civ. P. 12(b)(6) is not proper. Rather, I will consider the § 1498(a) issue after both parties have engaged in discovery, which will provide Plaintiff an opportunity to review the entire unredacted version of the '-0100 Contract and discover facts regarding that Contract.

The recent submissions by the parties underscore why discovery on this issue is needed. Moderna originally moved to dismiss Plaintiffs' claims as to *all* of its sales of COVID-19 vaccine doses to the U.S. Government. But now, both the Government and Moderna acknowledge that claims regarding sales under a second Government contract (W58P05-22-C-0017 (the '-0017 Contract)) were not with the authorization and consent of the Government and should not be dismissed. Had I granted the relief Moderna sought in its original motion to dismiss, this fact would not have come to light and the relief ordered could have been incorrect. Discovery is necessary to ensure that any application of § 1498(a) is based upon developed facts and not solely on the Government's say-so.

I reaffirm the analysis and conclusions set forth in my November 2, 2022 Memorandum Opinion and again conclude that the Complaint should not be partially dismissed based on 28 U.S.C. § 1498(a).  An appropriate Order follows.

# EXHIBIT 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

---

ARBUTUS BIOPHARMA CORPORATION
and GENEVANT SCIENCES GMBH,

   *Plaintiffs,*

v.

MODERNA, INC. and MODERNATX,
INC.,

   *Defendants.*

---

**Case No. 1:22-cv-00252-JDW**

---

**MEMORANDUM**

In Star Trek, members of Starfleet must observe the Prime Directive, even as they jump into or come out of warp speed. In this case, Arbutus Biopharma Corp. and Genevant Sciences GmbH (collectively, "Arbutus") claim that during the U.S. Government's own Operation Warp Speed to find a vaccine for Covid-19, Moderna Inc. and ModernaTX, Inc. (collectively, "Moderna") violated the Prime Directive of patent law: don't copy other people's inventions. Moderna asks me to hold as a matter of law that when it jumped to warp speed to make a Covid-19 vaccine, it did so for the Government, meaning the claims in this case belong in the Court Of Federal Claims. It also argues that Arbutus can't pursue claims under the doctrine of equivalents and that Arbutus's patents are invalid. For the reasons that follow, I conclude that most of this dispute belongs in this Court and that factual disputes require a jury to decide if the patents are invalid. But I also hold that the

cholesterol or a derivative thereof, wherein the phospholipid comprises from about 4 mol % to about 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from about 30 mol % to about 40 mol % of the total lipid present in the particle; and

(d) a conjugated lipid that inhibits aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

(D.I. 568 at 41–42.)

During patent prosecution, the patent examiner interpreted the use of the word "about" before each end of the molar ratio ranges listed for the lipid components as an ambiguous word that broadened the listed ranges by an amount of "+/- 10, 20, 30 mol % of [the] lipid component." (D.I. 568 at 46–48.) Given those broad ranges, the examiner rejected the claims of the '069 Patent as obvious and unpatentable, given the apparent overlap with a pending patent application 2006/0008910 ("MacLachlan"). According to the patent examiner, MacLachlan also taught a nucleic-acid-lipid particle with broad molar ratio ranges.

In response to the patent examiner's rejection, Arbutus amended its application to remove the word "about" before each end of the molar ratio ranges listed in the claim. The amended claim appeared as follows:

A nucleic acid-lipid particle comprising:

(a) a nucleic acid;

(b) a cationic lipid comprising from ~~about~~ 50 mol % to ~~about~~ 65 mol % of the total lipid present in the particle;

4

Government. Multiple amici filed responses to the Government's Statement of Interest, all of which argued that Section 1498(a) does not apply in this case.

Judge Goldberg issued his claim construction opinion on April 3, 2024. In that opinion, among other things, he addressed several of the Parties' arguments. In response to Moderna's claim that removing the word "about" from the ranges in the Molar Ratio Patents limited its claim to just the recited amounts, Judge Goldberg stated that such removal "only clearly disclaimed the[] broader ranges" that resulted from the patent examiner's expansive interpretation of the word "about." (D.I. 266 at 21.) In connection with Arbutus's argument that a person skilled in the art would have understood the '651 Patent to identify fluorescent dyeing as the method used to measure whether the mRNA in an LNP was "fully encapsulated," Judge Goldberg noted that such "method necessarily counts" partially encapsulated mRNA. (D.I. 266 at 36–37.)

On August 1, 2025, Moderna moved for summary judgment on three issues. Moderna seeks summary judgment on its affirmative defense regarding 28 U.S.C. § 1498; its argument that prosecution history estoppel bars Arbutus from bringing its infringement claims under the doctrine of equivalents; and its argument that some of Arbutus's patent claims are indefinite as a matter of law. In connection with its motion for summary judgment, Moderna filed a motion to exclude expert testimony of Alex Brill and Peter Pitts concerning its Section 1498(a) defense.

Case 1:22-cv-00252-JDW Document 607-2 Filed 02/02/26 Page 10 of 32 PageID #:
Case 3:26-cv-01193-SB Document 1-2 Filed 06/12/26 Page 125 of 262
55133

Arbutus opposed both motions, filed a cross motion for summary judgment, and moved to exclude expert testimony offered by Dr. George Rutherford, Dr. Christopher Vellturo, and Dr. Robert Prud'homme related to Moderna's Section 1498(a) defense and indefiniteness arguments. In its cross motion for summary judgment, Arbutus requests that I find as a matter of law that Moderna's Section 1498 affirmative defense fails and that most of Arbutus's alleged claims are not indefinite. Moderna opposed Arbutus's motions and moved to exclude expert testimony offered by Dr. Michael Mitchell related to Arbutus's argument that Moderna fraudulently induced the Government into entering the C-100 Contract. All of those motions are ripe for disposition.

## II. LEGAL STANDARD

### A. Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be entered against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. *Daubert*

In a patent case, regional circuit law applies to issues concerning the admissibility of expert opinions unless those issues are unique to patent law. *See Micro Chem., Inc. v.*

10

*Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed. Cir. 2003). "Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law," so Third Circuit law applies. *Id.* In the Third Circuit, the Federal Rules of Evidence "govern[] the admissibility of expert testimony." *Kannankeril v. Terminix Int'l., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert" may testify if the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. But when no question of fact needs to be resolved, there is no need for expert testimony. *See id.*

## III.   ANALYSIS

### A.   Section 1498

Section 1498 provides that when an patented invention "is used or manufactured by or for the United States ... the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture." 28 U.S.C. § 1498(a). The statute explains that the "use or manufacture of an invention described in and covered by a patent of the United States by a contractor ... for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United

11

States." *Id.* The Federal Circuit has further explained that Section 1498 "provides a cause of action against the United States (waiving sovereign immunity) for a patent owner to recover damages for the unauthorized use or manufacture of a patented invention '*by or for* the United States.'" *Astornet Techs. Inc. v. BAE Sys., Inc.*, 802 F.3d 1271, 1277 (Fed. Cir. 2015) (emphasis in original).

A defendant can raise Section 1498 as an affirmative defense in private litigation. *See BAE Sys. Info. & Elec. Sys. Integration Inc. v. Aeroflex Inc.*, Case No. 09-769-LPS, 2011 WL 3474344, at *2 (D. Del. Aug. 2, 2011). Because Section 1498(a) serves as an affirmative defense, the defendant bears the burden of showing that each of the two prongs of Section 1498(a) is met. *See Sevenson Envt'l Servs., Inc. v. Shaw Envt'l, Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007). That means the defendant must establish (1) the infringing use was "for the Government" and (2) the infringing use was done "with the authorization and consent of the Government." *Id.*[6] In the C-100 Contract, the Government authorized and consented to any necessary infringement.[7] But that contractual language does not resolve the question of whether Moderna's manufacture was for the Government.

---

[6] Section 1498(a) initially uses the phrase "used or manufactured by or for **the United States**," but it then describes "use or manufacture … **for the Government**." 28 U.S.C. § 1498(a) (emphases added). From that, it appears that the statute uses the terms "United States" and "Government" synonymously.

[7] Arbutus argues that Moderna procured the C-100 Contract by fraud, which renders it void. Arbutus does not cite a single binding case where a court permitted a party faced with a Section 1498 defense to challenge the validity of the contract that provided the required authorization. In fact, the Federal Circuit case that Arbutus identifies to support

12

I must first determine what "for the Government" means before I can decide whether the C-100 Contract falls within the statute's scope. As in any statutory construction case, I must start with the statutory text and proceed from the understanding that, unless otherwise defined, I interpret statutory terms in accordance with their ordinary meaning. *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). In doing so, I must read the statutory text in context. *See Pulsifer v. United States*, 601 U.S. 124, 133 (2024).

Although Section 1498 uses the phrase "for the Government," it does not define the phrase or any of the words in it. When Congress enacted the predecessor to Section 1498(a), the term "for" "[i]ntroduc[ed] the intended recipient." *For*, A New English Dictionary on Historical Principles (1901). And the term "government" referred to "the system of polity in a state," "authority," "the administration," "a commonwealth," and "a state." *Government*, Webster's Practical Dictionary (1910). Taken together, then, the statute indicates that the Government, as an entity, must be the intended recipient of the infringing product, as opposed to the public that the Government represents.

The statute's context reinforces this interpretation. The statute requires both the Government's authorization and that the use be for the Government. Those are separate

---

its voidability argument involves a voidability challenge that the Government made, not a non-contracting third party. *See Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1246 (Fed. Cir. 2007). But in this case, the Government never claimed that the C-100 Contract is void. In fact, as demonstrated by its Statement of Interest, the Government insists that the contract is valid.

requirements. But, if all it took to invoke Section 1498 were a public benefit, then the Government's authorization alone would be enough because one could infer from the Government's authorization that the Government perceives a public benefit. Congress didn't write the statute that broadly, though. Even if the Government authorizes the manufacture or use of a patented product, it must do so for its own benefit. That additional requirement reinforces that the Government must receive the benefit itself.

Cases interpreting Section 1498 reinforce this conclusion. Courts have held that the benefit to the Government must be material and direct; it cannot be merely incidental or "too remote." *Sheridan v. United States*, 120 Fed. Cl. 127, 131 (2015). The Government's interest can be too remote even if it just has an "interest in [a] program generally[] or funds or reimburses all or part of [the program's] costs." *Larson v. United States*, 26 Cl. Ct. 365, 369 (1992).

The Court Of Claims' decision in *Larson* is particularly instructive. In *Larson*, the Court Of Claims refused to approve a Section 1498 defense where the Government paid for medical splints and casts for patients participating in certain government programs. Rejecting the argument that the use of infringing splints and casts to treat patients was for the Government, the Court Of Claims stated that "[m]edical care is provided for the benefit of the patient, not the [G]overnment." *Id.*

In this case, the C-100 Contract, for the most part, did not authorize the manufacture or use of vaccines for the Government. Instead, it authorized their

14

manufacture and use for residents of the United States. As Judge Goldberg pointed out at the motion to dismiss stage, "medical care is provided for the benefit of the patient, not the [G]overnment." (D.I. 31 at 3 (quoting *Larson*, 26 Cl. Ct. at 369).) This case is indistinguishable from *Larson*. Like the patients receiving splints and casts in *Larson*, the patients receiving Moderna's mRNA vaccines were the beneficiaries. That is true regardless of whether the Government "funds or reimburses all or part of [the] costs" for them. *Id.*

Moderna points to the language of the C-100 Contract and its proposed expert testimony to argue that its infringement was "for the Government." But that too is not enough. In fact, language of the C-100 Contract arguably supports the holding that the vaccines were not for the Government. It states that the vaccine was to be developed to "improve **patient** care, thereby mitigating the impact of Covid-19 on the nation and **its people**." (D.I. 17–1 at 20 (emphases added).)

While Section 1498 does not apply to the infringement claims related to the vaccine doses that went to the general public, it does apply to the claims of direct infringement for the vaccine doses that the Government acquired and distributed to its own employees. For those doses, the Government was a direct beneficiary because it distributed the vaccines itself to its employees to ensure that it could continue to function. In that sense, the vaccine doses that the Government provided to its employees are not materially different from cellphones, paper, or staples that the Government acquires for

15

its employees to enable them to perform the work that the Government hires them to do. Those claims belong before the Court Of Federal Claims.

However, even for those doses, only the direct infringement claims must go before the Court Of Claims. Section 1498 does not apply to claims of indirect infringement. The Federal Circuit has recognized that Section 1498(a) does "not waive the Government's sovereign immunity for indirect infringement." *Zoltek v. United States*, 672 F.3d 1309, 1320 (Fed. Cir. 2012). It based that statement on a Court Of Claims decision that held that "the Government is not liable ... for what, but for [S]ection 1498, would be contributory (rather than direct) infringement of its suppliers." *Decca Ltd. V. United States*, 640 F.2d 1156, 1167 (Ct. Cl. 1980). Thus, Arbutus can pursue its indirect infringement claims even for the vaccine doses that the Government acquired and distributed to its employees.

Moderna argues that a plaintiff cannot pursue an indirect infringement claim in district court if the direct infringement claims belong in the Court Of Federal Claims. But the cases that Moderna cites for that proposition address what happens if a third party manufactures a product and then induces the Government to use it in a way that infringes a patent. *See, e.g., Astornet Techs. Inc.*, 802 F.3d at 1277–78; *Morpho Detection, Inc. v. Smiths Detection Inc.*, Case No. 2:11-cv-498, 2013 WL 5701522, at *4–6 (E.D. Va. Oct. 17, 2013). Arbutus, however, asserts that non-governmental third parties infringed and that Moderna contributed to or induced that infringement. Moderna has not pointed me to anything suggesting Congress intended to waive sovereign immunity for claims

16

Case 1:23-cv-00252-JDW-SB Document 697-2 Filed 02/02/26 Page 17 of 32 PageID #:
Case 3:26-cv-01193-SB Document 71-2 Filed 06/12/26 Page 132 of 262
55140

concerning the actions of third parties and therefore channel such claims to the Court Of Federal Claims under Section 1498.

Finally, because I can resolve the meaning of the statutory phrase "for the Government" through traditional tools of statutory construction, I do not need expert testimony on what actions were, and were not, for the Government. The facts are not in dispute, and expert testimony is never necessary to shed light on the interpretation of a statute. I will therefore grant the various motions to preclude each side's experts on this issue (*i.e.*, Alex Brill, Peter Pitts, George Rutherford, Chrisopher Vellturo, and Michael Mitchell[8]).

## B.    Prosecution History Estoppel

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997). Recognizing that this doctrine could apply "broadly"

---

[8] Dr. Mitchell's opinions go to Arbutus's fraud-in-the-inducement theory, which I have rejected, so they are irrelevant. Dr. Mitchell also offers some opinions that relate to prosecution history estoppel. Moderna seeks to exclude those opinions solely based on its supposition that Dr. Mitchell couldn't have done all the work that he claims to have done in the time available to him. But Moderna offers no convincing evidence to support that theory, and I will not credit its unsupported speculation. In any event, I do not rely on Dr. Mitchell's opinions in resolving the prosecution history estoppel arguments, so none of this matters.

17

and "take on a life of its own, unbounded by the patent claims," courts have imposed limits on a patent holder's ability to bring infringement claims pursuant to it. *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1329–30 (Fed. Cir. 2019) (alterations accepted and quotations omitted).

Prosecution history estoppel is one such limit. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733–34 (2002). Under it, a patent holder cannot claim under the doctrine of equivalents subject matter that the patent holder disclaimed during prosecution of the patent. *See id.* In practice, a patent holder can disclaim subject matter in one of two ways: (1) "by making a narrowing amendment to [a] claim" (referred to as "amendment-based estoppel") or (2) "by surrendering claim scope through argument to the patent examiner" (referred to as "argument-based estoppel"). *Amgen Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019). Whether amendment-based or argument-based estoppel bars a doctrine of equivalents claim is a question of law. *See Regents of Univ of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1371 (Fed. Cir. 2008).

Amendment-based estoppel applies when a patent applicant narrows a claim during patent prosecution by submitting an amended application. *See Festo Corp.*, 535 U.S. at 738. For example, if an examiner rejects a patent application due to the existence of prior art, an applicant may amend his application and remove the subject matter that overlapped with the prior art. *See id.* at 737. "Such a narrowing amendment is presumed to be a surrender of all equivalents within the territory between the original claim and the

18

amended claim." *Eli Lilly & Co.*, 933 F.3d at 1330 (quotation omitted). That presumption, however, is rebuttable. *See id.*

A patent holder can rebut the presumption by showing that his reason for amending his patent application "bear[s] no more than a tangential relation to the equivalent in question." *Festo Corp.*, 535 U.S. at 740. "The tangential relation criterion for overcoming the ... presumption is very narrow." *Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1315 (Fed. Cir. 2008). It focuses "on the patentee's objectively apparent reason for the narrowing amendment" and requires a showing that the "narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Id.* (quotation omitted). The reason for the narrowing amendment "should be discernable from the prosecution history record." *Id.* (quotation omitted). To make this tangentiality determination, courts do not apply a "bright-line" test; instead, the inquiry must "be decided in the context of the invention disclosed in the patent and the prosecution history." *Eli Lilly & Co.*, 933 F.3d at 1333. Courts conduct this analysis on a case-by-case basis. *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1366 (Fed. Cir. 2020).

Federal Circuit decisions on the tangentiality exception demonstrate that if an amendment cures an issue that is different in kind from the claim limit that is the subject of a claimed equivalent, then it can be tangential. But if the amendment is about the same claim limit, even though it is different in degree, then it is not tangential. Three decisions

19

Case 1:22-cv-00252-JDW Document 697-1-2 Filed 02/08/10/26 Page 20 of 35 PageID #:
Case 3:26-cv-01193-SB Document 71-2 Filed 06/12/26 Page 135 of 262
55143

illustrate situations where a difference in kind between the portion of the claim limit that

the patentee amended and the portion subject to a claimed equivalent led the Federal

Circuit to conclude that the tangential exception applied.

- In *Insituform Tech. Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1368 (Fed.

Cir. 2004), an applicant amended a claim about a method of using a vacuum or multiple

vacuums to fill a flexible tube with resin. A prior art reference disclosed a single vacuum

far from the resin source, and the amended application overcame that reference by

placing a single vacuum near the resin source. *See id.* at 1369–70. In a later suit, the

patentee accused a method involving several vacuums of infringement based on the

doctrine of equivalents. *See id.* at 1370. The Federal Circuit held that the tangential

exception applied because the purpose of the amendment was to distinguish the distance

from the vacuum to the resin source. It was not addressed to the number of vacuums. *See

id.* at 1368-70.

- In *Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364,

1368 (Fed. Cir. 2008), an applicant amended a claim about a method used to detect

chromosomal abnormalities. The original application involved a claim directed to general

methods of disabling the hybridization capacity of repetitive DNA sequences and a claim

that recited blocking nucleic acids. The patent prosecution history indicated that the

examiner and inventors discussed ways to distinguish the invention from prior art by

including "a proposed claim directed solely to the use of blocking nucleic acids to direct

20

probe hybridization to unique segments." *Id.* at 1378. The parties then limited the claim to a particular technique that used blocking nucleic acids. Then, in litigation, the patentee accused a blocking method that used synthetic nucleic acids instead of the human nucleic acids that the claim limit required. *See id.* The Federal Circuit concluded that the tangential exception applied because the purpose of the amendment was to overcome prior art on the method of blocking, not on the type of nucleic acid that the patented method would use. *See id.*

- In *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1284–85 (Fed. Cir. 2010), an applicant amended a claim about DNA sequences that encode a type of porcine circovirus, called "porcine circovirus II." The original claim recited DNA sequences consisting of a group of thirteen open reading frames, which are the portions of a gene that encode proteins. However, as originally written, the claim would have covered any sequence that included one of the thirteen open reading frames. The examiner rejected the original claim, noting that the claim as written could cover open reading frames from any organism. The applicants then amended the claim to require that the open reading frames be of porcine circovirus type II. In litigation, the patentee alleged that a DNA strain found in defendant's vaccine with over 99% nucleotide homology with porcine circovirus type II was an equivalent to porcine circovirus type II. Although the Federal Circuit recognized that there was a presumption that the patentees surrendered all equivalents outside of the open reading frames of porcine circovirus type II, the Court held that the

21

tangential exception applied because the "rationale for the amendment was to narrow the claimed universe of [open reading frames] down to those of [porcine circovirus type II], and bore only a tangential relation to the question of which DNA sequences are and are not properly characterized as" porcine circovirus type II. *Id.*

On the other hand, when a distinction is one of degree but still touches on the part of the claim limit that led to the amendment, the Federal Circuit has held that the tangential exception does not apply. For instance, in *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296 (Fed. Cir. 2005), the examiner rejected claims about a buffered phosphorus fertilizer over a prior art reference that disclosed a fertilizer that buffered when diluted. The applicant amended the claims to distinguish them from the prior art by indicating the claimed fertilizer had to be concentrated rather than diluted. *See id.* at 1306. In particular, the applicant added a limitation that required the fertilizer to include certain components "in an amount of about 30 to about 40 weight percent." *Id.* at 1305–06. The patentee then claimed that a fertilizer with compounds between 59% and 62% was equivalent. *See id.* at 1301. The Federal Circuit held that the tangential relation exception did not apply because "both the reason for the amendment and the asserted equivalent relate to the concentration of the fertilizer." *Id.* at 1306.

In this case, Arbutus narrowed its original application for the '069 Patent to address the examiner's concern about the imprecision of the molar ratio ranges. Now, it asserts an equivalent based on the molar ratio ranges in Moderna's vaccine. Because the

22

amendment in the application was about the same issue as the equivalent, amendment-based estoppel bars Arbutus from asserting an equivalent because the difference between the purpose of the amendment and the equivalent is one of degree, not of kind.

Arbutus argues that it only disclaimed the broader ranges in the original application to overcome MacLachlan, not the narrower ranges that it invokes against Moderna. However, that's not how amendment-based estoppel works. When an amendment touches on the same aspect of a claim limit as an alleged equivalent, the amendment bars it. Arbutus points to the Federal Circuit's decision in *Eli Lilly & Co.*, 933 F.3d at 1333, for the proposition that there is no "bright line rule" that requires application of amendment-based estoppel when the same claim limit is at issue in an amendment and a proposed equivalent. But that doesn't save Arbutus because the question is what aspect of the claim limit was at issue in the amendment. If, as in this case, it's the same limit as in the equivalent, then estoppel applies.

The Federal Circuit's decision in *Eli Lilly & Co.* does not counsel a different outcome. In that case, Lilly amended a patent claim to limit its claim to pemetrexed disodium, rather than antifolates generally. *See* 933 F.3d at 1326. In litigation, Eli Lilly then argued that a different form of pemetrexed salt was an equivalent. *See id.* at 1326–27. The Federal Circuit held that the narrowing amendment was designed to distinguish between antifolates generally and pemetrexed specifically, but that it did not necessarily limit the patent to a single type of pemetrexed salt. *See id.* at 1331. But the court also explained

23

that a party invoking the tangential exception must prove that the equivalent was "peripheral, or not directly relevant, to its amendment." *Id.* at 1332 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003)).

The decision in *Eli Lilly & Co.* is no different than the decision in *Intervet.* In both cases, the Federal Circuit held that an amendment to narrow a claim from a broad category to a specific type within that category did not estop the patentee from claiming that something was equivalent to the specific type of structure that it patented. But that's not this case. This case is about numerical ratios. Arbutus narrowed its claim to specify certain ratios, and now it claims ratios outside the claimed ranges are equivalent. But that imprecision is exactly what the examiner was worried about, and while the equivalent that Arbutus claims is narrower than the range about which the examiner expressed concern, the fact remains that Arbutus seeks to claim an equivalent that is about the very same issue that led to its amendment, not some tangential aspect. Because Arbutus has not shown that its amendment to limit the molar ratios that its patent covered was tangential to an equivalent with a molar ratio outside the range it claims, it has not satisfied its burden of proving that the exception applies.

Arbutus also argues that Judge Goldberg's claim construction ruling forecloses Moderna's argument, but I disagree. In construing the claims, Judge Goldberg determined that Arbutus had only "clearly disclaimed" the broader ranges as part of the amendment process. (D.I. 266 at 21.) But Judge Goldberg had no occasion as part of the claim

24

construction process to consider the application of amendment-based estoppel, so his ruling on a different issue does not require a different outcome.[9]

## C. Invalidity

An alleged infringer may challenge a patent's validity by contending that it is indefinite. *See* 35 U.S.C. § 282. A patent is indefinite if it fails to "particularly point[] out and distinctly claim[] the subject matter which the [applicant] . . . regards as [his] invention." 35 U.S.C. § 112. Courts have interpreted this statutory language to require a claim to "reasonably apprise those skilled in the art of the scope of the invention." *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1378 (Fed. Cir. 2000) (quotation omitted).

---

[9] Moderna also makes an argument about argument-based estoppel. Argument-based estoppel can estop a patent holder from bringing an infringement claim under the doctrine of equivalents for subject matter that the applicant surrendered via argumentation before the patent examiner. *See Conoco, Inc. v. Energy & Environmental Intern., L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006). For this type of estoppel to apply, the applicant's argument before the patent examiner "must evince a clear and unmistakable surrender of subject matter." *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1326 (Fed. Cir. 2003) (quotation omitted). Because I conclude that Arbutus cannot rely on equivalents outside the claimed molar ratios in the Molar Ratio Patents, Moderna's argument-based estoppel argument is moot. However, I note that no competitor would reasonably believe that Arbutus surrendered the equivalents at issue. During prosecution, Arbutus emphasized to the examiner the "new and unexpected results" of the 1:57 SNALP (57 mol % cationic lipid) formulation and the advantages imparted by "increased" amounts of cationic lipid. (*E.g.*, D.I. 514-25 at 11.) The only anchor in the '069 Patent's prosecution history against which to judge an increase is MacLachlan, which discusses 40 mol % cationic lipid or less. From that, it's possible to conclude that Arbutus's arguments to the examiner foreclose any molar ratio below 40 mol %. Moderna's argument to extend the ratio to a 50 mol % relies on rhetorical points in IPR proceedings that do not support its proposed outcome.

Although this requirement "mandates clarity," it does not require "absolute precision." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

In the context of evaluating a claim that discloses a particular measurement, the Federal Circuit has said that a "claim is not indefinite if a person of skill in the art would know how to utilize a standard measurement method ... to make the necessary measurement." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017). That is, "if a skilled person would choose an established method of measurement, that may be sufficient to defeat a claim of indefiniteness, even if that method is not set forth ... in the patent itself." *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 809 F.3d 1223, 1224 (Fed. Cir. 2015) (Prost, *C.J.*, Dyk & Wallach, *JJ.*, concurring).

The Parties dispute whether the asserted claims of the '651 Patent are indefinite. On the one hand, Moderna insists that the claims are indefinite as a matter of law. On the other hand, Arbutus argues that the claims are either definite as a matter of law or, at the very least, that there is a genuine dispute of material fact as to whether the claims provide a POSA with reasonable certainty about the scope of the invention. The Parties also argue over whether the claims in Arbutus's Molar Ratio Patents are definite as a matter of law.

### 1.    Dr. Prud'homme's Indefiniteness Opinion

The law provides that claims are indefinite where the claims, when read in light of the specification and prosecution history, fail to inform a POSA as to the scope of the invention with reasonable certainty. *See Nautilius, Inc.*, 572 U.S. at 901. While a "potential

26

infringer" need not "be able to determine ex ante if a particular act infringes the claims," the patent must "apprise the public 'of what is still open to them[]'" such that "a person of ordinary skill in the art could determine whether or not an accused product or method infringes the claim." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346–47 (Fed. Cir. 2022). This is an inquiry about the scope of the patent; not one into whether a competitor can determine it infringed. *See id.; see also Nautilus, Inc.*, 572 U.S. at 901.

Dr. Prud'homme grounds his opinions in this law. He opines about the indefiniteness of both the '651 Patent and the Molar Ratio Patents. For both, he concludes that they are indefinite because (a) a POSA would not know what method to use to measure the claimed inventions and (b) the various methods of measurement available produce meaningfully different results. Thus, he says, a POSA could not determine the scope of the claim in order to determine infringement. Dr. Prud'homme might not be right, but it is a fair opinion, backed by a stated methodology, about the ability of a POSA to determine the metes and bounds of the asserted claims.

Arbutus's argument to the contrary conflates indefiniteness analysis with infringement analysis. Although the Federal Circuit has used the word "infringes," it has also made clear that the inquiry is one of scope, not infringement. *See Niazi Licensing*, 30 F.4h at 1346–47. While the ability to determine the scope of a patent can implicate a competitor's ability to determine if it has infringed, that does not mean an expert's opinion about a patent's scope is about a competitor's ability to determine infringement.

27

That is particularly true in a case like this, in which the patents define the inventions in numerical terms, which binds the measurement question inextricably to the scope of the claims. In short, Dr. Prud'homme's indefiniteness opinion was not based on an application of the incorrect legal standard. I will therefore deny Arbutus's motion to exclude his opinions, and I will consider them among the quantum of admissible evidence in resolving the Parties' competing summary judgment motions on indefiniteness.

## 2. The '651 Patent

Claim 1 of the '651 Patent recites, "A lipid vesicle formulation comprising: … messenger RNA (mRNA), wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles."[10] (D.I. 512-4 at 30.) Judge Goldberg construed the phrase "fully encapsulated" to mean "fully, as distinct from partially" encapsulated. (D.I. 266 at 37.) Under this construction, to be fully encapsulated, the mRNA strand must be "fully contained inside the vesicle;" the claim does not cover strands that are "part-in-part-out" or not encapsulated at all. (D.I. 266 at 35–36.)

There are factual disputes about the definiteness of this claim that make summary judgment inappropriate. Each side has offered expert testimony about what a POSA would understand "fully encapsulated" to mean and what method of measurement that

---

[10] The other asserted claims of the '651 Patent are dependent on Claim 1. Claims 13 and 14 of the '651 Patent respectively require "at least 80%" and "about 90%" of the mRNA be "fully encapsulated." (D.I. 512-4 at 30.)

28

person would have understood the patent to require in order to measure encapsulation of mRNA. None of the Parties' arguments persuades me otherwise.

*First,* I disagree with Moderna that it offered unrebutted testimony about the meaning (or lack of meaning) of "fully encapsulated." (D.I. 508 at 30.) It offered Dr. Prud'homme's opinion, but Arbutus offered an opinion of Dr. Murthy, which uses the construction that Judge Goldberg applied, without confusion. (*See* D.I. 571-18 at 240–41.) That conflicting testimony precludes summary judgment, particularly in light of the high burden that Moderna has to demonstrate invalidity.

*Second,* there are factual disputes about what a POSA would have understood about how to measure encapsulation. Moderna offers evidence of at least one article that discloses seven different tests used to measure encapsulation efficiency and notes that the article reports different tests yield different results. (*See* D.I. 508 at 34.) However, the Parties offer conflicting testimony about what measurement method a POSA would have used. Dr. Prud'homme, for Moderna, suggests that a POSA wouldn't know which method to use. On the other hand, Dr. Murthy argues that a POSA would have known to use a dye-exclusion assay to measure full encapsulation within the context of the claimed invention. At this stage of the proceedings, both opinions are forms of admissible evidence, and I can't credit one over the other.

But even if I assumed that a POSA would use a dye-exclusion assay to measure full encapsulation, there would still be genuine issues of fact preventing the grant of summary

29

judgment. That is because, as Judge Goldberg noted, the technique known as, "fluorescent dyeing" "necessarily counts the inside section of part-in-part-out strands ... while containing no mechanism to identify which strands are part-in-part-out." (D.I. 266 at 36–37.) In other words, fluorescent dying cannot distinguish between partially encapsulated and fully encapsulated mRNA. Moderna argues that this means fluorescent dyeing cannot be a method of measurement that a POSA would have understood as a way of quantifying the "at least 70%," "at least 80%," and "about 90%" encapsulation of mRNA as required by the claims. However, Arbutus provides expert testimony that states partial encapsulation in lipid particles does not exist and, even if it could, there are techniques that can measure fully encapsulated mRNA and differentiate it from the hypothetical partially encapsulated mRNA. This amalgam of conflicting testimony makes summary judgment inappropriate.

### 3.    The Molar Ratio Patents

The asserted claims in the Molar Ratio Patents recite three or four lipid-component ranges in "mol %" "of the total lipid present in the particle." However, nothing in the Molar Ratio Patents indicates how to determine the mol % of lipids in individual particles or the formulation. While there is no test to measure the "mol %" of the lipid components in an individual lipid particle directly, there are multiple tests to do so indirectly (*e.g.*, measuring

aggregates or fractionated samples of lipid compositions containing millions of lipid particles).[11]

There is conflicting evidence in the record as to whether the existing methods would give meaningfully different results. "[W]here different approaches to measurement are involved," "the patent and prosecution history must disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select." *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 630 (Fed. Cir. 2015). Moderna highlights that Arbutus's expert ran different tests, both fractionated and not, on the same batch of samples, and the tests resulted in some lipid amounts being inside the claimed molar ratio ranges while others were not. Arbutus claims this comparison is flawed because the non-fractionated testing method produces "one overall value," whereas the fractionated testing method "yields information about the underlying compositional distribution of particles within the sample." (D.I. 610 at 7–8.) According to Arbutus, even though the tests are different, they do not produce different results. But since the Parties present conflicting evidence over whether the test results are materially different and over which test a POSA would

---

[11] One technique, known as a fractionation technique, allows researchers to "fractionate" (*i.e.*, separate) the composition of lipid particles. (*See* D.I. 571-18 at 676.) Those fractions can then be analyzed for their lipid composition. (*See id.*) A different technique, referred to as an aggregation technique, involves researchers simply testing the composition without fractionating it. (*See id.* at 673, 677–78.)

31

understand to have produced the claimed mol % of the lipid components, summary judgment is inappropriate.

## IV.  CONCLUSION

Most of Moderna's vaccine doses were not for the Government, so Arbutus's claims about them belong here as Section 1498 does not apply to them. Moderna has proven that prosecution history estoppel bars Arbutus's doctrine-of-equivalents claims about the Molar Ratio Patents, so I will grant Moderna's Motion on that issue. A jury will have to resolve questions of invalidity. An appropriate Order follows.

**BY THE COURT:**

_/s/ Joshua D. Wolson_____
JOSHUA D. WOLSON, J.

February 2, 2026

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **ARBUTUS BIOPHARMA CORPORATION and GENEVANT SCIENCES GMBH**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **MODERNA, INC. and MODERNTX, INC.**, <br><br> *Defendants.* | **Case No. 1:22-cv-00252-JDW** |

## ORDER

**AND NOW**, this 2nd day of February, 2026, for the reasons stated in the accompanying Memorandum, it is **ORDERED** as follows.

1.　Defendants Moderna, Inc. and ModernaTX, Inc.'s Motion For Summary Judgment (D.I. 507) is **GRANTED IN PART** and **DENIED IN PART** as follows.

　　a.　The Motion is **GRANTED** as to:

　　　　i.　Defendants' defense made pursuant to 28 U.S.C. § 1498(a) for the vaccines that went directly to United States Government employees; and

　　　　ii.　Defendants' claim that amendment-based estoppel bars Plaintiffs' infringement claims made pursuant to the doctrine of equivalents for U.S. Patent Nos. 8,492,359; 9,364,435; and 11,141,378; and

b. The Motion is **DENIED** in all other respects.

2. Defendants' Motion To Exclude Mr. Pitts' And Mr. Brill's Expert Reports (D.I. 510) is **GRANTED**.

3. Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH's Cross Motion For Summary Judgment (D.I. 562) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. The Motion is **GRANTED** as to Defendants' Section 1498 defense for the vaccines that did not go directly to United Government employees; and

b. The Motion is **DENIED** in all other respects.

4. Plaintiffs' Motion To Exclude Certain Expert Testimony Of Dr. Rutherford, Dr. Vellturo, and Dr. Prud'homme (D.I. 558) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. The Motion is **GRANTED** as to Dr. Rutherford and Dr. Vellturo; and

b. The Motion is **DENIED** as to Dr. Prud'homme.

5. Defendants' Motion To Exclude Certain Expert Testimony Of Dr. Mitchell (D.I. 595) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

a. The Motion is **GRANTED** as to Dr. Mitchell's opinions concerning Arbutus's fraudulent inducement theory regarding Moderna's C-100 Contract with the Government; and

b.      The Motion is **DENIED** as to Dr. Mitchell's opinions concerning

prosecution history estoppel.

**BY THE COURT:**

*/s/ Joshua D. Wolson* ___ ___ _____
JOSHUA D. WOLSON, J.

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARBUTUS BIOPHARMA CORPORATION
and GENEVANT SCIENCES GmbH,

        Plaintiffs,

v.

        C.A. No. 22-252 (JDW)

MODERNA, INC. and MODERNATX, INC.

        Defendants.

## CONSENT JUDGMENT AND ORDER

WHEREAS Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH have asserted various claims for patent infringement against Defendants Moderna, Inc. and ModernaTX, Inc.;

WHEREAS Defendants' Ninth Defense [D.I. 321] alleges that Plaintiffs' claims based on Moderna's manufacture and sale of the COVID-19 Vaccine pursuant to the C-100 Contract are barred by 28 U.S.C. § 1498;

WHEREAS Plaintiffs moved for summary judgment on Defendants' § 1498 defense, including with respect to the vaccines that did not go directly to United States Government employees, and the Court granted that portion of Plaintiffs' motion for summary judgment, *see* D.I. 697, 698 ¶ 3a;

WHEREAS Defendants moved for summary judgment on Defendants' § 1498 defense, including with respect to the 6,244,340 doses that went directly to United States Government employees, and the Court granted that portion of Defendants' motion for summary judgment and denied the motion as to the doses that did not go directly to United States Government employees, *see* D.I. 697, 698 ¶¶ 1(a)(i), 1(b);

1

NOW THEREFORE, the parties hereby stipulate, subject to the approval of the Court, as follows:

1. To conserve judicial resources and to avoid the time and expense of further litigation related to the asserted patents, the Parties respectfully request, and the Court hereby dismisses with prejudice:

   a. Counts 1 and 3 of Plaintiffs' Amended Complaint [D.I. 301];

   b. Defendants' Declaratory Judgment Counterclaims 1, 3, 7, and 9 [D.I. 321]; and

   c. Defendants' Affirmative Defenses 1, 2, 3, 4, 5, 6, 7, 8, and 10 [D.I. No. 321].

2. To conserve judicial resources and to avoid the time and expense of further litigation related to the asserted patents, the Parties respectfully request, and the Court hereby enters:

   a. judgment of infringement in Plaintiffs' favor as to Counts 2, 4, 5, and 6 of Plaintiffs' Amended Complaint [D.I. 301] and judgment against Defendants as to Defendants' Declaratory Judgment of Non-Infringement Counterclaims 2, 4, 5, and 6 [D.I. 321]; and

   b. judgment of no invalidity in Plaintiffs' favor and against Defendants as to Defendants' Declaratory Judgment of Invalidity Counterclaims 8, 10, 11, and 12 [D.I. No. 321] based solely on the disclosures of the asserted patents' specifications, the relevant priority dates, and the parties' contentions and expert opinions, the specific asserted relevant prior art, the specific prior related proceedings, and the asserted claims in the patents.

3. To conserve judicial resources and to avoid the time and expense of further litigation related to the asserted patents, as to Defendants' Ninth Defense ("Government Sales") [D.I. 321], the Parties respectfully request, and the Court hereby enters:

   a. judgment in Plaintiffs' favor and against Defendants with respect to the vaccines that did not go directly to United States Government employees;

   b. judgment in Defendants' favor and against Plaintiffs with respect to the 6,244,340 doses that were directly administered to United States Government employees; and

   c. the C-100 Contract is a valid contract and the Court hereby enters judgment in Defendants' favor and against Plaintiffs as to Plaintiffs' fraud-in-the-inducement theory regarding § 1498 referenced in footnote 7 of the Court's summary judgment order [D.I. 697].

4. The Parties waive all right to appeal or otherwise move for relief from this Consent Judgment and Order *except* Defendants expressly reserve their right to appeal this Court's adjudication with respect to Defendants' Ninth Defense under 28 U.S.C. § 1498(a) set forth above in Paragraph 3a [D.I. 697, 698]. While the Parties have agreed to the amounts of money owed by Defendants to Plaintiffs upon various dispositions of such an appeal, their dispute concerning the Defendants' Ninth Defense remains a definite and concrete dispute touching the Parties' adverse legal interests.

5. The Parties shall bear their own fees and costs in connection with this litigation, including attorneys' fees.

6. This Court shall retain jurisdiction of this litigation and over the Parties for purposes

of enforcement of the provisions of this Consent Judgment and Order.


/s/ Nathan R. Hoeschen
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorney for Plaintiffs*

/s/ Travis J. Murray
Brian P. Egan (No. 6227)
Travis J. Murray (No. 6882)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
tmurray@morrisnichols.com
*Attorneys for Defendants*

Dated: March 3, 2026


**BY THE COURT:**


March 4, 2026
Date

/s/ Joshua D. Wolson
JOSHUA D. WOLSON, J

4

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

STATE OF TEXAS and
STATE OF OKLAHOMA ,

          Plaintiffs,

v.

EMANUEL McCRAY, on behalf of
himself and all other similarly situated,

          Intervenor
          Plaintiff,

v.                          Civ. A. No. 4:23-cv-00066-Y

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.,

          Defendants.

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

LEIGHA SIMONTON
UNITED STATES ATTORNEY

s/ *Marti Cherry*
Mary M. (Marti) Cherry
Assistant United States Attorney
Texas Bar No. 24055299
1100 Commerce Street
Third Floor
Dallas, Texas 75242
Telephone: 214-659-8600
Facsimile: 214-659-8807
E-mail: mary.cherry@usdoj.gov
*Attorneys for Defendants*

## TABLE OF CONTENTS

I.     Introduction..........................................................................................................1

II.     Background..........................................................................................................2

    A.     HHS proposes five definitions of a "public health emergency," three
        of which refer to determinations made by the WHO or WHO
        officials. ....................................................................................................3

    B.     HHS quarantines thousands of individuals from Wuhan, China in
        response to the risks associated with the COVID-19 pandemic........................5

    C.     The States submit a petition of proposed rulemaking. ......................................5

    D.     The States sue HHS under the APA. .................................................................6

III.     Legal Standards....................................................................................................7

IV.     Argument and Authorities ...................................................................................8

    A.     The States lack standing to challenge the definition of a public health
        emergency related to the quarantine of individuals...........................................8

        1.     The States have not shown a concrete injury that is traceable to
            HHS's definition of a public health emergency.........................................10

        2.     There is no injunctive relief that would redress any injury.........................13

    B.     Even if the States could establish standing, their claims fail as
        unripe. ..............................................................................................................15

    C.     Even if the States could establish standing, they cannot establish that
        the definition of public health emergency to isolate or quarantine
        individuals is arbitrary or capricious. ..............................................................17

        1.     In response to the States' petition, HHS articulated a satisfactory
            explanation for its denial of the petition regarding definitions of a
            public health emergency...............................................................................19

        2.     HHS reasonably included multiple definitions of a public health
            emergency. ...................................................................................................21

V.     Conclusion .........................................................................................................22

## TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                    **<u>Page(s)</u>**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ............................................................................................... 9

*Casillas v. Madison Avenue Assocs., Inc.,*
    926 F.3d 329 (7th Cir. 2019) ................................................................................. 8

*Choice Inc. of Tex. v. Greenstein,*
    691 F.3d 710 (5th Cir. 2012) .......................................................................... 15–16

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ............................................................................................. 17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................................................ 8, 14

*Cmty. Fin. Services Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau,*
    51 F.4th 616 (5th Cir. 2022) ............................................................................... 18

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ............................................................................................. 7

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) .................................................................................... 17–18

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................................ 17

*Gulf Restoration Network v. McCarthy,*
    783 F.3d 227 (5th Cir. 2015) .......................................................................... 18–19

*Hawkins v. AT&T,*
    No. 3:12-CV-1173-L, 2013 WL 4505154 (N.D. Tex. Aug. 23, 2013) ................... 17

*In re Compl. of RLB Contracting, Inc.,*
    773 F.3d 596 (5th Cir. 2014) ................................................................................ 7

*Louisiana ex rel. Landry v. Biden,*
    *Lujan* No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022) .......................... 15

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................... 7–8, 14

*Machete Prods., LLC v. Page,*
    809 F.3d 281 (5th Cir. 2015) ............................................................................ 7

*Marshall Cnty. Health Care Auth. v. Shalala,*
    988 F.2d 1221 (D.C. Cir. 1993) .................................................................... 17

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ...................................................................................... 9

*Michigan v. EPA,*
    576 U.S. 743 (2015) ..................................................................... 17, 19, 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ..................................................................... 18, 20

*Nat'l Park Hospitality Ass'n v. DOI,*
    538 U.S. 803 (2003) ........................................................................... 16

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.,*
    45 F.4th 816 (5th Cir. Aug. 15, 2022) ........................................................ 8

*Ramming v. United States,*
    281 F.3d 158 (5th Cir. 2001) ....................................................................... 7

*Roark & Hardee LP v. City of Austin,*
    522 F.3d 533 (5th Cir. 2008) ..................................................................... 15

*Sierra Club v. U.S. Dep't of Interior,*
    990 F.3d 909 (5th Cir. 2021) ............................................................... 17–18

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ...................................................................................... 8

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019) ..................................................................... 13

*Tanzy v. Mayorkas,*
    No. 3:20-CV-3161-X-BH, 2021 WL 3625076 (N.D. Tex. July 20, 2021) ............ 17

*Texas v. United States,*
    523 U.S. 296 (1998) ..................................................................................... 16

*Texas v. United States,*
    50 F. 4th 498 (5th Cir. 2022) ........................................................................ 9

*Texas v. United States,*
    40 F. 4th 205 (5th Cir. 2022)..................................................................................... 9, 13

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ....................................................................................... 8–9, 14–15

*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981)............................................................................................ 7

**Statutes, Rules, and Other Authorities**

5 U.S.C. § 701(a)(1) ........................................................................................................ 18

5 U.S.C. § 701(a)(2) ........................................................................................................ 18

5 U.S.C. § 706(2)(A) ....................................................................................................... 17

42 U.S.C. § 264(a)........................................................................................................ 3, 12

42 U.S.C. § 264(d)............................................................................................................. 3

42 U.S.C. § 247d ............................................................................................................. 12

42 C.F.R. § 70.1...................................................................................................... 1, 10, 21

42 C.F.R. § 70.1(1)-(2)...................................................................................................... 4

42 C.F.R. § 70.1(3)-(5)............................................................................................. 1, 4, 10

42 C.F.R. § 70.2................................................................................................................. 3

42 C.F.R. § 70.6................................................................................................................. 5

42 C.F.R. § 71.23(a) .......................................................................................................... 5

42 C.F.R. § 71.33............................................................................................................... 5


Federal Rule of Civil Procedure 12(b)(1)...................................................................... 2, 7

Federal Rule of Civil Procedure 12(b)(6)......................................................................... 2

## I.    Introduction

Seeking to protect millions of individuals from the spread of a communicable disease, Defendant Health and Human Services (HHS) considered a plethora of scientific data both here and abroad when determining its response to the 2019 coronavirus disease (COVID-19).  COVID-19 is an easily transmissible, communicable disease that did not originate in the United States but rather migrated across the world, killing millions. Identifying, tracking, and analyzing the nature and scope of the pandemic was an international effort.  The federal government had previously promulgated regulations to respond to pandemics generally.  Federal regulations prescribed regulatory definitions of the term "public health emergency" and specified various steps that could be taken to protect residents from transmission of a communicable disease through quarantine measures.

Now, the States of Texas and Oklahoma (collectively, States) have demanded a new rulemaking, contending that the federal regulation, codified at 42 C.F.R. § 70.1 (§ 70.1), defining the phrase "public health emergency" as it relates to the isolation and quarantine of individuals is unlawful and/or unconstitutional.  The States argue that some of the definitions, by referring to international guidelines issued by organizations like the World Health Organization (WHO), unlawfully delegate public-health decisions to foreign nationals or international organizations and "potentially" permit the federal government to encroach on the property or person of the States' populations.  (Doc. 1, ¶ 21.)  The States object to three definitions of a public health emergency (§ 70.1(3)-(5)) that refer to the World Health Organization's (WHO) (collectively, three definitions).

Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 1

The States seek declaratory and injunctive relief against the "unlawful" three definitions of a communicable disease event.

The States' claims should be dismissed, however, because the States lack standing to bring these claims under the Administrative Procedure Act (APA). The States have identified no current or certainly impending injury that would be remedied by the requested rulemaking. The challenged definitions, by their very nature and in this context, identify an existing circumstance and operate as a predicate to action. But none of the definitions (including the three definitions) prescribe that HHS or the Centers for Disease Control and Prevention (CDC) take a certain action. Rather, other statutes and regulations authorize actions, not the regulatory definitions. Nor have the States identified any harm or a substantial risk of harm from the three definitions, as they must, to establish standing to sue the government. Any dispute is not ripe because Plaintiffs' claims are entirely speculative and based on the premise that HHS may take some action in response to a future pandemic. And even if the States had identified a justiciable controversy, the States cannot show that HHS's decision not to initiate a new rulemaking was arbitrary or capricious in violation of the APA. Defendants move to dismiss all claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6).

## II.    Background

Section 361 of the Public Health Service Act of 1944 ("PHSA") authorizes HHS "to make and enforce such regulations as in [the Secretary's] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign

countries into the States or possessions, or from one State or possession into any other State or possession."[1]  42 U.S.C. § 264(a).  The CDC Director implements this authority through regulations at 42 C.F.R. part 70 (interstate) and part 71 (foreign) and permits the CDC to act when state or local control is inadequate.  *See* Control of Communicable Diseases, 82 Fed. Reg. 6890, 6892 (Jan. 17, 2017); 42 C.F.R. § 70.2.  If a public health emergency exists, HHS is statutorily permitted to isolate and examine individuals moving or about to move from one U.S. State into another and "reasonably believed to be infected with a communicable disease in a qualifying stage" in order to prevent the spread of communicable disease within the United States.  42 U.S.C. § 264(d).

## A.  HHS proposes five definitions of a "public health emergency," three of which refer to determinations made by the WHO or WHO officials.

In August 2016, HHS published a Notice of Proposed Rulemaking (81 FR 53240), proposing new definitions of the term "public health emergency" as used in Part 70 of Title 42, which is related to interstate quarantine in the public health context.  (Doc. 1-3, at 2.)  HHS felt it was important to define "public health emergency" as used under section 361(d)(2) to provide the public with a clear understanding of HHS/CDC's authority for interstate quarantine, isolation or conditional release.  (Doc. 1-3 at 2.)

Two subsections of the proposed rule would define "public health emergency" to

---

[1] Although the statute assigns this authority to the Surgeon General, Reorganization Plan No. 3 of 1966 transferred all statutory powers and functions from the Surgeon General to the Secretary of Health, Education, and Welfare, now the Secretary of Health and Human Services, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966), *see also* An Act to Establish a Dep't of Educ., Pub. L. No. 96-88, § 509, 93 Stat. 695 (October 17, 1979) (codified at 20 U.S.C. 3508(b)).  Although the Office of the Surgeon General was later re-established, the Secretary retains these authorities.

include a communicable disease event determined by the Director of the CDC or the Secretary of HHS, respectively. 42 C.F.R. § 70.1(1)-(2). The last three subsections define "public health emergency" to mean a communicable disease event that is notified to an international organization (WHO), is determined by the Director-General of WHO, or for which the Director-General of WHO has issued recommendations to prevent or detect communicable disease events. *Id.* at § 70.1(3)-(5).

HHS requested public comment on the definition of public health emergency. (Doc. 1-3, at 1-2.) In its final rule published on January 19, 2017, HHS explained that public health emergency used in Section 361(a) of the Public Health Services Act differs from how the term is used in other provision of the PHSA because it could be used to isolate and examine specific individuals (those in the precommunicable stage of a quarantinable communicable diseases) if the disease was likely to cause a public health emergency (82 Fed. Reg. 6905 Jan. 19, 2017). (Doc. 1-3, at 2-3.) HHS believed it necessary to define public health emergency because it "is a statutory prerequisite to the apprehension and examination of individuals in the precommunicable state of a quarantinable communicable disease." (Doc. 1-3 at 3.) In the 2017 Final Rule, HHS considered and rejected comments expressing concerns that references to WHO relinquished U.S. sovereignty, explaining that HHS and/or the CDC would continue to make its own decisions regarding when a quarantinable communicable disease may be likely to cause a public health emergency and when it would apprehend or detain individuals. (Doc. 1-3, at 3.)

Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 4

**B.    HHS quarantines thousands of individuals from Wuhan, China in response to the risks associated with the COVID-19 pandemic.**

In response to COVID-19, HHS later repatriated approximately 1,100 individuals who had been in Wuhan, China or who had been onboard the *Diamond Princess* cruise ship in Yokohama, Japan, and quarantined them in the United States for 14 days. (Doc. 1-3, at 3.) HHS later quarantined another 2,000 individuals who were onboard the *Grand Princess* cruise ship in San Francisco, California. (Doc. 1-3, at 4.) HHS relied on various regulations to detain these individuals, including 42 C.F.R. §§ 70.6, 71.23(a), and 71.33.

**C.    The States submit a petition of proposed rulemaking.**

On July 18, 2022, more than five years after publication of the final rule, various States submitted a petition to amend that definition.[2] (Doc. 1-2.) However, HHS considered and rejected the petition. (Doc. 1-3.) HHS explained that the language and structure of the regulations (finalized in 2017) and agency practice in implementing its regulations were carried out subject to HHS/CDC's independent judgment. (Doc. 1-3 at 3.) HHS also rejected the States' concerns regarding purported political influence on the WHO's decision-making as a reason to remove the three definitions of public health emergency. (*Id.* at 4.) While the WHO developed International Health Regulations, those regulations had not been fully implemented by various nations. (*Id.*) Although the United States consulted with the WHO regarding international regulations, international

---

[2] Numerous States joined the petition for rulemaking (Doc. 1-3, at 1, n.1), but only Texas and Oklahoma filed this suit.

regulations do not provide the WHO with enforcement powers and do not authorize WHO to interfere in the United States' internal decision-making process. (*Id.* at 4–5.) Claims that the international regulations diminished U.S. sovereignty "are false." (*Id.* at 5.) HHS also addressed and rejected the States' allegation that HHS/CDC would not be harmed by deleting the three definitions because the definitions were important for the public and an expenditure of agency resources to amend the definitions was not justified. (*Id.* at 6.)

## D.   The States sue HHS under the APA.

This lawsuit has followed. In a four-count complaint, the States bring claims against Defendants under APA seeking declaratory and injunctive relief. (Doc. 1, at 2.) The States assert that HHS's definition of public health emergency authorizes HHS to act solely on decisions of the Director of the WHO or member states, improperly delegates decisions regarding public health emergencies to WHO or members of WHO, and "potentially permits the federal government to encroach" or infringe upon State sovereignty in violation of the Constitution.[3] (Doc. 1, ¶¶ 2, 17, 21, 67-75 (Count 4).) The States aver that HHS refused to adequately answer their petition for rulemaking

---

[3] The States oppose the definition of public health emergency as an "unlawful regulation." (Doc. 1, at ¶ 17.) According to the States, "the existing definitions [of public health emergency] exceed HHS's authority by unlawfully delegating their decisions to foreign nations or international organizations, absent express permission from Congress." (Doc. 1, at ¶ 24.) The States contend that WHO allows political factors to influence its health determinations and WHO was subject to politically-based manipulation in handling the COVID pandemic. (*Id.*) At various times, the States also claim that federal *statutes* and regulations "permit the federal government to encroach on State property and detain State Personnel in public health emergencies." (Doc. 1, at ¶ 20.) However, the States do not appear to challenge relevant statutes but only the regulatory definition of public health emergency. (Doc. 1 at 18.)

related to these definitions. (Doc. 1, ¶¶ 2, 35-46, (Counts 1).) They also contend that HHS's refusal to repeal the definition of public health emergency is arbitrary and capricious. (Doc. 1, at ¶¶ 47-66) (Counts 2-3).) They ask the Court to set aside the three alleged unlawful definitions. (Doc. 1, ¶ 75, Prayer for Relief, at 18.) Alternatively they ask the Court to grant the petition for rule-making, or alternatively, remand their petition for rulemaking for an adequate response to that petition. (Doc. 1, at 18.)

### III.    Legal Standards

The States' claims should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). "Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). To survive a Rule 12(b)(1) motion, a plaintiff bears the burden to establish a court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted). "[I]n examining a Rule 12(b)(1) motion, a district court is empowered to find facts as necessary to determine whether it has jurisdiction." *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015). Accordingly, "the district court may consider evidence outside the pleadings and resolve factual disputes." *In re Compl. of RLB Contracting, Inc.*, 773 F.3d 596, 601 (5th Cir. 2014); *see also Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (on a Rule 12(b)(1) motion, a district court is "free to weigh the evidence and satisfy itself . . . of its power to hear the case") (citation omitted.)

**Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 7**

## IV.    Argument and Authorities

**A.    The States lack standing to challenge the definition of a public health emergency related to the quarantine of individuals.**

Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The law of Article III standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

To establish Article III standing to resolve a case or controversy, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560–561). If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve. *TransUnion*, 141 S. Ct. at 2203 (citing *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). "Article III standing requires a concrete injury even in the context of a statutory violation," regardless of whether a statutory right is procedural or substantive. *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 823 (5th Cir. Aug. 15, 2022) (quoting *TransUnion*, 141 S. Ct at 2205). Legal infractions alone do not constitute concrete harm for the purpose of standing. *TransUnion*, 141 S. Ct. at 2205 ("[U]nder Article III, an injury in law is not an injury in fact."). "No concrete harm, no standing."

Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 8

*Id.* at 2200.

Despite "special solicitude" given to States, they too must prove "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" [4] *Texas v. United States* (*Texas INS Enforcement*), 40 F. 4th 205, 215–16 (5th Cir. 2022) (citations omitted); *see also Texas v. United States* (*Texas DACA*), 50 F. 4th 498, 513 (5th Cir. 2022).

The States challenge HHS's regulatory definition of public health emergency. They argue that three of the five definitions are unlawful because they improperly delegate the United States' or States' authority to foreign nations or international organizations. (Doc. 1, ¶¶ 35–59) (Counts 1, 2).) But the States have not alleged an injury that is "'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *See Texas INS Enforcement*, 40 F. 4th at 215–16. Nor have the States identified an imminent or substantial risk of harm. *See TransUnion*, 141 S. Ct. at 2210. The States cannot show that the three definitions of a public health emergency that reference WHO are traceable to any harm or even a risk of harm to the States that would support standing.

---

[4] The Fifth Circuit has held that "special solicitude" has two requirements: (1) the State must have a procedural right to challenge the action, and (2) the challenged action must affect one of the State's quasi sovereign interests. *Texas DACA*, 50 F. 4th at 514. The Complaint identifies a "quasi-sovereign interest in the health and well-being of their residents against unlawfully intrusive action delegation," (¶ 22), but does not identify what that speculative action may be nor how it would impact the health and well-being of Plaintiffs' residents. In any event, "it is no part" of a State's "duty or power to enforce [its residents'] rights in respect of their relations with the Federal Government," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607, 610 n.16 (1982) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)).

**1.    The States have not shown a concrete injury that is traceable to HHS's definition of a public health emergency.**

Plaintiffs cannot show that the challenged definition has been or will be used in a way that causes a concrete harm. Section 70.1, which includes five definitions, explains what the term "public health emergency" means. 42 C.F.R. § 70.1 Each of the five definitions is accompanied by an "or," meaning that each of the five definitional predicates may establish a "public health emergency." The States' umbrage is directed toward the last three definitions, which identify a public health emergency as a communicable disease event (3) which is notified to the World Health Organization as one that may constitute a public health emergency, (4) which is determined by the World Health Organization to constitute a public health emergency, or (5) which WHO has issued temporary or standing recommendations to prevent or detect the communicable disease. 42 C.F.R. § 70.1(3)-(5).

All of these definitions assist HHS in determining whether a public health emergency from a communicable disease actually exists. And, as HHS previously advised (Doc. 1-3, at 4), these regulatory definitions inform the public of what HHS *may* consider when determining whether a public health emergency exists. The three definitions recognize that the WHO may determine that a communicable disease event may occur or has occurred. But the existence of a public health emergency from a communicable disease, as defined in Section 70.1, does not authorize any action—even if it is a predicate to action. A communicable disease *may* be a threat or a concern to public health (anywhere)—and it *may* spread. For example, a communicable disease event

Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 10

determined by WHO may be a threat or concern to a population or a subset of a population in another country or on another continent, but that disease event may not be a concern to the United States and may not spread to the United States. Each definition contained in the regulation is but one tool or measure to identify a communicable disease of which HHS may take note and if concerned, may take action. Plaintiffs incorrectly attempt to characterize these definitions as an automatic trigger to the exercise of HHS's and CDC's authority, such that a decision made by WHO about any number of public health situations in the world would somehow compel HHS or CDC to declare a public health emergency in the United States.

Moreover, the 2017 Final Rule makes clear that federal isolation and quarantine events are expected to be rare events, with the 2017 Final Rule estimating CDC might issue 1-2 quarantine or isolation orders in any given year, and that these orders would be issued to an individual and on a temporary basis. *See* 82 Fed. Reg. at 6916 ("CDC notes that historically, the issuance of Federal orders is rare (*i.e.*, one to two orders issued per year). The fact that the recent COVID-19 pandemic was an unprecedented public health situation requiring CDC to exercise its quarantine/isolation authority in no way foretells an increase in the frequency of such public health events or any change in the Government's approach to the use of this extraordinary authority. It also bears noting that the public health emergency declarations issued (and renewed multiple times) in response to the COVID-19 pandemic never relied on a determination by WHO as a justification; for instance, the first declaration noted confirmed cases in the United States, and the most recent renewal noted the continued consequences of the COVID-19

Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 11

pandemic.[5]

Other statutes and regulations provide discretionary authority to HHS/CDC to take action. For example, 42 U.S.C. § 247d explains that "if the Secretary determines . . . that a disease or disorder present a public health emergency, . . . the Secretary *may* take such action as may be appropriate to respond to the public health emergency." (emphasis added). A different statute, 42 U.S.C. § 264(a), permits the Secretary "to make and enforce such regulations as *in his judgment* are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the Sates or possessions, or from one State or possession into any other State or Possession." (emphasis added). These statutes provide discretionary authority to the Secretary to respond to a "public health emergency."

Even if the States disagree with one or more definitions of public health emergency related to quarantine of individuals, the three definitions do not trigger any action that would or could pose a harm or even a risk of harm to the States. The definitions do not identify the scope or the exigency of a threat, the harm that may occur, or the steps that should be taken—let alone direct HHS or CDC to act. While the definitions may be a predicate to action by HHS/CDC, the definitions that identify a

---

[5] *See* Determination That a Public Health Emergency Exists (Jan. 31, 2020) ("*As a result of confirmed cases* of 2019 Novel Coronavirus (2019-nCov) . . . .) (emphasis added), *available at* https://aspr.hhs.gov/legal/PHE/Pages/2019-nCoV.aspx; *see also* Renewal of Determination That a Public Health Emergency Exists As a Result of the Continued Consequences of the Coronavirus Disease 2019 (COVID-19) Pandemic, (Feb. 9, 2023) ("*As a result of the continued consequences of the Coronavirus Disease 2019 (COVID-19) pandemic* and to allow for an organized and coordinated transition from this unprecedented public health emergency . . . .) (emphasis added), *available at* https://aspr.hhs.gov/legal/PHE/Pages/COVID19-9Feb2023.aspx.

public health emergency do not require any action. The States' abstract disagreement with part of a definition that may or may not be used in the future is not a concrete injury to a sovereign interest. Plaintiffs certainly cannot show that such speculative and unspecified future action is causing "certainly impending" harm to the States' interest.

The States cannot trace an injury from the definition of a public health emergency to their interest in the well-being of their populations where the definitions themselves do not authorize HHS to act and do not intrude upon the States' ability to act. In sum, no concrete, particularized, actual or imminent harm fairly traceable to the challenged action (three definitions of a public health emergency) has been shown to support standing. *See Texas INS Enforcement*, 40 F. 4th at 215–16.

### 2.    There is no injunctive relief that would redress any injury.

The States also have not shown that they have suffered a concrete harm or face a certainly impending future concrete harm, and thus, injunctive relief will not redress any injury. Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements. *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). Plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. *Id.* That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact. *Id.* To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else, (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.' *Id.* at 721. "[F]uture harm can satisfy the concrete-harm requirement

Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 13

. . . so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210.

The Supreme Court has repeatedly held that "[a]llegations of possible future injury are not sufficient;" rather, any threatened injury must be "certainly impending" to constitute injury in fact. *Clapper*, 568 U.S. at 409; *see also Lujan*, 504 U.S. at 564 n.2. The purpose of the requirement that the injury be "imminent" is "to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper*, 568 U.S. at 409; *see also TransUnion*, 141 S. Ct. at 2212 (finding that the risk of dissemination of information to third parties was too speculative to support Article III standing).

Here, the States have not shown any past or future injury that is redressable by this Court. The definitions of a public health emergency do not compel HHS to take any action to prevent the spread of communicable diseases or impede the right of the States to identify and respond to a public health emergency. The definitions may inform HHS (and the public) of what constitutes a public health emergency either in this country or abroad, but the definitions themselves do not authorize any action by HHS or establish a concrete harm that is redressable here.

The States also have not shown any *concrete* harm because they appear to speculate that a sequence of events *may* occur as a result of the three definitions at issue: (a) that HHS may *disagree* with WHO that an event involving a communicable disease has occurred *but* (2) relying *solely* on the WHO's determination that a public health emergency exists (and not its own independent analysis that such emergency exists), HHS would take action to contain or address the communicable disease, *and* (3) HHS's

determination of what action to take would infringe on the State's right to take actions to protect its populations from HHS's response to that public health emergency. Texas does not allege any facts that suggest that this sequence of events actually occurred, is likely to occur, or is imminent.

The States also have not identified a substantial harm to the States from the definition of public health emergency, even if this sequence actually did or would occur. The States have not pointed to any action by HHS as a result of the definitions that actually infringed on their sovereignty or rights. The States aver that the definitions are unlawful—but this allegation is an injury in law, not an injury in fact. *See TransUnion*, 141 S. Ct at 2205. Layers of speculation do not establish any harm that would conceivably support standing or a request for injunctive relief. *See Louisiana ex rel. Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *2 (5th Cir. Mar. 16, 2022) (finding government defendants were likely to succeed on the merits because the plaintiff States lacked standing where plaintiff States failed to meet their burden on causation and redressability). The States' claims should be dismissed for lack of standing.

**B.    Even if the States could establish standing, their claims fail as unripe.**

"[A] ripeness inquiry is often required when a party is seeking pre-enforcement review of a law or regulation." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 544 (5th Cir. 2008). "The ripeness doctrine's 'basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . .'" *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012); *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 807 (2003). "A court should

**Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 15**

dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical," and "the key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' *Choice Inc. of Tex*, 691 F.3d at 715. A claim is not ripe if it is "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations omitted).

Here, the challenged portions of the definition do not create any legal rights or obligations, and Plaintiffs' claim rests on potential future interpretations and application of the public health emergency definitions, which could conceivably be one precondition for possible future interstate quarantine actions. The validity of such actions would depend on a host of factual circumstances not available to the Court at this time, including to what extent the agency relied on the challenged portions of the definitions and whether such reliance was accompanied by independent judgment, as well as whether the other prerequisites for quarantine orders were met. Thus, the issues are not fit for judicial review at this time, and would benefit from further factual development. Even if a purely legal issue were presented, however, Plaintiffs would still have to show some hardship in order to establish ripeness. *Choice Inc. of Tex*, 691 F.3d at 715. This they cannot do. The States are not conceivably suffering any hardship as a result of the existence of a definition with which they disagree. The Court should dismiss these claims as unripe.

**C.  Even if the States could establish standing, they cannot establish that the definition of public health emergency to isolate or quarantine individuals is arbitrary or capricious.**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."[6] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). The APA requires agencies to engage in "reasoned decisionmaking", and directs that agency actions be "set aside" if they are "arbitrary" or "capricious." *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 750 (2015); 5 U.S.C. § 706(2)(A)). Under this "narrow standard of review," a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (internal quotation marks omitted)); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021). Although the APA establishes a basic presumption of review for legal wrongs due to agency action, the presumption can be rebutted by a showing that the

---

[6] Generally speaking, judicial review of agency action proceeds on the basis of an administrative record, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1977), and if this matter proceeds to summary judgment, the agency will compile and certify the administrative record for the denial of the rulemaking petition. At the Motion to Dismiss stage, the Court may take judicial notice of key documents from the administrative record. *See, e.g., Hawkins v. AT&T*, No. 3:12-CV-1173-L, 2013 WL 4505154, at *3 (N.D. Tex. Aug. 23, 2013) ("Documents contained in a Title VII administrative record are public records for which the court can take judicial notice and consider in a motion to dismiss."); *Tanzy v. Mayorkas*, No. 3:20-CV-3161-X-BH, 2021 WL 3625076, at *3 (N.D. Tex. July 20, 2021) (considering agency documents attached to complaint), report and recommendation adopted, No. 3:20-CV-03161-X-BH, 2021 WL 3618109 (N.D. Tex. Aug. 16, 2021); *see also Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (holding that the district court "can consult" the administrative record to answer the legal questions before the court even on a motion to dismiss).

relevant statute "preclude[s]" review, § 701(a)(1), or that the "agency action is committed to agency discretion by law," § 701(a)(2). *Dep't of Homeland Sec.*, 140 S. Ct. at 1905.

The scope of review under the "arbitrary and capricious" standard is narrow and highly deferential. *Sierra Club*, 990 F.3d at 913. A court is not to substitute its judgment for that of the agency. *Id.* Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider,[7] entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.* The court may nevertheless uphold an agency's decision of "less than ideal clarity if the agency's path may reasonably be discerned." *Sierra Club*, 990 F.3d at 913 (citations omitted). An agency's denial of a petition for rulemaking may be reviewable agency action, but "as a substantive matter, such review is 'extremely limited' and 'highly deferential.'" *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 234 (5th Cir. 2015); *see also Cmty. Fin. Servs. Ass'n of Am. v. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 630 n.4 (5th Cir. 2022).

---

[7] The States do not point to any authority that Congress does not intend for HHS to consider any data or decisions by international bodies who also assess whether a public health emergency from a communicable disease exists outside U.S. borders.

**Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 18**

1.      **In response to the States' petition, HHS articulated a satisfactory explanation for its denial of the petition regarding the three definitions of a public health emergency.**

HHS reasonably did not initiate new rulemaking, engaged in "reasoned decisionmaking" when including all five definitions of public health emergency, and explained its reasoning in denying the States' Petition for Rulemaking.[8] *See Michigan*, 576 U.S. at 750; *Gulf Restoration Network*, 783 F.3d at 234. The States served a Petition for Rulemaking, regarding HHS's definitions of public health emergency, challenging the inclusion of the three definitions as an "unlawful delegation" of its judgment. (Doc. 1-2 at 1–6.) Responding to that petition, HHS explained that the purpose of the new definitions was to provide the public with a clear understanding of HHS's authority for interstate quarantine, isolation, or conditional release as set forth in other regulations. (Doc. 1-3, at 2–3.) In addition, inclusion of references to WHO was not based on political considerations but was intended "to inform the public of the circumstances that HHS/CDC may consider when determining a public health emergency exists." (Doc. 1-3 at 4, 6.) Given the lessons learned during the COVID-19 pandemic, HHS believed it was important to reference WHO to increase transparency, improve rapid pathogen information sharing, and build strong response coordination. (Doc. 1-3 at 4.) In addition, the exercise of authority (which is not contained within the definitions) is found in other

---

[8] To the extent the Court finds the definitions of public health emergency constitute rule making, the Court may find that the agency's denial of a petition for rule making is presumptively reviewable. *Gulf Restoration Network*, 783 F.3d at 235. However, because the States have not established standing and the agency's decision to include all definitions are reasonable, the States' request to remand for a response to their petition for rule making should be denied and the claims dismissed.

Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 19

regulations, including 42 C.F.R. Part 70 governing the isolation of individuals with quarantinable communicable diseases.[9] (Doc. 1-3, at 3.)

HHS specifically considered and expressly rejected the States' concern (reiterated here) that references to the WHO implicate U.S. sovereignty. (Doc. 1-3, at 3.) Thus, this is not a situation where a federal agency "entirely failed to consider an important aspect of the problem." *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. 29 at 43. HHS explained that it had and would continue to make its own independent decisions regarding when a quarantinable communicable disease may be likely to cause a public health emergency if transmitted to other individuals. (Doc. 1-3, at 3.) HHS also noted that agency practice since 2017 (during the COVID-19 pandemic) was consistent with HHS exercising its own independent judgment as to when and how to take action and quarantine individuals.[10] (*Id.* at 3–4.) As HHS explained, the "language and structure of the regulations, as well as the agency's practice" implementing those regulations, belies any contention that unlawful delegation occurred. (Doc. 1-3 at 4.) Instead, "apprehension and quarantine determinations are only carried out subject to the CDC Director's independent judgment." (*Id.*) HHS thus reasonably concluded that the

---

[9] For example, federal quarantine orders "must identify the individuals or groups to be quarantined, the location of the quarantine, explain the factual basis for the Director's reasonable belief that the individual is in the qualifying stage of the disease, explain the factual basis for the Director's reasonable belief that the individual is moving or about to move from one U.S. State into another or otherwise constitutes a probable source of infection to other individuals moving between U.S. States, explain that the order will be reassessed within 72 hours, and notify the individual of the opportunity for an agency medical review, as well as the potential for criminal penalties if non-compliant." (Doc. 1-3 at 3.)

[10] HHS provided two concrete examples with regard to quarantining passengers on two ships based on the Secretary's determination that COVID-19 constituted a public health emergency.

burdens of a new rulemaking were unwarranted under the circumstances.

HHS articulated clear reasons why it included the three definitions of a public health emergency in § 70.1. The States have not shown that the agency did not engage in reasoned decisionmaking—even if the States disagree with HHS's reasoning or ultimate conclusion—under the highly deferential standard for denial of a Petition for Rulemaking.

### 2. HHS reasonably included multiple definitions of a public health emergency.

And finally, it must be noted that the process by which HHS reached the definition is logical and rational. *See Michigan*, 576 U.S. at 750. The definitions merely explain what a public health emergency means. Having multiple definitions provides alternative measures for HHS to determine whether a public health emergency exists because of a communicable disease event. Considering multiple organizations' (or officials') views of a public health emergency gives HHS more data points, more facts, and more evidence to consider when deciding whether to take discretionary action. Including various definitions from other entities is particularly reasonable in this context because of the difficulty in identifying a public health emergency in the first place, especially where the communicable disease being considered does not originate in the United States, as with COVID-19. A determination that a public health emergency exists is based upon the nature of the threat, the source of the threat, the scope of the threat (how wide-spread, how it is communicated, how quickly it is communicated) and the effect of that condition on various populations (confined to one type of population, all populations, etc.). The

Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief – Page 21

nature of the communicable disease itself may change both within and outside the United States, which may also inform HHS whether the potential for an emergency or existence of an emergency is waxing or waning. Multiple definitions (including the three definitions) are used by HHS as a guide to identify the threat—that may be exploding and impacting populations outside the United States even if it has not yet reached the United States. HHS promulgated multiple definitions of a public health emergency in manner that is transparent and takes into account the cross-border transmission of a communicable disease.

Even if HHS considers or relies upon the three definitions to determine that a health emergency exists, other statutes provide discretion for HHS to independently determine what action to take.[11] No decisions or actions are delegated beyond the federal government. The definitions only identify and explain what a public health emergency means. The three definitions, in particular, merely identify when an international organization believes a public health emergency exists as something HHS or the CDC may, but need not, consider. HHS's definitions of a public health emergency are logical and rational and do not violate the APA.

## V.     Conclusion

The States have not established standing to challenge HHS's definitions and their claims are not actually ripe. All of the States' claims against HHS should be dismissed

---

[11] The myriad assumptions on which the States conclusions rest do not establish that the agency's definitions of public health emergency violate the APA.

for lack of subject matter jurisdiction. Even if they have standing, HHS reasonably

denied the State's Petition for Rulemaking with reasons, and HHS's definitions are not

arbitrary or capricious. The States' complaint should be dismissed in its entirety.


Dated: March 27, 2023


Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

s/ *Marti Cherry*_____
Mary M. (Marti) Cherry
Assistant United States Attorney
Texas Bar No. 24055299
1100 Commerce Street
Third Floor
Dallas, Texas 75242
Telephone: 214-659-8600
Facsimile: 214-659-8807
E-mail: mary.cherry@usdoj.gov
*Attorneys for Defendants*

Certificate of Service

On March 27, 2023, I electronically submitted the foregoing document with the

clerk of court for the U.S. District Court, Northern District of Texas, using the electronic

case filing system of the court.  I hereby certify that I have served all parties

electronically or by another manner authorized by Federal Rule of Civil Procedure

5(b)(2).

*s/ Mary M. (Marti) Cherry*
Mary M. (Marti) Cherry
Assistant United States Attorney

# EXHIBIT 18



THE WHITE HOUSE

WASHINGTON

May 18, 2020

His Excellency
Dr. Tedros Adhanom Ghebreyesus
Director-General of the World Health Organization
Geneva, Switzerland

Dear Dr. Tedros:

On April 14, 2020, I suspended United States contributions to the World Health Organization pending an investigation by my Administration of the organization's failed response to the COVID-19 outbreak. This review has confirmed many of the serious concerns I raised last month and identified others that the World Health Organization should have addressed, especially the World Health Organization's alarming lack of independence from the People's Republic of China. Based on this review, we now know the following:

- The World Health Organization consistently ignored credible reports of the virus spreading in Wuhan in early December 2019 or even earlier, including reports from the Lancet medical journal. The World Health Organization failed to independently investigate credible reports that conflicted directly with the Chinese government's official accounts, even those that came from sources within Wuhan itself.

- By no later than December 30, 2019, the World Health Organization office in Beijing knew that there was a "major public health" concern in Wuhan. Between December 26 and December 30, China's media highlighted evidence of a new virus emerging from Wuhan, based on patient data sent to multiple Chinese genomics companies. Additionally, during this period, Dr. Zhang Jixian, a doctor from Hubei Provincial Hospital of Integrated Chinese and Western Medicine, told China's health authorities that a new coronavirus was causing a novel disease that was, at the time, afflicting approximately 180 patients.

- By the next day, Taiwanese authorities had communicated information to the World Health Organization indicating human-to-human transmission of a new virus. Yet the World Health Organization chose not to share any of this critical information with the rest of the world, probably for political reasons.

- The International Health Regulations require countries to report the risk of a health emergency within 24 hours. But China did not inform the World Health Organization of

Wuhan's several cases of pneumonia, of unknown origin, until December 31, 2019, even though it likely had knowledge of these cases days or weeks earlier.

- According to Dr. Zhang Yongzhen of the Shanghai Public Health Clinic Center, he told Chinese authorities on January 5, 2020, that he had sequenced the genome of the virus. There was no publication of this information until six days later, on January 11, 2020, when Dr. Zhang self-posted it online. The next day, Chinese authorities closed his lab for "rectification." As even the World Health Organization acknowledged, Dr. Zhang's posting was a great act of "transparency." But the World Health Organization has been conspicuously silent both with respect to the closure of Dr. Zhang's lab and his assertion that he had notified Chinese authorities of his breakthrough six days earlier.

- The World Health Organization has repeatedly made claims about the coronavirus that were either grossly inaccurate or misleading.

  - On January 14, 2020, the World Health Organization gratuitously reaffirmed China's now-debunked claim that the coronavirus could not be transmitted between humans, stating: "Preliminary investigations conducted by the Chinese authorities have found no clear evidence of human-to-human transmission of the novel coronavirus (2019-nCov) identified in Wuhan, China." This assertion was in direct conflict with censored reports from Wuhan.

  - On January 21, 2020, President Xi Jinping of China reportedly pressured you not to declare the coronavirus outbreak an emergency. You gave in to this pressure the next day and told the world that the coronavirus did not pose a Public Health Emergency of International Concern. Just over one week later, on January 30, 2020, overwhelming evidence to the contrary forced you to reverse course.

  - On January 28, 2020, after meeting with President Xi in Beijing, you praised the Chinese government for its "transparency" with respect to the coronavirus, announcing that China had set a "new standard for outbreak control" and "bought the world time." You did not mention that China had, by then, silenced or punished several doctors for speaking out about the virus and restricted Chinese institutions from publishing information about it.

- Even after you belatedly declared the outbreak a Public Health Emergency of International Concern on January 30, 2020, you failed to press China for the timely admittance of a World Health Organization team of international medical experts. As a result, this critical team did not arrive in China until two weeks later, on February 16, 2020. And even then, the team was not allowed to visit Wuhan until the final days of their visit. Remarkably, the World Health Organization was silent when China denied the two American members of the team access to Wuhan entirely.

- You also strongly praised China's strict domestic travel restrictions, but were inexplicably against my closing of the United States border, or the ban, with respect to people coming from China. I put the ban in place regardless of your wishes. Your political gamesmanship on this issue was deadly, as other governments, relying on your

2

comments, delayed imposing life-saving restrictions on travel to and from China. Incredibly, on February 3, 2020, you reinforced your position, opining that because China was doing such a great job protecting the world from the virus, travel restrictions were "causing more harm than good." Yet by then the world knew that, before locking down Wuhan, Chinese authorities had allowed more than five million people to leave the city and that many of these people were bound for international destinations all over the world.

- As of February 3, 2020, China was strongly pressuring countries to lift or forestall travel restrictions. This pressure campaign was bolstered by your incorrect statements on that day telling the world that the spread of the virus outside of China was "minimal and slow" and that "the chances of getting this going to anywhere outside China [were] very low."

- On March 3, 2020, the World Health Organization cited official Chinese data to downplay the very serious risk of asymptomatic spread, telling the world that "COVID-19 does not transmit as efficiently as influenza" and that unlike influenza this disease was not primarily driven by "people who are infected but not yet sick." China's evidence, the World Health Organization told the world, "showed that only one percent of reported cases do not have symptoms, and most of those cases develop symptoms within two days." Many experts, however, citing data from Japan, South Korea, and elsewhere, vigorously questioned these assertions. It is now clear that China's assertions, repeated to the world by the World Health Organization, were wildly inaccurate.

- By the time you finally declared the virus a pandemic on March 11, 2020, it had killed more than 4,000 people and infected more than 100,000 people in at least 114 countries around the world.

- On April 11, 2020, several African Ambassadors wrote to the Chinese Foreign Ministry about the discriminatory treatment of Africans related to the pandemic in Guangzhou and other cities in China. You were aware that Chinese authorities were carrying out a campaign of forced quarantines, evictions, and refusal of services against the nationals of these countries. You have not commented on China's racially discriminatory actions. You have, however, baselessly labeled as racist Taiwan's well-founded complaints about your mishandling of this pandemic.

- Throughout this crisis, the World Health Organization has been curiously insistent on praising China for its alleged "transparency." You have consistently joined in these tributes, notwithstanding that China has been anything but transparent. In early January, for example, China ordered samples of the virus to be destroyed, depriving the world of critical information. Even now, China continues to undermine the International Health Regulations by refusing to share accurate and timely data, viral samples and isolates, and by withholding vital information about the virus and its origins. And, to this day, China continues to deny international access to their scientists and relevant facilities, all while casting blame widely and recklessly and censoring its own experts.

3

- The World Health Organization has failed to publicly call on China to allow for an independent investigation into the origins of the virus, despite the recent endorsement for doing so by its own Emergency Committee. The World Health Organization's failure to do so has prompted World Health Organization member states to adopt the "COVID-19 Response" Resolution at this year's World Health Assembly, which echoes the call by the United States and so many others for an impartial, independent, and comprehensive review of how the World Health Organization handled the crisis. The resolution also calls for an investigation into the origins of the virus, which is necessary for the world to understand how best to counter the disease.

Perhaps worse than all these failings is that we know that the World Health Organization could have done so much better. Just a few years ago, under the direction of a different Director-General, the World Health Organization showed the world how much it has to offer. In 2003, in response to the outbreak of the Severe Acute Respiratory Syndrome (SARS) in China, Director-General Harlem Brundtland boldly declared the World Health Organization's first emergency travel advisory in 55 years, recommending against travel to and from the disease epicenter in southern China. She also did not hesitate to criticize China for endangering global health by attempting to cover up the outbreak through its usual playbook of arresting whistleblowers and censoring media. Many lives could have been saved had you followed Dr. Brundtland's example.

It is clear the repeated missteps by you and your organization in responding to the pandemic have been extremely costly for the world. The only way forward for the World Health Organization is if it can actually demonstrate independence from China. My Administration has already started discussions with you on how to reform the organization. But action is needed quickly. We do not have time to waste. That is why it is my duty, as President of the United States, to inform you that, if the World Health Organization does not commit to major substantive improvements within the next 30 days, I will make my temporary freeze of United States funding to the World Health Organization permanent and reconsider our membership in the organization. I cannot allow American taxpayer dollars to continue to finance an organization that, in its present state, is so clearly not serving America's interests.

Sincerely,



4

# EXHIBIT 19



# MILITARY TRIBUNALS

## CASE NO. 1

## THE UNITED STATES OF AMERICA

— against —

KARL BRANDT, SIEGFRIED HANDLOSER, PAUL ROSTOCK, OSKAR SCHROEDER, KARL GENZKEN, KARL GEBHARDT, KURT BLOME, RUDOLF BRANDT, JOACHIM MRUGOWSKY, HELMUT POPPEN-DICK, WOLFRAM SIEVERS, GERHARD ROSE, SIEGFRIED RUFF, HANS WOLFGANG ROMBERG, VIKTOR BRACK, HERMANN BECKER - FREYSENG, GEORG AUGUST WELTZ, KONRAD SCHAE-FER, WALDEMAR HOVEN, WILHELM BEIGLBOECK, ADOLF POKORNY, HERTA OBERHEUSER, and FRITZ FISCHER.

Defendants

PROPERT⁙ ⸱⸱ ⸱⸱⸱ ᴺ⸱ ARMY
THE JUDGE ADVOCATE GENERAL'S SCHOOL LIBRARY

OFFICE OF MILITARY GOVERNMENT FOR GERMANY (US)
NUREMBERG 1946

## INDICTMENT

The United States of America, by the undersigned Telford Taylor, Chief of Counsel for War Crimes, duly appointed to represent said Government in the prosecution of war criminals, charges that the defendants herein participated in a Common Design or Conspiracy to commit and did commit War Crimes and Crimes against Humanity, as defined in Control Council Law No. 10, duly enacted by the Allied Control Council on 20 December 1945. These crimes included murders, brutalities, cruelties, tortures, atrocities, and other inhumane acts, as set forth in Counts One, Two, and Three of this Indictment. Certain defendants are further charged with membership in a Criminal Organization, as set forth in Count Four of this Indictment.

The persons accused as guilty of these crimes and accordingly named as defendants in this case are:

KARL BRANDT—Personal physician to Adolf Hitler; Gruppenführer in the SS and Generalleutnant in the Waffen SS (Major General); Reich Commissioner for Health and Sanitation (Reichskommissar für Sanitäts- und Gesundheitswesen); and member of the Reich Research Council (Reichsforschungsrat).

SIEGFRIED HANDLOSER—Generaloberstabsarzt (Lieutenant General, Medical Service); Medical Inspector of the Army (Heeres-Sanitätsinspekteur); and Chief of the Medical Services of the Armed Forces (Chef des Wehrmachtssanitätswesens).

PAUL ROSTOCK—Chief Surgeon of the Surgical Clinic in Berlin; Surgical Advisor to the Army; and Chief of the Office for Medical Science and Research (Amtschef der Dienststelle Medizinische Wissenschaft und Forschung) under the defendant Karl Brandt, Reich Commissioner for Health and Sanitation.

OSKAR SCHROEDER—Generaloberstabsarzt (Lieutenant General, Medical Service); Chief of Staff of the Inspectorate of the Medical Service of the Luftwaffe (Chef des Stabes, Inspekteur des Luftwaffe-Sanitätswesens); and Chief of the Medical Service of the Luftwaffe (Chef des Sanitätswesens der Luftwaffe).

KARL GENZKEN—Gruppenführer in the SS and Generalleutnant in the Waffen SS (Major General) and Chief of the Medical

3

Department of the Waffen SS (Chef des Sanitätsamts der Waffen SS).

KARL GEBHARDT—Gruppenführer in the SS and Generalleutnant in the Waffen SS (Major General); Personal physician to Reichsführer SS Himmler; Chief Surgeon of the Staff of the Reich Physician SS and Police (Oberster Kliniker, Reichsarzt SS und Polizei); and President of the German Red Cross.

KURT BLOME—Deputy Reich Health Leader (Reichsgesundheitsführer); and Plenipotentiary for Cancer Research in the Reich Research Council.

RUDOLF BRANDT—Standartenführer in the Allgemeine SS (Colonel); Personal Administrative Officer to Reichsführer SS Himmler (Persönlicher Referent von Himmler); and Ministerial Counsellor and Chief of the Ministerial Office in the Reich Ministry of the Interior.

JOACHIM MRUGOWSKY—Oberführer in the Waffen SS (Senior Colonel); Chief Hygienist of the Reich Physician SS and Police (Oberster Hygieniker, Reichsarzt SS und Polizei); and Chief of the Hygienic Institute of the Waffen SS (Chef des Hygienischen Institutes der Waffen SS).

HELMUT POPPENDICK—Oberführer in the SS (Senior Colonel); and Chief of the Personal Staff of the Reich Physician SS and Police (Chef des Persönlichen Stabes des Reichsarztes SS und Polizei).

WOLFRAM SIEVERS—Standartenführer in the SS (Colonel); Reich Manager of the "Ahnenerbe" Society and Director of its Institute for Military Scientific Research (Institut für Wehrwissenschaftliche Zweckforschung); and Deputy Chairman of the Managing Board of Directors of the Reich Research Council.

GERHARD ROSE—Generalarzt of the Luftwaffe (Brigadier General); Vice President, Chief of the Department for Tropical Medicine, and Professor of the Robert Koch Institute; and Hygienic Advisor for Tropical Medicine to the Chief of the Medical Service of the Luftwaffe.

SIEGFRIED RUFF—Director of the Department for Aviation Medicine at the German Experimental Institute for Aviation (Deutsche Versuchsanstalt für Luftfahrt).

HANS WOLFGANG ROMBERG—Doctor on the Staff of the Department for Aviation Medicine at the German Experimental Institute for Aviation.

VIKTOR BRACK—Oberführer in the SS (Senior Colonel) and Sturmbannführer in the Waffen SS (Major); and Chief Administrative Officer in the Chancellery of the Führer of the NSDAP (Oberdienstleiter, Kanzlei des Führers der NSDAP).

HERMANN BECKER-FREYSENG—Stabsarzt in the Luftwaffe (Captain, Medical Service); and Chief of the Department for Aviation Medicine of the Chief of the Medical Service of the Luftwaffe.

GEORG AUGUST WELTZ—Oberfeldarzt in the Luftwaffe (Lieutenant Colonel, Medical Service); and Chief of the Institute for Aviation Medicine in Munich (Institut für Luftfahrtmedizin).

KONRAD SCHAEFER—Doctor on the Staff of the Institute for Aviation Medicine in Berlin.

WALDEMAR HOVEN—Hauptsturmführer in the Waffen SS (Captain); and Chief Doctor of the Buchenwald Concentration Camp.

WILHELM BEIGLBOECK—Consulting Physician to the Luftwaffe.

ADOLF POKORNY—Physician, Specialist in Skin and Venereal Diseases.

HERTA OBERHEUSER—Physician at the Ravensbruck Concentration Camp; and Assistant Physician to the defendant Gebhardt at the Hospital at Hohenlychen.

FRITZ FISCHER—Sturmbannführer in the Waffen SS (Major); and Assistant Physician to the defendant Gebhardt at the Hospital at Hohenlychen.

## COUNT ONE — THE COMMON DESIGN OR CONSPIRACY

1. Between September 1939 and April 1945 all of the defendants herein, acting pursuant to a common design, unlawfully, wilfully, and knowingly did conspire and agree together and with each other and with divers other persons, to commit War Crimes and Crimes against Humanity, as defined in Control Council Law No. 10, Article II.

2. Throughout the period covered by this Indictment all of the defendants herein, acting in concert with each other and with others, unlawfully, wilfully, and knowingly were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving, the commission of War Crimes and Crimes against Humanity.

3. All of the defendants herein, acting in concert with others for whose acts the defendants are responsible unlawfully, wilfully, and knowingly participated as leaders, organizers, instigators, and accomplices in the formulation and execution of the said common design, conspiracy, plans and enterprises to commit, and which involved the commission of, War Crimes and Crimes against Humanity.

4. It was a part of the said common design, conspiracy, plans and enterprises to perform medical experiments upon concentration camp inmates and other living human subjects, without their consent, in the course of which experiments the defendants committed the murders, brutalities, cruelties, tortures, atrocities, and other inhumane acts, more fully described in Counts Two and Three of this Indictment.

5. The said common design, conspiracy, plans and enterprises embraced the commission of War Crimes and Crimes against Humanity, as set forth in Counts Two and Three of this Indictment, in that the defendants unlawfully, wilfully, and knowingly encouraged, aided, abetted, and participated in the subjection of thousands of persons, including civilians, and members of the armed forces of nations then at war with the German Reich, to murders, brutalities, cruelties, tortures, atrocities, and other inhumane acts.

## COUNT TWO — WAR CRIMES

6. Between September 1939 and April 1945 all of the defendants herein unlawfully, wilfully, and knowingly committed War Crimes, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving medical experiments without the subjects' consent, upon civilians and members of the armed forces of nations then at war with the German Reich and who were in the custody of the German Reich in exercise of belligerent control, in the course of which experiments the defendants committed murders, brutalities, cruelties, tortures, atrocities, and other inhumane acts. Such experiments included, but were not limited to, the following:

(A) HIGH ALTITUDE EXPERIMENTS. From about March 1942 to about August 1942 experiments were conducted at the Dachau Concentration Camp for the benefit of the German Air Force to investigate the limits of human endurance and existence at extremely high altitudes. The experiments were carried out in a low-pressure chamber in which the atmospheric conditions and pressures prevailing at high altitude (up to 68,000 feet) could be duplicated. The experimental subjects were placed in the low-pressure chamber and thereafter the simulated altitude therein was raised. Many victims died as a result of these experi-

6

ments and others suffered grave injury, torture, and ill treatment. The defendants Karl Brandt, Handloser, Schroeder, Gebhardt, Rudolf Brandt, Mrugowsky, Poppendick, Sievers, Ruff, Romberg, Becker-Freyseng, and Weltz are charged with special responsibility for and participation in these crimes.

(B) FREEZING EXPERIMENTS. From about August 1942 to about May 1943 experiments were conducted at the Dachau Concentration Camp primarily for the benefit of the German Air Force to investigate the most effective means of treating persons who had been severely chilled or frozen. In one series of experiments the subjects were forced to remain in a tank of ice water for periods up to three hours. Extreme rigor developed in a short time. Numerous victims died in the course of these experiments. After the survivors were severely chilled, rewarming was attempted by various means. In another series of experiments, the subjects were kept naked outdoors for many hours at temperatures below freezing. The victims screamed with pain as parts of their bodies froze. The defendants Karl Brandt, Handloser, Schroeder, Gebhardt, Rudolf Brandt, Mrugowsky, Poppendick, Sievers, Becker-Freyseng, and Weltz are charged with special responsibility for and participation in these crimes.

(C) MALARIA EXPERIMENTS. From about February 1942 to about April 1945 experiments were conducted at the Dachau Concentration Camp in order to investigate immunization for and treatment of malaria. Healthy concentration camp inmates were infected by mosquitoes or by injections of extracts of the mucous glands of mosquitoes. After having contracted malaria the subjects were treated with various drugs to test their relative efficacy. Over 1,000 involuntary subjects were used in these experiments. Many of the victims died and others suffered severe pain and permanent disability. The defendants Karl Brandt, Handloser, Rostock, Gebhardt, Blome, Rudolf Brandt, Mrugowsky, Poppendick, and Sievers are charged with special responsibility for and participation in these crimes.

(D) LOST (MUSTARD) GAS EXPERIMENTS. At various times between September 1939 and April 1945 experiments were conducted at Sachsenhausen, Natzweiler, and other concentration camps for the benefit of the German Armed Forces to investigate the most effective treatment of wounds caused by Lost gas. Lost is a poison gas which is commonly known as Mustard gas. Wounds deliberately inflicted on the subjects were infected with Lost. Some of the subjects died as a result of these experiments and others suffered intense pain and injury. The defendants Karl Brandt, Handloser, Blome, Rostock, Gebhardt, Rudolf Brandt, and Sievers are charged with special responsibility for and participation in these crimes.

7

(E) SULFANILAMIDE EXPERIMENTS. From about July 1942 to about September 1943 experiments to investigate the effectiveness of sulfanilamide were conducted at the Ravensbruck Concentration Camp for the benefit of the German Armed Forces. Wounds deliberately inflicted on the experimental subjects were infected with bacteria such as istreptococcus, gas gangrene, and tetanus. Circulation of blood was interrupted by tying off blood vessels at both ends of the wound to create a condition similar to that of a battlefield wound. Infection was aggravated by forcing wood shavings and ground glass into the wounds. The infection was treated with sulfanilamide and other drugs to determine their effectiveness. Some subjects died as a result of these experiments and others suffered serious injury and intense agony. The defendants Karl Brandt, Handloser, Rostock, Schroeder, Genzken, Gebhardt, Blome, Rudolf Brandt, Mrugowsky, Poppendick, Becker-Freyseng, Oberheuser, and Fischer are charged with special responsibility for and participation in these crimes.

(F) BONE, MUSCLE, AND NERVE REGENERATION AND BONE TRANSPLANTATION EXPERIMENTS. From about September 1942 to about December 1943 experiments were conducted at the Ravensbruck Concentration Camp for the benefit of the German Armed Forces to study bone, muscle, and nerve regeneration, and bone transplantation from one person to another. Sections of bones, muscles, and nerves were removed from the subjects. As a result of these operations, many victims suffered intense agony, mutilation, and permanent disability. The defendants Karl Brandt, Handloser, Rostock, Gebhardt, Rudolf Brandt, Oberheuser, and Fischer are charged with special responsibility for and participation in these crimes.

(G) SEAWATER EXPERIMENTS. From about July 1944 to about September 1944 experiments were conducted at the Dachau Concentration Camp for the benefit of the German Air Force and Navy to study various methods of making seawater drinkable. The subjects were deprived of all food and given only chemically processed seawater. Such experiments caused great pain and suffering and resulted in serious bodily injury to the victims. The defendants Karl Brandt, Handloser, Rostock, Schroeder, Gebhardt, Rudolf Brandt, Mrugowsky, Poppendick, Sievers, Becker-Freyseng, Schaefer, and Beiglboeck are charged with special responsibility for and participation in these crimes.

(H) EPIDEMIC JAUNDICE EXPERIMENTS. From about June 1943 to about January 1945 experiments were conducted at the Sachsenhausen and Natzweiler Concentration Camps for the benefit of the German Armed Forces to investigate the causes of, and inoculations against, epidemic jaundice. Experimental subjects were deliberately infected with epidemic jaundice, some of whom died as a result, and

8

others were caused great pain and suffering. The defendants Karl Brandt, Handloser, Rostock, Schroeder, Gebhardt, Rudolf Brandt, Mrugowsky, Poppendick, Sievers, Rose, and Becker-Freyseng are charged with special responsibility for and participation in these crimes.

(I) STERILIZATION EXPERIMENTS. From about March 1941 to about January 1945 sterilization experiments were conducted at the Auschwitz and Ravensbruck Concentration Camps, and other places. The purpose of these experiments was to develop a method of sterilization which would be suitable for sterilizing millions of people with a minimum of time and effort. These experiments were conducted by means of X-Ray, surgery, and various drugs. Thousands of victims were sterilized and thereby suffered great mental and physical anguish. The defendants Karl Brandt, Gebhardt, Rudolf Brandt, Mrugowsky, Poppendick, Brack, Pokorny, and Oberheuser are charged with special responsibility for and participation in these crimes.

(J) SPOTTED FEVER EXPERIMENTS. From about December 1941 to about February 1945 experiments were conducted at the Buchenwald and Natzweiler Concentration Camps for the benefit of the German Armed Forces to investigate the effectiveness of spotted fever and other vaccines. At Buchenwald numerous healthy inmates were deliberately infected with spotted fever virus in order to keep the virus alive; over 90 % of the victims died as a result. Other healthy inmates were used to determine the effectiveness of different spotted fever vaccines and of various chemical substances. In the course of these experiments 75 % of the selected number of inmates were vaccinated with one of the vaccines or nourished with one of the chemical substances and, after a period of three to four weeks, were infected with spotted fever germs. The remaining 25 % were infected without any previous protection in order to compare the effectiveness of the vaccines and the chemical substances. As a result, hundreds of the persons experimented upon died. Experiments with yellow fever, smallpox, typhus, paratyphus A and B, cholera, and diphtheria were also conducted. Similar experiments with like results were conducted at Natzweiler Concentration Camp. The defendants Karl Brandt, Handloser, Rostock, Schroeder, Genzken, Gebhardt, Rudolf Brandt, Mrugowsky, Poppendick, Sievers, Rose, Becker-Freyseng, and Hoven are charged with special responsibility for and participation in these crimes.

(K) EXPERIMENTS WITH POISON. In or about December 1943 and in or about October 1944 experiments were conducted at the Buchenwald Concentration Camp to investigate the effect of various poisons upon human beings. The poisons were secretly administered to experimental subjects in their food. The victims died as a result of the poison or were killed immediately in order to permit autopsies. In or about

9

September 1944 experimental subjects were shot with poison bullets and suffered torture and death. The defendants Genzken, Gebhardt, Mrugowsky, and Poppendick are charged with special responsibility for and participation in these crimes.

' (L) INCENDIARY BOMB EXPERIMENTS. From about November 1943 to about January 1944 experiments were conducted at the Buchenwald Concentration Camp to test the effect of various pharmaceutical preparations on phosphorus burns. These burns were inflicted on experimental subjects with phosphorus matter taken from incendiary bombs, and caused severe pain, suffering, and serious bodily injury. The defendants Genzken, Gebhardt, Mrugowsky, and Poppendick are charged with special responsibility for and participation in these crimes.

7. Between June 1943 and September 1944 the defendants Rudolf Brandt and Sievers unlawfully, wilfully, and knowingly committed War Crimes, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving the murder of civilians and members of the armed forces of nations then at war with the German Reich and who were in the custody of the German Reich in exercise of belligerent control. One hundred twelve Jews were selected for the purpose of completing a skeleton collection for the Reich University of Strasbourg. Their photographs and anthropological measurements were taken. Then they were killed. Thereafter, comparison tests, anatomical research, studies regarding race, pathological features of the body, form and size of the brain, and other tests, were made. The bodies were sent to Strasbourg and defleshed.

8. Between May 1942 and January 1943 the defendants Blome and Rudolf Brandt unlawfully, wilfully, and knowingly committed War Crimes, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving the murder and mistreatment of tens of thousands of Polish nationals who were civilians and members of the armed forces of a nation then at war with the German Reich and who were in the custody of the German Reich in exercise of belligerent control. These people were alleged to be infected with incurable tuberculosis. On the ground of insuring the health and welfare of Germans in Poland, many tubercular Poles were ruthlessly exterminated while others were isolated in death camps with inadequate medical facilities.

9. Between September 1939 and April 1945 the defendants Karl Brandt, Blome, Brack, and Hoven unlawfully, wilfully, and knowingly committed War Crimes, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted,

10

took a consenting part in, and were connected with plans and enterprises involving the execution of the so-called "euthanasia" program of the German Reich in the course of which the defendants herein murdered hundreds of thousands of human beings, including nationals of German-occupied countries. This program involved the systematic and secret execution of the aged, insane, incurably ill, of deformed children, and other persons, by gas, lethal injections, and divers other means in nursing homes, hospitals, and asylums. Such persons were regarded as "useless eaters" and a burden to the German war machine. The relatives of these victims were informed that they died from natural causes, such as heart failure. German doctors involved in the "euthanasia" program were also sent to the Eastern occupied countries to assist in the mass extermination of Jews.

10. The said War Crimes constitute violations of international conventions, particularly of Articles 4, 5, 6, 7, and 46 of the Hague Regulations, 1907, and of Articles 2, 3, and 4 of the Prisoner-of-War Convention (Geneva, 1929), the laws and customs of war, the general principles of criminal law as derived from the criminal laws of all civilized nations, the internal penal laws of the countries in which such crimes were committed, and of Article II, of Control Council Law No. 10.

### COUNT THREE — CRIMES AGAINST HUMANITY

11. Between September 1939 and April 1945 all of the defendants herein unlawfully, wilfully, and knowingly committed Crimes against Humanity, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving medical experiments, without the subjects' consent, upon German civilians and nationals of other countries, in the course of which experiments the defendants committed murders, brutalities, cruelties, tortures, atrocities, and other inhumane acts. The particulars concerning such experiments are set forth in Paragraph 6 of Count Two of this Indictment and are incorporated herein by reference.

12. Between June 1943 and September 1944 the defendants Rudolf Brandt and Sievers unlawfully, wilfully, and knowingly committed Crimes against Humanity, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving the murder of German civilians and nationals of other countries. The particulars concerning such murders are set forth in Paragraph 7 of Count Two of this Indictment and are incorporated herein by reference.

13. Between May 1942 and January 1943 the defendants Blome and

11

Rudolf Brandt unlawfully, wilfully, and knowingly committed Crimes against Humanity, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving the murder and misreatment of tens of thousands of Polish nationals. The particulars concerning such murder and inhumane treatment are set forth in Paragraph 8 of Count Two of this Indictment and are incorporated herein by reference.

14. Between September 1939 and April 1945 the defendants Karl Brandt, Blome, Brack, and Hoven unlawfully, wilfully, and knowingly committed Crimes against Humanity, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving the execution of the so-called "euthanasia" program of the German Reich, in the course of which the defendants herein murdered hundreds of thousands of human beings, including German civilians, as well as civilians of other nations. The particulars concerning such murders are set forth in Paragraph 9 of Count Two of this Indictment and are incorporated herein by reference.

15. The said Crimes against Humanity constitute violations of international conventions, including Article 46 of the Hague Regulations, 1907, the laws and customs of war, the general principles of criminal law as derived from the criminal laws of all civilized nations, the internal penal laws of the countries in which such crimes were committed, and of Article II of Control Council Law No. 10.

### COUNT FOUR — MEMBERSHIP IN CRIMINAL ORGANIZATION

16. The defendants Karl Brandt, Genzken, Gebhardt, Rudolf Brandt, Mrugowsky, Poppendick, Sievers, Brack, Hoven, and Fischer are guilty of membership in an organization declared to be criminal by the International Military Tribunal in Case No. 1, in that each of the said defendants was a member of DIE SCHUTZSTAFFELN DER NATIONALSOZIALISTISCHEN DEUTSCHEN ARBEITERPARTEI (commonly known as the "SS") after 1 September 1939. Such membership is in violation of Paragraph I (d) Article II of Control Council Law No. 10.

Wherefore, this Indictment is filed with the Secretary General of the Military Tribunals and the charges herein made against the above named defendants are hereby presented to MILITARY TRIBUNAL No. I.

TELFORD TAYLOR
Brigadier General, USA
Chief of Counsel for War Crimes
Acting on Behalf of the United States of America

Nürnberg, 25 October 1946

12

# MILITARY TRIBUNALS

CASE No. 6

## THE UNITED STATES OF AMERICA

— against —

CARL KRAUCH, HERMANN SCHMITZ, GEORG VON
SCHNITZLER, FRITZ GAJEWSKI, HEINRICH HOERLEIN,
AUGUST VON KNIERIEM, FRITZ TER MEER, CHRISTIAN
SCHNEIDER, OTTO AMBROS, MAX BRUEGGEMANN,
ERNST BUERGIN, HEINRICH BUETEFISCH, PAUL
HAEFLIGER, MAX ILGNER, FRIEDRICH JAEHNE, HANS
KUEHNE, CARL LAUTENSCHLAEGER, WILHELM MANN,
HEINRICH OSTER, KARL WURSTER, WALTER DUERR-
FELD, HEINRICH GATTINEAU, ERICH VON DER HEYDE,
and HANS KUGLER, officials of I. G. FARBENINDUSTRIE
AKTIENGESELLSCHAFT

Defendants

OFFICE OF MILITARY GOVERNMENT FOR GERMANY (US)
NURNBERG 1947

## COUNT THREE

## SLAVERY AND MASS MURDER

## STATEMENT OF THE OFFENSE

120. All of the defendants, acting through the instrumentality of FARBEN and otherwise, with divers other persons, during the period from 1 September 1939 to 8 May 1945, committed War Crimes and Crimes against Humanity as defined by Article II of Control Council Law No. 10, in that they participated in the enslavement and deportation to slave labor on a gigantic scale of members of the civilian population of countries and territories under the belligerent occupation of, or otherwise controlled by Germany; the enslavement of concentration camp inmates, including German nationals; the use of prisoners of war in war operations and work having a direct relation to war operations, including the manufacture and transportation of war material and equipment; and the mistreatment terrorization, torture and murder of enslaved persons. In the course of these activities, millions of persons were uprooted from their homes deported, enslaved, illtreated, terrorized, tortured and murdered. All of the defendants committed these War Crimes and Crimes against Humanity, as defined by Article II of Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, were connected with plans and enterprises involving, and were members of organizations or groups, including FARBEN, which were connected with, the commission of said crimes.

## PARTICULARS OF DEFENDANTS' PARTICIPATION IN SLAVERY AND MASS MURDER

### A. Role of FARBEN in Slave Labor Program

121. The acts, conduct, plans, and enterprises referred to above were carried out as part of the slave labor program of the Third Reich, in the course of which millions of persons, including women and children were subjected to forced labor under cruel and inhuman conditions which resulted in widespread suffering and millions of deaths. At least five million workers were deported to Germany. Conscription of labor was implemented in most cases by brutal and violent methods, among which were included systematic manhunts in the streets, motion picture theatres, houses of worship and other public places, and frequent invasions of homes during the night. Workers deported for the Reich were sent under armed guard to Germany, often packed in trains without heating, food, clothing, or sanitary facilities, as a result of which many of them

44

were dead upon arrival, and most of the survivors were seriously ill. Those inhabitants of occupied countries who were not deported to Germany were conscripted and compelled to work in their own countries to assist the German war machine.

122. In the execution of said plans and enterprises the human and material resources of the belligerently occupied countries, completely out of proportion to the needs of the occupying forces, were seized and harnessed to the German war machine. The needs of the respective countries were utterly disregarded and the family honor and rights of the civilian populations involved were ruthlessly despoiled. Prisoners of war were forced to labor at work related directly to war operations including work in factories engaged in production for war. The principle guiding the handling and treatment of the civilian slave laborers and the prisoners of war was the one enunciated in official orders to the effect that they should "be fed, sheltered, and treated in such a way as to exploit them to the greatest possible extent at the lowest conceivable degree of expenditure."

123. The defendant KRAUCH, with the aid and assistance of FARBEN officials and with the knowledge and approval of the Vorstand, prepared and organized the details of the plans of the chemical industry for war mobilization. Such plans included, among other things, provisions for the procurement and exploitation of slave labor to supply the German war machine with materials and equipment with which to wage aggressive war. The defendant KRAUCH, as general Plenipotentiary for Special Questions of Chemical Production in the Four Year Plan, was the highest authority in passing on allocations of labor for the entire chemical industry, including foreign and concentration camp labor and prisoners of war. KRAUCH attended meetings of the Central Planning Board, the top governmental authority responsible for the overall planning and coordination of all matters relating to war production, including labor supply.

124. The exploitation of enslaved workers and of prisoners of war for works directly connected with war operations was standard policy of FARBEN. In 1941 the defendant SCHMITZ, in his business report to the Aufsichtsrat, stated that the respective works of FARBEN must direct their efforts to obtaining necessary workers and that its requirements could in general be covered through foreign workers and prisoners of war.

125. FARBEN established labor recruiting offices which were specifically charged with responsibility for combing the labor field of the chemical industries in the newly conquered countries, or countries and territories otherwise under Nazi control, to the end that skilled workers be forcibly deported to the Reich to work for FARBEN. In furtherance

45

of such policy, FARBEN with the knowledge and approval of the Vorstand and acting throught the defendants AMBROS, SCHNITZLER, TER MEER and others, exerted special pressure on French industrialists and with the aid and assistance of the German occupying forces, recruited by forcible deportation, and by willful misrepresentations, skilled and non-skilled French workers to come to Germany and work in the FARBEN plants where war material and equipment was being produced. French workers who were alleged to have come voluntarily were free to go home if they so chose. Any attempt to exercise freedom of contract by leaving their work was followed by manhunts, and capture resulted in transfers by "special transport" to the nearest labor office where they were returned to their involuntary servitude in FARBEN plants.

126. Concentration camp inmates were utilized by FARBEN as a source and means of procuring slave labor and to make more efficient use of this human commodity FARBEN constructed camps to house them. These camps were enclosed with barbed wire, and the slave laborers housed therein were guarded by SS men. Deportees from Eastern occupied countries were guarded by armed plant guards accompanied by watch dogs. In its plants FARBEN accepted and appointed as its security representatives men designated by the SS and Gestapo and in the administration of its plants adopted the policies and practices of the Gestapo. Although the FARBEN plant manager was responsible for the morale and discipline of its slave workers, it was standard policy to call in the Gestapo to enforce discipline.

127. FARBEN was aggressive in its acquisition of slave laborers and sent its representatives to concentration camps to make selections of those considered most physically fit for servitude in FARBEN plants. This is illustrated by a complaint made by the head of the Personnel Divison of FARBEN's Kamerawerke, Munich, to the Commandant of the Dachau Concentration Camp, that a transport which left Ravensbruck with inmates selected by FARBEN engineers contained only 250 Dutch women instead of 260 and that 63 of this number were not selected by them. Another instance is the demand made in January, 1944, by the same office of FARBEN's Kamerawerke, Munich, to the Labor Office, Munich, for the requisition of Polish female prisoners whose term of imprisonment was about to expire. In this case FARBEN specifically requested that the sentences of such prisoners be extended.

128. In all FARBEN plants and works, where slave labor was used, sub-human standards of living were the established order. Inadequate food rations, overcrowded and filthy sleeping quarters, excessive hours of hard physical labor, continued beatings and other cruel disciplinary measures, brought about a high percentage of illness and disease among the inmates. In cases of disease, little or no medical care was furnished, as a result of which many slave laborers died.

46

129. The extent of FARBEN slave labor activities is shown by the following figures: During the period here involved, the total number of workers reached 200,000 of which approximately 50 per cent were slave labor. Beginning in 1941, with approximately 10,000 slave laborers, FARBEN progressively increased its exploitation of such slave labor to approximately 22,000 in 1942; 58,000 in 1943; 85,000 in 1944 and 100,000 in 1945. These figures represent only the numbers of slave laborers in FARBEN plants at a given time and do not reflect the fact that many died and were replaced and many were "exchanged". FARBEN in its use of slave labor affected the freedom, the well-being, and the lives of many hundreds of thousands of human beings.

130. In FARBEN's internal organization, the Technical Committee passed upon and recommended to the Vorstand the construction of barracks and concentration camps, together with installations and equipment necessary to house the slave labor. The Vorstand, thereupon, gave its approval to the projects so recommended and authorized the necessary expenditures. The welfare of such slave labor, including the administration of the barracks and concentration camps and the type of disciplinary action to be taken against the slave labor, was under the immediate supervision of the plant leaders and plant managers, including the defendants WURSTER, AMBROS, LAUTENSCHLAEGER, BUERGIN and GAJEWSKI. The Vorstand "delegated" its overall responsibility for the welfare of laborers in all its plants to the defendant SCHNEIDER as Hauptbetriebsfuehrer (Chief of Plant Leaders). SCHNEIDER consulted with the plant leaders and plant managers and other members of the Vorstand, including the defendants VON SCHNITZLER, ILGNER, TER MEER and BRUEGGEMANN in formulating policy decisions. The defendant KRAUCH discussed with SCHNEIDER and other members of the Vorstand the requisitioning and handling of slave labor.

B. **Use of Poison Gas and Medical Experimentation upon Enslaved Persons.**

131. Poison gases and various deadly pharmaceuticals manufactured by FARBEN and supplied by FARBEN to officials of the SS were used in experimentation upon and the extermination of enslaved persons in concentration camps throughout Europe. Experiments on human beings (including concentration camp inmates), without their consent, were conducted by FARBEN to determine the effect of deadly gases, vaccines, and related products.

C. **FARBEN at Auschwitz.**

132. The Auschwitz concentration camp was established for the main purpose of exterminating human beings. Life or death of the inmates depended solely upon their fitness for work. All who were considered fit to work were used as slave laborers; all who were not considered fit

47

to work were exterminated in gas chambers and their bodies burned. When the remainder of dead exceeded the capacity of the specially constructed crematoria, the "overflow" of human beings was burned in huge open bonfires. Here many victims were also burned alive. In Auschwitz alone, three to four million persons were exterminated, and another one-half million died from disease and starvation.

133. The decision between life and death of newly arrived inmates was made pursuant to a screening system which operated as follows: There were two SS doctors on duty to examine the incoming transports of prisoners. The prisoners would be marched by one of the doctors who would make spot decisions as they walked by. Those who appeared fit for work were sent into the camp. Others were sent immediately to the extermination chambers. Children of tender years were usually exterminated, since by reason of their youth, most of them were considered unable to work. Steps were taken to conceal from the victims the fact that they were to be exterminated and it was represented to them that by going through the gas chambers they were only going through a bathing and delousing process. It took from three to fifteen minutes to kill the people in the death chamber, and when their screaming had stopped it was assumed they were dead. About a half hour later, the doors were opened and the bodies removed, whereupon special commandos of the SS took off the rings and extracted the gold from the teeth of the corpses. The bodies were then cremated and after cremation, their ashes were used for fertilizer. In some instances, attempts were made to utilize the fat from the bodies of the victims in the commercial manufacture of soap.

134. At Auschwitz, innumerable inmates were forcibly subjected to cruel and unusual experiments in surgery and tests of various medications. These surgical and medical experiments consisted in the main of castrations, ovarian operations, amputations, complete removal of sexual organs, abortions, sterilization by X-Ray, injection with the virus of certain diseases, and subsequent oral or intra-venal application of various drugs and pharmaceutical products. Many of the pharmaceuticals used were manufactured by and procured from one or more of FARBEN's plants.

135. In or about 1940, the defendant KRAUCH discussed the construction of a new buna plant with the defendant AMBROS. The defendant AMBROS in consultation with the defendant TER MEER proceeded to make a survey of suitable locations and recommended to the FARBEN Vorstand that the buna plant be constructed at Auschwitz. In recommending said location, the defendant AMBROS called specific attention to the available labor supply from the concentration camps in that area. The Vorstand approved the recommendations and authorized the construction of a buna plant at Auschwitz.

48

# EXHIBIT 20

# 2026
# (U) ANNUAL THREAT ASSESSMENT

## OF THE U.S. INTELLIGENCE COMMUNITY

**March 2026**



# ANNUAL THREAT ASSESSMENT
# OF THE U.S. INTELLIGENCE COMMUNITY

March 2026

# INTRODUCTION

This annual report of worldwide threats to the national security of the U.S. responds to Section 617 of the FY21 Intelligence Authorization Act (Pub. L. No. 116-260). This report reflects the collective insights of the Intelligence Community (IC), which is committed to providing the nuanced, independent, and unvarnished intelligence that policymakers, warfighters, and domestic law enforcement personnel need to protect American lives and America's interests around the world.

This assessment focuses on the most direct, serious threats to the U.S. primarily during the next year. All these threats require a robust intelligence response, including those where a near-term focus may help head off greater threats in the future.

Information available as of 14 March 2026 was used in the preparation of this assessment.

# CONTENTS

INTRODUCTION...................................................................................................................2

FOREWORD.......................................................................................................................4

HOMELAND.......................................................................................................................5

   Border Security ...............................................................................................................5

      Foreign Illicit Drug Actors ...........................................................................................5

      Other Transnational Criminals ....................................................................................6

      Migration...................................................................................................................7

   Terrorism ........................................................................................................................7

   Homeland Defense ........................................................................................................10

   Arctic.............................................................................................................................11

TECHNOLOGICAL CHALLENGES.......................................................................................12

   AI..................................................................................................................................12

   Quantum Computing .....................................................................................................13

DIVERSE THREAT VECTORS..............................................................................................14

   Military .........................................................................................................................14

   Space ...........................................................................................................................15

   Cyber............................................................................................................................16

   WMD ............................................................................................................................17

      Arms Control.............................................................................................................19

   Regional Challenges......................................................................................................19

      Western Hemisphere..................................................................................................20

      Asia ..........................................................................................................................21

      Europe-Eurasia .........................................................................................................25

      Middle East ...............................................................................................................29

      Africa .......................................................................................................................32

# FOREWORD

The 2026 Annual Threat Assessment (ATA) is the Intelligence Community's (IC) official evaluation of an array of threats to U.S. citizens, the Homeland, and U.S. interests around the world. Recent efforts to strengthen Homeland defense have had positive effects, but more work remains to be done to address the complex and evolving threats facing the U.S. For example, border enforcement has been especially successful due to President Trump sealing the U.S.–Mexico border. Migrant encounters and fentanyl seizures at the U.S.–Mexico border have sharply decreased since early 2025, thanks to a combination of tougher U.S. policies and regional enforcement. However, transnational criminal organizations are threatening our citizens, primarily by producing and trafficking illicit drugs, which are responsible for the deaths of tens of thousands of Americans, and for facilitating illegal migrant flows to the U.S. A range of terrorist groups, especially those motivated by Islamist ideology, continue to pose threats to freedom and American lives here at home and abroad. In addition, state and nonstate actors have the capability to directly strike the Homeland.

However, as the National Security Strategy (NSS) makes clear, America has world-leading assets, resources, and advantages. These make some threats to our Homeland less acute, especially since we maintain a powerful and capable military, and a secure nuclear deterrent, that help keep us safe here at home. We also maintain a favorable geographic position, with vast oceans separating us from other great powers and with no competing powers in our Hemisphere. Yet we must remain vigilant about extant and emerging threats, with intelligence playing a critical role in providing early warnings and indicators of changes to adversary intent and capabilities to inform national policymakers.

The global security environment is becoming more complex. The risk of global economic fragmentation is rising, and emerging technologies such as AI and quantum computing are expected to have a significant impact on national security. Furthermore, armed conflict is becoming more common globally, major power competition continues, and military capabilities among state and nonstate actors are improving. Intensifying competition over supply chains and technological primacy, more diverse threats in key domains, and unresolved or potential regional conflicts create interconnected risks. However, we should be cautious about thinking that every problem in the world directly threatens us or is of equal importance to the U.S. In a more complex world, it is especially important that we think prudently and prioritize our efforts, that we find opportunities to advance peace and mutually beneficial solutions to problems, while also not underrating those threats that do impinge on our freedom and our interests.

This 2026 ATA supports the Office of the Director of National Intelligence's commitment to keeping the U.S. Congress and American people informed, representing the IC's dedication to monitoring, evaluating, and warning of threats to the nation's security. In preparing this assessment, the ODNI's National Intelligence Council (NIC) worked with all IC components and the wider U.S. Government to provide the most timely, objective, and useful insights for strategic warning and U.S. decision advantage. This 2026 ATA describes threats to the Homeland first, followed by a discussion of the full range of threats organized by threat and geographic categories. The NIC stands ready to support policymakers with additional information in a classified setting.

[ 4 ]

# HOMELAND

*The IC assesses that the Homeland faces a variety of threats in the coming year, including our top concerns: transnational organized crime, illicit drug trafficking, migration, the threat of Islamist ideology and terrorism, major power competition, and WMD threats. Transnational criminal organizations (TCOs) are smuggling illegal drugs into the U.S., engaging in financial fraud, and laundering money through international financial institutions. Changes in U.S. policies during 2025 on illegal migration, and increased enforcement efforts at the U.S.–Mexico border and regionally, have deterred illegal immigration and drastically reduced migrant encounters, but the underlying factors that for years have driven migration to the U.S. from various parts of the world remain largely unchanged. Meanwhile, Russia, and China to a lesser extent, are expanding their interest and presence in the Arctic to counter perceived U.S. inroads and advance their strategic interests. China, Russia, and North Korea are also developing new, novel, or advanced delivery systems to increase or obtain a capability to strike the Homeland.*

## BORDER SECURITY

### Foreign Illicit Drug Actors

*Mexico-based TCOs involved in illicit drug production and trafficking bound for the U.S. endanger the health and safety of millions of Americans and contribute to regional instability.* Fentanyl and other synthetic opioids remain the most lethal of drugs trafficked into the country, causing more than 38,000 U.S. deaths during the 12-month period from September 2024 to September 2025. This represents a nearly 30 percent decrease in synthetic opioid-related overdose deaths, according to CDC data. Separately, fentanyl seizures by weight have decreased 56 percent at the U.S.–Mexico border since President Trump took office, because of increased U.S. and Mexican counterdrug pressure as well as cartel infighting in the interior of Mexico. Although we do not know the total amount of fentanyl entering from Canada to the U.S., information from Customs and Border Protection (CBP) seizures on the border shows an increase during the past three years from 2 pounds to 77 pounds seized at the northern border, in contrast to more than 11,000lbs seized in 2025 alone at the Mexican border.

- Mexico-based TCOs—including the Sinaloa Cartel and the New Generation Jalisco Cartel (CJNG)—are the dominant producers and suppliers of illicit drugs, including fentanyl, heroin, methamphetamine, and South America-sourced cocaine, for the U.S. market. Official ports of entry along the U.S.–Mexico border probably remain the main access point for illicit drugs, often concealed in passenger vehicles and tractor trailers. However, some TCOs probably have at least temporarily changed smuggling techniques and routes in response to increased Mexican and U.S. border security.

- Colombia-based TCOs and illegal armed groups, including the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), are responsible for producing and trafficking large volumes of cocaine to the U.S. and European markets. Colombia remains the world's largest producer of cocaine and Colombian criminal groups have expanded their trafficking relationships with neighboring Ecuadorian and Brazilian gangs.

While there has been noticeable improvement, ***China and India remain the primary source countries for illicit fentanyl precursor chemicals and pill pressing equipment.*** Following a meeting in October 2025 between the U.S. President and Chinese President Xi in Busan, South Korea, Beijing agreed to halt the flow of fentanyl precursor chemicals to North America, issued an industry advisory notice to China-based companies, and established a new requirement for export licenses for certain fentanyl precursor chemicals. India has increased counternarcotics efforts during the last year. In January 2026, Prime Minister Modi and other Indian officials signaled a willingness to deepen engagement with the U.S. on counternarcotics. Despite these actions, Mexico-based drug traffickers continue to circumvent international controls through mislabeled shipments and the purchase of unregulated chemicals.

## Other Transnational Criminals

***Transnational gangs in the Western Hemisphere, some of which are involved in the U.S.-bound drug trade, threaten public health and safety in the Homeland and the well-being of civilians and partners abroad through their violent criminal activities and expansion efforts.*** These groups engage in a wide array of violent criminal activities, including murder, kidnapping, robbery, human trafficking, prostitution, extortion, drug trafficking, and firearms offenses, at times alternating between competing and partnering with other TCOs in the region, fueling increased violence and instability.

- The Venezuelan-origin transnational gang Tren de Aragua (TdA) capitalized on U.S.-bound migration to expand its presence throughout South America and the U.S. TdA members in the U.S. targeted large Venezuelan communities for extortion rackets, resulting in murders, assaults, and arson attacks.

- The Mara Salvatrucha (MS-13) transnational gang is well-established in cells in the U.S. It uses violence to intimidate the Salvadoran diaspora and engages in murder, extortion, retail-level drug trafficking, robbery, prostitution, firearms offenses, and other crimes. Many foreign MS-13 leaders are in maximum security prisons in El Salvador—a country which has reduced violence and insecurity from violent criminal gangs.

- Haitian gangs threaten the security and stability of Haiti through their attacks on security forces and through the use of intimidation and sexual violence targeting civilians. Gangs also extort businesses, conduct kidnappings for ransom, and some engage in arms-for-drugs transactions with Jamaican gangs. Since September 2025, Haitian gang members have conducted periodic gunfire attacks targeting the U.S. Embassy compound in Port-au-Prince and are seeking to sow unrest before the arrival of UN-authorized multinational security forces and national elections planned in August.

## Migration

*Foreign public perceptions of stricter U.S. migration policies and U.S. and regional border security enforcement have contributed to a sharp decrease in migrant encounters at the U.S.– Mexico border since early 2025. These perceptions probably will continue to serve as a deterrent for migrants seeking to illegally enter the U.S. Most cases of migration are a matter of economic migration. Some migrants are likely to continue to see the U.S. as a preferred destination over regional alternatives despite the increased risk of failure, because of proximity, established routes and smuggling networks, family ties in the U.S., the lure of employment or government programs and benefits, improved social conditions, and better public security.*

- As of March 2026, migrant encounters on the southwest border continue to decline. Based on CBP data, January 2026's monthly encounters are down 83.8 percent compared to January 2025. Encounters declined 79 percent in 2025 compared to 2024.

- Instability and significant hardships for the populaces in several countries, particularly Cuba and Haiti, almost certainly will continue in 2026, creating the risk of potential migration surges from each of these countries if conditions worsen.

- Real or perceived changes to immigration laws or travel policies in destination and transit countries could trigger unexpected spikes in irregular migration and overwhelm transit countries already struggling to manage persistently high migration flows.

- Extreme weather events are likely to continue to indirectly drive migration by worsening the economic and food security of many low-income countries, particularly in Central America.

- Regional governments are likely to prioritize short-term enforcement efforts over more expensive, sustained measures to grant legal residency to migrant communities because of public opposition, budget shortfalls, and competing security demands, which may increase pressure for migration to the U.S.–Mexico border.

Human smugglers continue to operate, adapting to enforcement of laws and policies, as TCOs and criminals view such activities as low-risk and lucrative. They will likely exploit the increased demand created by migrants seeking other means of entry to the U.S.

# TERRORISM

*The U.S. continues to face a complex and evolving threat landscape with a geographically diverse set of Islamist terrorist actors seeking to propagate their ideology globally and harm Americans, even as al-Qa'ida and ISIS are significantly weaker than at their respective peaks during the early 2000s and mid-2010s.*

- A decade ago, ISIS controlled large parts of Iraq and Syria and in November 2015 had launched coordinated attacks around Paris, killing 130 people and injuring more than 400 others. Up through the mid-2010s, al-Qa'ida had repeatedly advanced innovative plots threatening the West including efforts to bypass aviation security with hidden explosives.

- By 2019, under sustained pressure from U.S.-led global CT operations, ISIS had lost its physical caliphate, while the capture or removal of many of al-Qa'ida's key leaders and plotters over a decade had significantly degraded its ability to develop sophisticated plots. Nevertheless, elements of these groups—including al-Qa'ida in the Arabian Peninsula (AQAP) in Yemen and ISIS branches in South Asia and Syria—persist in efforts to rebuild and threaten the U.S. Homeland and our global interests.

*The spread of Islamist ideology—in some cases led by individuals and organizations associated with the Muslim Brotherhood who have provided financial and other forms of material support to terrorist groups such as HAMAS and Hizballah—poses a fundamental threat to freedom and foundational principles that underpin Western Civilization.* Violent networks, including supporters of al-Qa'ida and ISIS, often use appeals to Islamist identities and ideology to fuel recruiting and financial support for terrorist groups and individuals around the world. At the extreme end are groups that endorse the violent imposition of Sharia in governance, directly undermining fundamental Western freedoms of speech and religion, with the ultimate aim of establishing an Islamist caliphate. There are growing examples of this in various European countries such as Austria, Germany, and the UK. The designation of Muslim Brotherhood chapters that fund and promote violence as Foreign Terrorist Organizations (FTOs) is a mechanism to secure Americans against this threat.

*In response to setbacks to their capabilities that have mitigated the threat of large-scale, complex attacks and reinforced the regional focus of the largest groups, Islamist terrorists have shifted attention to executing information operations to spread propaganda and inspire or enable individuals located in or with access to the West.*

- U.S. military operations and collaboration with international partners in Iraq, Pakistan, Somalia, and Syria during 2025 removed key terrorist leaders and operatives, degrading the capability of al-Qa'ida and ISIS to pursue terrorist attacks against the Homeland and U.S. interests overseas.

- Border security measures adopted last year and deportations of individuals with suspected links to Islamist terrorists have reduced access to the Homeland and removed potential sources of future violence. We face, however, an enduring challenge of detecting individuals who might seek to commit acts of terror after entering the Homeland, including from the population of tens of thousands of asylees and Afghan evacuees who entered the U.S. during the past few years. Since January, U.S. officials have only had a handful of encounters at our southern or northern borders with individuals associated with terrorist groups with a strategic intent to attack the Homeland, such as al-Qa'ida and ISIS. While this is a positive trend, we need to continue efforts to identify, locate, and remove suspected foreign terrorists who have exploited border vulnerabilities during the last five years.

*In recent years, al-Qa'ida and ISIS plotters intent on targeting the Homeland have focused more on virtually recruiting U.S.-based aspirants to encourage and enable potential attacks.* This shift probably has been driven by CT operations degrading foreign terrorist groups' capabilities to locally train and deploy operatives, coupled with increased border security, stricter screening and vetting, and improved international information sharing that have disrupted potential operatives' travel.

[ 8 ]

***While al-Qa'ida and ISIS maintain the intent to launch operations targeting the U.S., the most likely terrorist attack scenario in the Homeland involves U.S.-based lone offenders—such as the New Orleans attacker on New Year's Day in 2025 and the perpetrator of the attack on a pro-Israel gathering in Boulder, Colorado in June 2025.*** These individuals take inspiration from foreign terrorist ideologies and propaganda that often exploit world events such as the Gaza conflict to fuel radicalization and mobilization. Al-Qa'ida and ISIS release media encouraging U.S.-based supporters to conduct attacks and often offer tactical guidance.

- In 2025, AQAP increased its media production calling for attacks in the West, including against senior U.S. officials. Meanwhile, ISIS's ability to inspire violence was underscored by the New Orleans attack, which used tactics promoted by the group to kill 15 people and injure many more amid holiday celebrations.

- Teenage Islamist extremists were responsible for a significant portion of U.S.-based plotting in 2025, continuing a trend from the past several years. These individuals were driven in part by the ease of accessing terrorist messaging and networks on social media. In March 2025, a 16-year-old from Virginia, motivated by Islamist ideology, who had consumed terrorist media and wanted to join ISIS, rammed a stolen vehicle into a police car in New Jersey and tried to stab the officer.

***Jihadist ideology and influencers play a key role in mobilizing individuals to violence by advancing anti-Western and pro-militant narratives.*** Such narratives have influenced most U.S.-based Sunni violent extremist attacks in recent years. Those promoting Islamist ideology have been able to appeal to broader and younger audiences through their use of technology, and in recent years have increasingly focused on emotionally evocative and grievance-based narratives rather than on traditional jihadist scholarship and ideological writings. Moreover, migrants who were already influenced by Islamism before they arrived, particularly in Europe, create risks that could increase given the deteriorating security environment in some countries.

- These ideological narratives are delivered online using sensationalist short-form content that seeks to provide religious justification for violence. Jihadists create close-knit online communities isolated from the outside world by framing perceived grievances within a larger narrative of Muslim oppression and redefining Islamic identity in opposition to Western values of freedom, including religious freedom, and democratic governance.

- Jihadist narratives that address personal grievances may be attractive to individuals seeking validation of violent desires or moral clarity, even if they lack familiarity with Islam. Such content normalizes intolerance of other beliefs and persons and attracts followers to Islamism. Anti-Western and anti-Semitic narratives probably influence Muslim youths facing integration challenges or who are disaffected by the West's role abroad, including with the Israel–HAMAS conflict.

***Al-Qa'ida and ISIS pose the biggest threat to U.S. interests overseas in parts of Africa, the Middle East, and South Asia, where these groups operate.*** These groups will continue to exploit political instability and ungoverned territory, striving to rebuild their capabilities and relying on the resilience of geographically distant elements.

[ 9 ]

- Al-Qa'ida probably has between 15,000 and 28,000 members worldwide, while ISIS has between 12,000 and 18,000 members. The growth of these groups during the last five years has occurred primarily in local conflicts in Africa—where their largest and most violent affiliates and branches are active. AQAP in Yemen, ISIS-Khorasan (ISIS-K) in South Asia, and ISIS in Syria probably are the most likely groups to support external plotting. ISIS in Syria probably will seek to rebuild its ranks, expand support networks, and solicit funds by reengaging with at least some of the several hundred ISIS detainees and thousands of ISIS-linked women and children who escaped or were released from prisons and displaced persons camps previously run by the Syrian Democratic Forces in northeast Syria.

***We are continuing to assess how the U.S.–Israel–Iran conflict will affect the worldwide terrorism landscape during the coming year.*** Iran and Iranian-aligned terrorist actors—including HAMAS and Lebanese Hizballah—have been severely degraded by Israeli-led operations, U.S. intelligence and weapons support to Israel, and U.S. operations in the region following HAMAS's attack against Israel in October 2023 through the current U.S. and Israeli-led military campaign. Nevertheless, these groups remain capable of asymmetrically attacking U.S. interests and our allies in the Middle East, and continue to spread Islamist propaganda to incite terrorist acts.

- Iran has proven capable of developing lethal operations against Americans at home and abroad and probably will attempt to pursue such efforts again if the current government remains in power and is able to rebuild. Hizballah and HAMAS probably are still able to conduct attacks outside the Middle East, but Israel intends to continue to degrade their capabilities. The Huthis and Iraqi Shia militias probably remain resilient and are likely to continue to threaten U.S. and allied interests in the Middle East. During Operation Epic Fury, some Iraqi Shia militias responded to Iran's call to attack U.S. bases, causing some damage and demonstrating their continued threat to U.S. interests and to Iraq's security and stability.

- Some Shia worldwide, particularly in the Middle East and South Asia, responded to the killing of Iranian Supreme Leader Ayatollah Ali Khamenei on 28 February with anger and protests. Prominent Shia religious leaders in Iran issued religious decrees calling to avenge Khamenei, which is likely to inspire at least some individuals to seek to conduct terrorist activities against U.S. targets worldwide. Meanwhile, while condemning the U.S. and Israeli attack on Iran, Grand Ayatollah Ali al-Sistani in Iraq issued a statement calling on all countries to stop the conflict and find a peaceful solution.

# HOMELAND DEFENSE

***The U.S.'s secure nuclear deterrent capability continues to ensure our safety here at home. However, China, Russia, North Korea, Iran, and Pakistan have been researching and developing an array of novel, advanced, or traditional missile delivery systems with nuclear and conventional payloads, that can strike the Homeland.*** The IC projects threats to the Homeland will expand to more than 16,000 missiles by 2035, from the current figure of more than 3,000 missiles.

- North Korea has successfully tested ICBMs capable of reaching the entire Homeland, and prior to Operation Epic Fury, Iran had developed space-launch vehicles that it could use to develop a military-viable ICBM by 2035 should Tehran decide to do so.

- In spite of the growing proliferation of one-way attack UAVs that perform missile-like functions, China, Iran, North Korea, Pakistan, and Russia will continue to prioritize advanced missiles that can threaten the U.S. However, their militaries almost certainly will plan to pair their high-end missiles with cheaper, expendable systems to stress U.S. missile defenses.

**Adversaries will seek to understand U.S. plans for advanced missile defense for the Homeland, almost certainly for the purposes of shaping their own missile development programs and assessing U.S. intentions regarding deterrence.** China, Russia, and North Korea almost certainly will continue enhancing their own missile and counterspace capabilities during the next five years.

- Chinese officials probably fear that the Golden Dome for America will reduce Washington's threshold for initiating military action against Beijing in a crisis, which is likely driving China to focus on using international arms control discussions, particularly on its space-based elements.

# ARCTIC

*Russia has the largest Arctic coastline and views itself as part of the neighborhood. Russia is our primary challenge in the Arctic as it aims to further its interests in the region as part of broader global balance-of-power competition. Moscow is seeking to expand and deepen its presence in the Arctic through increased maritime trade, natural resource extraction, and military activity. In addition to its own domestic economic and security concerns, this activity is aimed at countering a perceived growing U.S. emphasis on expanding its influence and presence in the Arctic as a key national security strategic objective.* As a non-Arctic country, China is engaged in more limited efforts in the region to advance its strategic and economic interests primarily via its relationship with Russia, and Beijing has signaled its intent to grow its presence when international waters are accessible.

Russia controls about half of the Arctic coastline and views the region as essential to its economic well-being and national security. Moscow wants to further develop its Arctic oil and gas reserves and position itself to reap benefits from expected increases in maritime trade. While Russia has enhanced its ability to operate in the Arctic by focusing on combat readiness and using dual-use technologies and facilities for defense, its war with Ukraine has limited its ability to fully achieve its Arctic ambitions.

- The bulk of Russia's Arctic forces are concentrated in the Kola Peninsula, which hosts about two-thirds of Russia's second-strike nuclear capabilities. The area is home to Russia's Northern Fleet, including seven of the country's nuclear-armed ballistic missile strategic submarines. Russia has made major investments in the fleet, including adding long-range missiles, UAVs, and underwater drones. Russia has at least three air bases on the Kola Peninsula that host fighter jets, surveillance, and transport aircraft.

- In January 2025, Russian President Putin emphasized that Moscow was intensifying its efforts to develop its icebreaker fleet, which is already the world's largest. The Russian Arctic Fleet has 42 icebreakers, including eight nuclear and 34 diesel-electric. Russia is building what could become the most powerful nuclear icebreaker in the world, which is reported to be operational by 2030.

China describes itself as a polar power and is seeking to expand its presence in the Arctic including plans to incorporate the "Polar Silk Road" into its Belt and Road Initiative as shipping lanes become more accessible and economically viable. Beijing seeks to expand its Arctic presence using scientific research, investments, and commercial ventures along the Northern Sea Route. Russia has invited China to cooperate at times in the Arctic, including conducting joint patrols.

# TECHNOLOGICAL CHALLENGES

*Leadership in emerging technologies is increasingly defining global power and influence. For technology powers such as the U.S. and China, AI and quantum information science— especially quantum computing—are at the center of this leadership competition. These technologies will foster broad new capabilities during the coming years that will impact economies and countries' national security advantages. At the same time, these technologies open up new risks across the spectrum of domestic and national security interests that require serious analysis and mitigation from the outset.*

## AI

*AI is a defining technology for the 21st century, enabling computers and machines to simulate human learning, comprehension, problem solving, creativity, and autonomy.* Recent developments in generative AI—or models capable of creating original content such as long-form text, high-quality images, and realistic video and audio—have sparked global interest in AI that shows no signs of slowing. However, it is essential to make sure that humans maintain control of the machines and how AI is used.

*Maintaining a global leadership role in AI provides the U.S. with first-mover advantage.* Other global powers' robust progress in AI is challenging U.S. economic competitiveness and national security advantages.

- AI's growing impact on all industries and domains will increase during the coming years. In the defense industry, AI has already been employed in recent conflicts to influence targeting and streamline decisionmaking, marking a significant shift in the nature of modern warfare. AI also has the potential to aid in weapons and systems design, influence offensive and defensive cyber operations, and increase the autonomy of uncrewed vehicles. In the intelligence domain, AI allows analysts to rapidly make sense of immense datasets and generate novel ideas and insights on complex national security issues. These applications,

however, also carry risks that require careful human engineering to appropriately mitigate risk of AI autonomy before they are broadly deployed.

Advanced semiconductors, also known as advanced chips, underpin the most advanced AI R&D, allowing the largest and most expensive models to train on massive datasets at speeds and scales that might otherwise be impossible. Because advanced chip R&D and manufacturing is concentrated in few regions, and demands deep expertise and precision, the ability to design and produce these chips domestically is both an economic and geopolitical priority for the U.S., China, and other countries.

The leading position of the U.S. in AI innovation, including advanced chip design, is driving other global powers to build competitive AI ecosystems of their own. China is the most capable competitor in the AI space, and aims to displace the U.S. as the global AI leader by 2030. China is driving AI adoption at scale—both domestically and internationally—by using its sizeable talent pool, extensive datasets, government funding, and burgeoning global partnerships.

## QUANTUM COMPUTING

*Early developers in quantum computers will give their countries an extraordinary technological advantage over others in terms of the ability to both quickly process national security information and break current encryption methodology.* Quantum computers consist of quantum bits, or qubits, which play a similar role to the bits in today's digital computers. However, qubits can encode exponentially more information than bits, and by manipulating information stored in these qubits, scientists can produce high-quality solutions to vexing problems. Indeed, quantum computing may revolutionize human abilities to solve problems that are hard to address with even the largest supercomputers.

The emergence of a cryptographically relevant quantum computer (CRQC), which no country has yet to build, threatens the encryption underpinning secure online transactions and communication. CRQC could break the current encryption methods used to protect sensitive finance, health care, and government information, leading to a compromise in the confidentiality and integrity of the information. The far-reaching consequences of such a compromise has strengthened technology leaders' interest in quantum-resistant encryption methods to safeguard national security information.

The timeframe for transitioning to quantum computing is unclear due to a multitude of challenges. These include the need for more effective private-public coordination, scaling qubits and the overall quantum computer architecture, and R&D in foundational areas such as advanced software and algorithms, materials, hardware, and standards and benchmarks, at a minimum. The U.S., China, EU, Japan, and the UK are all investing billions of dollars to overcome these challenges and secure a first-mover advantage in this emerging field.

[ 13 ]

# DIVERSE THREAT VECTORS

*The global security landscape is volatile and complex, with armed conflict growing more common and posing potential threats to U.S. interests. Strategic competition and regional and smaller powers becoming more willing to use force to pursue their interests heighten the risk of conflict. The space domain is becoming increasingly contested, with China and Russia developing counterspace capabilities to challenge our own space efforts and U.S. dominance more generally. The threats of nuclear proliferation and chemical and biological warfare capabilities continue to grow.*

## MILITARY

**Armed conflict across the globe may pose a threat to U.S. interests and forces through the end of the decade.** The trend is likely to vary significantly in scope and severity, ranging from full-scale conventional wars to low-intensity irregular conflicts, including violence and coercion below the threshold of war. This dynamic stems from a combination of major power competition, state and nonstate actors choosing to use force to achieve their goals, instability within states and regions, and increasing military and unconventional capabilities of both state and nonstate actors.

- In 2024, there were 61 active state-based conflicts across the world, the highest number since the end of World War II, according to the Peace Research Institute of Oslo. These conflicts resulted in about 129,000 battle-related deaths, the fourth highest of any year since the end of the Cold War, and were superseded only by 2021, 2022, and 2023.

- The risk of conflict is heightened by major power competition. Beijing and Moscow view Washington and its allies and partners as aggressors, and hostile toward their interests in Europe and the Asia-Pacific region. They could respond with force should they determine there are critical threats to their core interests.

- Even if the great powers refrain from conflict, many regional and smaller powers are growing much more willing to use force to pursue their interests. Countries such as Egypt, Israel, Pakistan, Turkey, and the UAE are using a mix of lethal aid, proxy forces, or their own military assets to provoke or undermine their rivals or to tilt nearby conflicts in their favor.

- Many countries are now more willing to use deniable, coercive, or violent approaches below the threshold of war. These include acts of sabotage, assassinations, detentions, non-lethal attacks, and the use of migration as a weapon.

[ 14 ]

**The fundamental principles of warfare are unchanged, and combatants are likely to blend many "tried and true" approaches with innovative technologies and techniques.**

- Future warfare will require rapid adaptation, both on the offense and defense. In particular, the proliferation of remotely operated or autonomous weapons systems on the battlefield in Ukraine has shortened timelines for tactical adaptation, with both sides of the conflict devising new measures and countermeasures in the span of weeks.

- Future warfare will require a balance between quality and quantity. Exquisite, high-end capabilities—expensive and slow to manufacture—cannot be continually replenished at scale in a lengthy, high-intensity conflict. Alternatively, some combatants have mass produced cheap and low-tech weapons whose sheer numbers make up for their lack of sophistication.

- Intelligence and information will continue to be important to military success. Uncrewed systems are already ubiquitous on the battlefield, and these will make real-time surveillance and targeting achievable for many militaries, particularly when teamed with commercial imagery and AI or machine learning systems. Proliferation of commercial networks, personal devices, and extensive video recording capabilities will provide additional vectors to gain intelligence insights.

- Future battlefields are more likely to be urban given the steady growth of cities worldwide as well as their political and economic significance.

# SPACE

**Rapid advances in space technology, lower barriers to entry, the deployment of counterspace systems, and the expansion of civilian and military applications have solidified the space domain as a key arena for strategic competition and future conflicts.** Decreasing costs for space launches and satellite manufacturing have enabled a greater number of actors—both state and nonstate entities—to develop or to exploit others' space capabilities. A broader range of actors can now use space capabilities to threaten U.S. and allied military operations, expose sensitive U.S. intelligence activities, and facilitate illicit activities such as drug trafficking and terrorism.

- China has eclipsed Russia as the key U.S. competitor in space. Beijing's rapid deployment of space capabilities positions it to use space to advance its foreign policy goals, challenge U.S. military and technological superiority in space, and project power on a global scale. Russia remains a capable space power, even while its space industry suffers from systemic underfunding, quality control issues, international sanctions, and export controls.

- The evolution of the Russia–Ukraine war has heightened global awareness of the impact that space services have on military operations. Ukraine demonstrated for the first time that a nation without its own space infrastructure can integrate commercial and partner space services to defend against an adversary with established space systems and decades of military space operations experience.

[ 15 ]

***Competitor threats to U.S. space architectures are growing in scale and complexity as nations prioritize the development of extensive counterspace capabilities to contest U.S. space dominance.*** Architecture improvements aimed at making satellites and constellations safer and more capable will pose a security dilemma to U.S. competitors, and probably will incentivize them to pursue new weapons and more aggressive strategies that introduce new escalatory risks.

- Competitors are closely monitoring U.S. space developments, and probably will seek new ways to overcome or counter larger and more resilient U.S. space architectures during the coming decade. Ukraine's use of Starlink for resilient communications and U.S. plans to deploy hundreds of missile defense satellites probably are amplifying adversary views of the importance of defeating large constellations.

- Disruptive attacks against space services have become more common and probably will be normalized during crises or periods of strained relations between nations. Adversaries are using jammers against U.S. satellites, and the risks stemming from cyber attacks against satellite communications are also growing as global reliance on digital systems expands the number of exploitable cyber vulnerabilities associated with space services.

***Nuclear weapons are a growing threat to satellites.*** Russia is developing a new satellite meant to carry a nuclear weapon as an antisatellite capability. A nuclear detonation in outer space would harm all countries' national security and commercial satellites and infrastructure, as well as impair U.S. use of space as a driver for economic development.

# CYBER

***Cyber actors from China, Russia, Iran, North Korea, and ransomware groups will continue to pose critical threats to U.S. networks and critical infrastructure.*** These global cyber actors almost certainly will continue malicious cyber activities because they gain unmatched intelligence collection value and financial incentives from these operations. These cyber adversaries also have the ability to pre-position or execute disruptive and destructive attacks against U.S. critical infrastructure and other targets. They continue to pour resources into operations to compromise U.S. systems and core global IT resources.

***China is the most active and persistent cyber threat to U.S. Government, private-sector, and critical infrastructure networks, while Russia poses a persistent, advanced cyber attack and foreign intelligence threat.*** Both countries are continuing their R&D and pre-positioning efforts to advance their premier cyber attack capabilities for use against the U.S.

***Iran poses a threat to U.S. networks and critical infrastructure in the form of cyber espionage and cyber attacks. Iran's cyber operators previously have used cyber attacks to effect against poorly defended targets and weaker opponents, such as Albania.*** Iran maintains persistent intent to target the U.S. and its allies and partners with cyber operations despite the challenges it faced most recently on display during the 12-Day War in 2025, during which Tehran struggled to defend itself against Israeli cyber attacks and to respond in kind. We note that Iranian proxies and hacktivists outside of Iran will also seek cyber-enabled operations against U.S. targets but these probably will be less technically advanced. On 11 March, a hacking group linked to Iran claimed

[ 16 ]

responsibility for a cyber attack against a U.S. medical technology company in retaliation for U.S. attacks against Iran. The hacking group claimed that it had erased 200,000 systems and extracted 50 terabytes of data from the company.

***North Korea's cyber program—combined with Pyongyang's use of IT workers with falsified credentials to gain employment with unwitting companies—is sophisticated and agile, and North Korea is capable of conducting espionage, cybercrime, and cyber attacks.*** It is focused on evading financial sanctions, stealing funds to support its military, and conducting cyber espionage to fill gaps in the regime's weapons programs. Pyongyang's cyber forces are capable of achieving a variety of strategic objectives against diverse targets, including in the U.S. and South Korea, while its growing use of human insider access to circumvent cyber security measures threatens targets with stronger defensive measures. Cryptocurrency heists and other financial crimes also continue to net at least $1 billion each year to fund the regime's weapons programs. North Korean cyber actors' expansion of ransomware attacks and other cybercriminal activities increase the disruptive threat to the U.S. IT systems and critical infrastructure entities.

***Financially or ideologically motivated nonstate actors such as ransomware groups, other cyber criminals, and hacktivists are taking more aggressive cyber attack postures.*** Ransomware attacks in particular harm U.S. critical infrastructure and business operations, leading to operational disruptions, loss of revenue, and loss and theft of sensitive data. Ransomware groups are shifting to faster, high-volume attacks, making it harder for security experts to identify and mitigate incidents.

# WMD

***Governments' respective threat perceptions and competition with other states will continue to drive WMD modernization, expansion, and testing efforts.*** Countries probably will continue to develop a range of WMD capabilities with small and large effects to diversify their toolkits of military options. Countries without WMD capabilities may choose to pursue them in response to perceived increases in regional insecurity, a deterioration of global WMD norms, greater doubts about relying on existing security agreements with others, and reduced confidence that the international community would impose and maintain credible consequences.

- Beijing views nuclear modernization as critical for strategic competition with the U.S. For its part, Moscow views U.S. long-range precision-strike systems and future developments in U.S. missile defenses as threats to its nuclear deterrent. In addition, North Korea is investing in nuclear-capable systems to deter the U.S., challenge regional missile defenses, and hold targets in South Korea at risk.

- Adversary states probably maintain offensive CBW programs in part because they perceive that the U.S. and its allies have these capabilities. Some states with these offensive programs probably will continue to invest in their large-scale CBW capabilities as part of their broader suites of military options and contingencies, including stockpile replenishment, the modernization of production capabilities, and the development of delivery systems.

[ 17 ]

***Countries with WMD capabilities are modernizing, expanding, and testing those capabilities and delivery systems.*** The range of WMD threats to the U.S. will grow as states create more diverse use options and delivery systems that could reduce the threshold for use, circumvent U.S. missile defenses, or evade detection. The ongoing development and inclusion of these dual-use technologies also challenge the IC's ability to collect on and detect their emergence or developmental progress, including for WMD efforts, as well as identify ways to counter the development and production of these capabilities.

- With varying degrees of success, China, North Korea, Pakistan, and Russia probably will continue to research, develop, and field delivery systems that will increase their ranges and accuracy, challenge U.S. missile defenses, and provide new WMD-use options. India also is developing new and longer-range nuclear delivery systems.

- Russia has the largest and most diverse nuclear weapons stockpile and is modernizing its nuclear weapons capabilities in the face of multiple failed tests of new systems. China remains intent on modernizing, diversifying, and expanding its nuclear posture for strategic rivalry with the U.S. Both countries are continuing to develop nuclear-capable systems meant to penetrate or bypass U.S. missile defenses. North Korea is strongly committed to expanding its nuclear weapons arsenal, as shown by its pace of flight tests and publicized uranium enrichment capabilities.

- Prior to Operation Epic Fury, Iran was pursuing increasingly capable missile systems, was non-compliant with its Chemical Weapons Convention obligations, had not abandoned its intention to conduct R&D of biological agents and toxins for offensive purposes, was intending to try to recover from the devastation of its nuclear infrastructure sustained during the 12-Day War, and refused to live up to its nuclear obligations with the IAEA, including refusing to allow IAEA access to key nuclear facilities. During Operation Epic Fury, the IAEA confirmed recent damage from airstrikes to the entrance buildings of the underground Natanz Fuel Enrichment Plant, but did not anticipate any release of radiological materials. We are monitoring Iranian WMD-related capabilities and actions following the initiation of Operation Epic Fury.

***Most states with CBW programs have developed these weapons for tactical use such as targeted killings, special military operations, and CT or counterintelligence operations, and probably will continue these investments during the next several years.*** States with CBW programs are developing a range of capabilities designed to challenge the ability to detect, treat, or attribute attacks, and in recent years some have pursued, maintained, or expanded large-scale CBW capabilities for battlefield use. China, North Korea, and Russia probably maintain the knowledge and capability to produce and employ traditional biological pathogens and toxins, and historically have pursued—or, in the case of North Korea, continues to pursue—pathogens that cause highly infectious or contagious diseases.

- Russia's scientists continue developing new CBW capabilities. Its intelligence services have used Novichok nerve agents twice since 2018 in assassination attempts, and its military has used chemicals in thousands of attacks against Ukrainian forces since 2022. China probably possesses CBW capabilities that threaten U.S., allied, and partner forces as well as civilian

populations. North Korea maintains its CW capabilities, and Pyongyang may use such weapons during a conflict or in an unconventional or clandestine attack.

- State programs are pursuing advanced technologies to develop military capabilities, such as novel industrial processes and bioenergy sources, which may also support the creation of antiagriculture, antimaterial, and antipersonnel agents. Advances in dual-use biotechnology—including bioinformatics, synthetic biology, nanotechnology, and genomic editing—could lead to novel biological threats or raise the potential for biological safety events resulting in the unintentional release of pathogens.

## Arms Control

Some countries will continue to challenge arms control regimes and normative behavior regarding WMD development by avoiding, abandoning, or subverting existing or future agreements; using perceived tolerance of small-scale use and testing; and developing asymmetric capabilities. Russia, in particular, has undermined arms control agreements during the last five years and used chemical weapons in Ukraine, although Moscow probably will continue to abide by the longstanding norm against the large-scale use of chemical, biological, and nuclear weapons absent a significant shift in its conflict with Kyiv.

Since the start of its war in Ukraine, Russia has levied nuclear threats against the U.S. and NATO, declared that it deployed nuclear weapons in Belarus, and unilaterally suspended its data exchanges required by the New START Treaty, while holding to its central numeric limitations. Moscow has also deratified its participation in the Comprehensive Nuclear Test Ban Treaty. In addition, Moscow is developing space-based antisatellite nuclear weapons, which, if deployed, would be inconsistent with its obligations under the Outer Space Treaty.

# REGIONAL CHALLENGES

***China, Russia, Iran, and North Korea view the U.S. as a strategic competitor and potential adversary, perceiving it as a threat to their respective interests and ambitions, and seek to counter and undermine U.S. influence and power through a range of diplomatic, economic, and military means.*** China aims to dominate its region and challenge Washington's leadership, promote its own multilateral and economic influence, and strengthen its military while viewing the U.S. as its main strategic competitor. Russia continues to challenge U.S. interests and power, seeking to restore its influence in the former Soviet space, particularly Ukraine. Iran's strategic position faces extreme challenges as it attempts to address potentially regime-threatening conflict and the ongoing risk of domestic unrest. For now, it retains the ability to project power in the region and to suppress internal threats to the regime's hold on power. North Korea is committed to expanding its strategic weapons programs, including missiles and nuclear warheads, to solidify its deterrent capability. However, even in an era of major power competition, these powers will sometimes have common or overlapping interests where they can cooperate for mutual benefit, as we saw recently between the U.S. and China with the Busan Agreement.

***Selective cooperation among China, Russia, Iran, and North Korea, driven by the common goal of balancing U.S. efforts and actions and supporting their own strategies, is bolstering the threat that each of them poses to the U.S.*** However, the relationships are limited and primarily bilateral, and the concept of "adversary alignment" overstates the depth of cooperation that is currently occurring. China's economic support for Russia and Iran and their increasing trade has helped Moscow and Tehran to each withstand U.S.-led international sanctions. North Korea's and Iran's military support to Russia have helped Moscow in its war against Ukraine, which is in turn bolstered by Western support. These four countries are likely to continue to look for opportunities to increase their cooperation, although enduring divergent interests as well as concerns over directly confronting the U.S. will constrain the actual scale and scope of their relationships.

## Western Hemisphere

***Flagging economies, high crime rates, pervasive organized crime, migration flows, corruption, and narcotics trafficking present continuing risks to U.S. interests, while strategic competitors seek greater influence in the region that challenges Washington.*** Latin America and the Caribbean almost certainly will see hotspots of volatility during the coming year, which have the potential to undermine or distract countries, particularly U.S. partners, from improving living conditions, tackling illicit drug flows, and warding off foreign influence.

- Venezuela continues to struggle with many of these dynamics, but since the arrest of Nicolas Maduro—who led a corrupt, authoritarian government—we have seen a willingness on the part of the Venezuelan Government to cooperate with the U.S. to open up its economy and develop the country's abundant oil and natural gas extraction capability. The government has released some political prisoners as part of an amnesty program.

- The review of the U.S.–Mexico–Canada Agreement (USMCA) scheduled for 2026 almost certainly will increase uncertainty among Latin American economies, particularly those that rely on Mexico as an export destination for intermediate goods for manufacture and onward export to the U.S. Some are being affected by new Mexican tariffs, designed to limit the practice. Expecting stricter requirements under a revised USMCA, the Mexican Government took action in December 2025 to protect North American supply chains from foreign transshipment when it approved new tariffs on inputs from countries lacking free-trade agreements with Mexico.

- China, Russia, and Iran are seeking to sustain economic, political, and military engagement with Latin America that may conflict with U.S. interests in the region. China's demand for raw materials is likely to drive continued economic outreach to Latin America, while Russia probably wants to expand its current security and diplomatic ties with Cuba, Nicaragua, and Venezuela.

[ 20 ]

## Asia

### China Strategic Overview

*President Xi and his government aim to achieve "the great rejuvenation of the Chinese nation" by 2049. China will seek to increase its power and influence to shape its region and world events; create an environment favorable to Chinese interests; overcome perceived containment efforts by the U.S.; secure its freedom of movement at sea; reduce U.S. military presence and operations on its periphery; and fend off challenges to its reputation, legitimacy, and capabilities at home and abroad. China also sees benefits to and is prioritizing a productive, stable economic relationship with the U.S., as evinced by its approach to the Busan Agreement with the Trump administration.*

- Beijing has been deeply suspicious of Washington's intentions and has long viewed the U.S. as pursuing a coordinated effort to contain China's development and rise, undermine Chinese Communist Party (CCP) rule, and prevent the country from achieving its aims.

- At the same time, Chinese leaders will seek to reduce tension with Washington when they believe that such efforts benefit Beijing, protect China's core interests, and buy time to strengthen its position.

- Beijing will continue to strengthen its conventional military capabilities and strategic forces, intensify competition in space, and sustain its industrial- and technology-intensive economic strategy to compete with U.S. economic power, making advances in the "Global South" in advanced manufacturing and the exportation of goods. China will likely continue working to maintain U.S. dependence on sectors such as critical minerals, energy storage systems, pharmaceutical ingredients, and UAVs, while accelerating efforts to reduce China's dependence on the U.S. in sensitive or strategic areas, such as semiconductors and AI. In addition, China has shown its ability to compromise U.S. infrastructure through formidable cyber capabilities for both espionage and strategic advantage in the event of a conflict.

- China's engagement with Russia substantially strengthens Moscow's ability to sustain the war in Ukraine and resist external pressure. China's imports of Russian oil and natural gas provide key sources of revenue for Moscow, helping it weather international sanctions. China's exports of dual-use goods and technology to Russia help sustain Moscow's defense production while reducing its incentives to reach a cease-fire in Ukraine.

**China–Taiwan**

*In 2026, Beijing probably will continue seeking to set the conditions for eventual unification with Taiwan short of conflict.* China, despite its threat to use force to compel unification if necessary and to counter what it sees as a U.S. attempt to use Taiwan to undermine China's rise, prefers to achieve unification without the use of force, if possible. The People's Liberation Army (PLA) also continues to develop military plans and capabilities for attempting to achieve unification using military force if directed to do so.

The PLA probably is making steady but uneven progress on capabilities that it would use in any attempt to seize Taiwan and deter—and, if necessary, defeat—U.S. military intervention. At times, it has increased the scope, size, and pace of operations around Taiwan.

- The IC assesses that Chinese leaders do not currently plan to execute an invasion of Taiwan in 2027, nor do they have a fixed timeline for achieving unification. However, China publicly insists that unification with Taiwan is required to achieve its goal of "national rejuvenation" by 2049—the 100th year anniversary of the founding of the People's Republic of China (PRC). Beijing almost certainly will consider a variety of factors in deciding whether and how to pursue military approaches to unification, including PLA readiness, the actions and politics of Taiwan, and whether or not the U.S. will militarily intervene on Taiwan's behalf.

- Chinese officials recognize that an amphibious invasion of Taiwan would be extremely challenging and carry a high risk of failure, especially in the event of U.S. intervention.

A conflict between China and Taiwan may disrupt U.S. access to trade and semiconductor technology critical to the global economy. If the U.S. were to intervene, it probably would face significant but recoverable disruptions to its transportation sector from Chinese cyber attacks. Even without Washington's involvement, U.S. and global economic and security interests would face significant and costly consequences, with tech supply chains disrupted and investor fear across markets. In addition, a protracted war with the U.S. risks unprecedented economic costs to the U.S., Chinese, and global economies.

**China–East Asia**

*China seeks to advance political and military control of its claimed territory in the South China Sea.* During the past year, China has advanced its control over disputed maritime territory in the South China Sea, particularly at the Philippine-claimed Scarborough Reef and Second Thomas Shoal, through persistent military and coast guard patrols and diplomatic and legal actions.

- In September 2025, China publicly established a nature reserve at Scarborough Reef, which lies within the Philippines Exclusive Economic Zone. The reserve covers more than 3,500 hectares on the northeast side of Scarborough, with a "core zone" and outer "experimental zone" that requires approval for foreigners' entry and bans human activities, such as fishing.

[ 22 ]

***China–Japan tensions increased significantly in November 2025 following comments made by Japanese Prime Minister Takaichi describing a potential Chinese invasion of Taiwan as a "survival threatening situation" for Japan.*** *In response,* China is employing multidomain coercive pressure that probably will intensify through 2026, aimed both at punishing Japan and deterring other countries from making similar statements about their potential involvement in a Taiwan crisis.

- Prime Minister Takaichi's specific comments carry weight in Japan's system because the phrase "survival threatening situation" serves as a possible legal justification for military authorities under Japan's 2015 Legislation for Peace and Security. Her comments represent a significant shift for a sitting Japanese prime minister. China perceived her comments to be escalatory and violation of the Sino-Japanese Joint Statement of 1972 and their Treaty of Peace and Friendship of 1978, which included Japan's recognition of the PRC as China's sole government and respecting China's position that Taiwan is an inalienable part of its territory. China probably is concerned that Prime Minister Takaichi's comments will bolster Taiwan's independence movement.

- China's initial actions have included aggressive official rhetoric, the cancellation of flights and cultural exchanges, and the reimposition of its ban on Japanese seafood imports. Beijing probably will escalate to additional coercive economic measures if tensions increase.

- China probably will also increase military and coast guard activity around the Senkaku Islands—disputed territory administered by Japan but claimed by China—to signal displeasure and test Japanese responses. These activities could increase the risk of accidents or miscalculation leading to inadvertent escalation.

**North Korea Strategic Overview**

***North Korea remains committed to expanding its strategic weapons programs, including missiles and nuclear warheads, and to solidifying its deterrent capability.*** North Korea's WMD, conventional military capabilities, illicit cyber activities, and demonstrated willingness to use asymmetric capabilities to attack South Korea and the U.S. pose significant threats to the U.S. and its allies, particularly South Korea and Japan. Increased trade after the pandemic, income from selling munitions to Russia, and illicit cyber activities including cryptocurrency thefts have boosted North Korea's foreign currency revenue generation to its highest levels since before extensive sanctions were imposed in 2018. North Korea's partnership with Russia is growing, and in 2025, North Korean leader Kim Jong Un took steps to improve ties to China—still North Korea's most important trading partner and economic benefactor—after the relationship had cooled because of Beijing's earlier opposition to Pyongyang's nuclear and missile tests.

- A more confident North Korea continues to reject direct engagement with South Korea and refers to Seoul as its "main enemy."

The benefits that North Korea receives for its support for Russia in the war against Ukraine have increased North Korean capabilities. North Korean military forces have gained valuable combat experience in 21st Century warfare along with equipment. North Korea's ability to institutionalize lessons learned and consolidate gains from Russia will determine how valuable it will be. However, North Korea is likely to remain deterred by U.S. and allied forces.

- In 2024, North Korea deployed more than 11,000 troops to Russia to support combat operations in Kursk. North Korea has also provided artillery munitions, military equipment, and ballistic missiles to Russia during the course of the conflict.

**South Asia**

***During the past year, South Asia remained a source of enduring security challenges for the U.S.*** India–Pakistan relations remain a risk for nuclear conflict given past conflicts where these two nuclear states squared off, creating the danger of escalation. The terrorist attack last year near Pahalgam, in the Indian Union Territory of Jammu and Kashmir, demonstrated the dangers of terrorist attacks sparking conflict. President Trump's intervention deescalated the most recent nuclear tensions, and we assess that neither country seeks to return to open conflict, but that conditions exist for terrorist actors to continue to create catalysts for crises.

- ISIS-K maintains a foothold in the region and aspires to conduct external attacks, but the Taliban is improving its security services and has taken aggressive action against it. The Taliban has conducted extensive raids against ISIS-K targets, probably thwarted some attacks, and driven some ISIS-K leaders to relocate to neighboring countries.

[ 24 ]

- Pakistan continues to develop increasingly sophisticated missile technology that provides its military the means to develop missile systems with the capability to strike targets beyond South Asia, and if these trends continue, ICBMs that would threaten the U.S.

- Relations between Pakistan and the Taliban have been tense, with intermittent cross-border clashes, as Islamabad has become increasingly frustrated with anti-Pakistan terrorist groups' presence in Afghanistan while Islamabad faces growing terrorist violence. On 26 February, the Afghan Taliban launched strikes against Pakistani military positions along their shared border, claiming retaliation for prior Pakistani airstrikes. Pakistan responded within hours by bombing Afghan border provinces and the capital Kabul—the first time Pakistan has struck Afghanistan's urban centers. The fighting has continued since it erupted. Pakistan's army chief warned this month that lasting peace requires the Taliban to sever ties with militants targeting Pakistan. The Taliban's public posture has been to call for dialogue, but it has denied harboring anti-Pakistani militants.

## Europe-Eurasia

### Europe

***As the primary economic and military partners of the U.S., the strength and resiliency of European countries have clear implications for U.S. interests and national security.*** European leaders have taken action to reverse decades of underinvestment in defense and national security and are increasing defense spending. At the same time, much of Europe faces challenges or capacity limitations that inhibit robust security cooperation in the near term. Several EU members face mounting levels of national debt, coupled with anemic growth. In addition, many countries across the continent are contending with the effects of large-scale migration, to include Islamist radicalization within some immigrant communities.

- Demographic trends indicate that EU members, including Italy, Germany, and many countries in Eastern Europe, will face serious fiscal challenges as waves of retirees strain public pension systems, with fewer young workers available to replace them. Much of Europe has relied on low-skilled immigration to ease labor shortages, particularly as the continent's median age surpasses 47. However, various factors, including a lack of effective assimilation, have limited the capacity to absorb new arrivals, and different values systems have fueled social tensions.

- As of 2024, Europe hosted about 90 million international migrants, mostly in Western Europe. Large increases since 2020 have included more than 6 million Ukrainians registered for temporary protection, and waves of asylum seekers and refugees, economic migrants, and family members from Asia, the Middle East, Africa, Latin America, and the Caribbean.

The lack of social integration and limited employment opportunities in some EU member countries, coupled with contrasting cultural and religious values, have made some immigrant youth more susceptible to political and religious radicalization—or they arrive having already been radicalized. Acts of terrorism, violence toward women, and anti-Semitism among immigrants from Islamic

countries are on the rise. One of the effects of these trends is unsurprisingly greater anti-immigration sentiment among many European voting constituencies.

- Many European political parties seek to curtail the tide of non-European immigration that has endured during the past 20 years. Polls suggest that most Europeans see non-European immigration as creating problems for their countries, and in the spring of 2025, European respondents ranked immigration as the top noneconomic problem facing their countries.

- There is a multiplicity of Islamic movements in Europe, some of which are connected to the Islamist ideological movement of the Muslim Brotherhood (MB). Islamist terrorist groups and hostile actors have exploited HAMAS's attacks against Israel and Israel's response as a rallying call to plot attacks against Christian and Jewish targets in Europe.

Europe's economic challenges and slow growth have been compounded by Russia's invasion of Ukraine in 2022 and COVID-era fiscal policies. High energy prices and inflation continue to hamper economic growth and may place pressure on efforts to sustain defense spending. Across Europe, governments already strained by high-deficit spending and debt are pledging dramatically higher defense commitments. Higher European defense spending could promote a more robust defense industrial base on both sides of the Atlantic.

Most European countries regard Russia as their greatest and most enduring adversary. Russia's invasion of Ukraine, employment of gray zone tactics against industry and civil society in Europe, and efforts to fuel frozen conflicts have galvanized European attitudes and strengthened Europe's focus on defense. NATO and EU member states are eager to see the war in Ukraine resolved in a way that not only preserves Ukrainian sovereignty, but also deters future Russian aggression in Europe.

- Russia's war in Ukraine revived fears of ethnic conflict and reinforced political fault lines in the Western Balkans between Russia and the West. Russia fuels instability between Serbia— which it favors—and Kosovo over Kosovo's statehood, and backs the separation of Serb entity Republika Srpska from Bosnia and Herzegovina. Russia also uses state-sponsored nongovernmental entities to direct campaigns with the goal of obstructing NATO and the EU, highlighting Serb victimhood and promoting ties to Russia, particularly in Bosnia and Herzegovina, Montenegro, and Serbia, which have large ethnic Serb populations.

- Disruptions to Europe's critical infrastructure by state-affiliated actors have the potential to cause loss of life, harm U.S. and European commercial interests, and affect Ukrainian military supplies. For example, European countries are increasing spending on capabilities to detect, track, identify, and counter small UAVs and other threats.

**Eurasia**

***Russia retains the capability to selectively challenge U.S. interests globally by military and nonmilitary means.*** Its robust, advanced conventional and nuclear forces are an enduring threat to the Homeland, U.S. allies and partners, and U.S. forces abroad. The most dangerous threat posed by Russia to the U.S. is an escalatory spiral in an ongoing conflict such as Ukraine or a new conflict that led to direct hostilities, including nuclear exchanges. Russia has also cultivated partnerships with China, Iran, and North Korea to further its own interests, and makes use of an

[ 26 ]

array of tools that fall into the gray zone of geopolitical competition below the level of direct armed conflict. At the same time, Russia's aspirations for multipolarity could allow for selective collaboration with the U.S. if Moscow's threat perceptions regarding Washington were to diminish.

- Even with wartime attrition, Russia's ground forces have grown, and its air and naval forces are intact and arguably more capable than before the full-scale invasion. Russia has advanced systems, including counterspace weapons, hypersonic missiles, and undersea capabilities designed to negate U.S. military advantages. Russia is also building novel nuclear weapons platforms to supplement its already formidable nuclear air, land, and sea-based triad, complicating U.S. nuclear deterrence calculus.

- Russia is likely to remain resilient against Western sanctions and export controls, although at the cost of expanding budget deficits and underinvestment in the civilian economy that increase the risk of long-term economic stagnation and deepening dependence on China. Moscow relies on its partnerships with other U.S. adversaries to evade sanctions. It also is attempting to evade sanctions by setting up alternate payment systems.

- Russia's gray zone tools include cyber attacks, disinformation and influence operations, energy market manipulation, military intimidation, and sabotage. Russia often hides and denies its role, complicating U.S. efforts to counter it.

**The U.S.-sponsored Peace Summit on 8 August between Armenia and Azerbaijan has created an opportunity for the two countries to establish a lasting peace deal and contributed to increasing regional stability.** The results of the Peace Summit included a provisional agreement on the terms of a peace treaty and plans to establish the "Trump Route for International Peace and Prosperity" (TRIPP), managed by the U.S., that will connect Azerbaijan to its exclave of Naxcivan across southern Armenia, unlocking trade flows for both nations and the region.

- These developments represent a significant change in direction for Armenian–Azerbaijani relations. In 2020 and 2023, Azerbaijan militarily retook control of its Nagorno-Karabakh region from an ethnic Armenian population supported by Yerevan.

- Since 8 August, both sides have appeared willing to maintain the momentum from the Peace Summit. Border ceasefire violations between Armenia and Azerbaijan have plummeted and now are almost nonexistent. In October 2025, Azerbaijani President Ilham Aliyev announced that Azerbaijan had lifted restrictions on cargo transit through Azerbaijan to Armenia, a move that Armenian Prime Minister Nikol Pashinyan reciprocated within days. Since then, Azerbaijan has shipped gasoline and permitted transshipments of wheat to Armenia.

- There are still hurdles to the final conclusion of a peace deal. For example, President Aliyev continues to insist that Armenia change its constitution to remove a reference that he characterizes as claiming Nagorno-Karabakh is part of Armenia, a step which would require Armenia to hold a constitutional referendum whose passage is not guaranteed.

**Russia–Ukraine**

*During the past year, Russia has maintained the upper hand in its war against Ukraine and sees little reason to stop fighting so long as its forces continue to gain ground. Moscow almost certainly remains confident that it will prevail on the battlefield in Ukraine and force a settlement on its terms.* However, U.S. efforts to forge peace hold the potential to change this dynamic and ameliorate some of the conflict's regional effects. A durable settlement to the war in Ukraine could open the door for a thaw in U.S.–Russia relations and an improved bilateral geostrategic and commercial relationship.

- The continuation of the war increases the risk of both inadvertent and deliberate escalation to direct conflict between Russia and NATO forces. Russia's continued willingness to use sabotage against U.S. and European allies to disrupt their support for Ukraine—for example, the railway explosion in Poland in November 2025—exemplifies this threat.

- Similarly, Russia's use of nuclear threats and combat use of dual-capable intermediate range ballistic missile systems in Ukraine raises the specter of a regional conflict expanding to an existential threat to the Homeland.

- The war also will continue to have spillover effects in other parts of the globe, as shown with North Korean troops gaining valuable warfighting experience and military technology from Russia for participating in combat operations against Ukraine.

**Russia Strategic Overview**

*Russia views itself as a key geostrategic competitor of the U.S. and seeks a multipolar world order in which Russia reaches and maintains a privileged position, equal to that of the U.S. and other great powers, including China. Russia is trying to reshape global politics, frequently at U.S. expense, and seeks to restore its sphere of influence and prevent further NATO expansion in the former Soviet space, especially Ukraine.* Russia probably will continue selectively confronting the U.S. and its partners globally with its full range of capabilities where it sees opportunities to gain an advantage, driven in part by its longstanding perception that the U.S. poses a significant threat to its interests. Russia is also likely to continue collaborating with other powers, including U.S. adversaries, to jointly oppose the U.S. where their respective interests overlap.

*Regional developments in the post-Soviet space, particularly the South Caucasus and Central Asia, pose both challenges and opportunities for the U.S.* The region contains substantial reserves of key resources, including critical minerals, oil, and gas. Opportunities also exist for U.S. investment in diversified transit corridors connecting the Eurasian landmass with global markets and commercial opportunities. However, Russian political and economic influence in many of these countries presents an obstacle for U.S. private-sector engagement, as does pervasive corruption. Growing Chinese economic and political influence—often at Russia's expense—poses similar difficulties while also threatening to divert critical resources to the Chinese market. The region also remains a hub for drug trafficking and jihadist terrorist activity, which continues to pose a threat to the U.S. and our allies and partners. Ongoing U.S. engagement to resolve regional conflicts, such as between Armenia and Azerbaijan, can improve U.S. access to the region and facilitate strategic investments and commercial opportunities.

## Middle East

*In the Middle East during the next year, conflict and instability will shape security, political, and economic dynamics in a variety of ways. The U.S.-led Operation Epic Fury launched at the end of February is advancing fundamental change in the region that began with HAMAS's attack on Israel on 7 October 2023 and continued with the 12-Day War, resulting in weakening Iran and its partners and proxies.*

*Simultaneously, Israel's tolerance for persistent threats on its border has eroded and its policy of projecting military force beyond its borders to address emerging or potential threats has created domestic pressure on Arab leaders, challenged Gulf economic plans, and made overt Arab partnerships with Israel more challenging.*

- Israeli leaders this year are likely to continue using proactive and sometimes provocative military action in a bid to undermine and deter regional adversaries. If the regime in Tehran survives, Israel is likely to use all available means to prevent Iran from rebuilding its capabilities devastated during the 12-Day War and Operation Epic Fury. It will also seek

additional ways to undermine the regime. Iran, meanwhile, will try to recover and rebuild its influence, including maintaining its ability to project power and pose a viable retaliatory threat to Israeli and U.S. interests.

- Meanwhile, leaders across the region, and particularly in Egypt, Jordan, Lebanon, and the West Bank, are facing substantial political and socioeconomic strains that are exacerbated by regional conflict. Additional shocks—such as mass population movements from Gaza or neighboring countries, or new rounds of conflict—could provoke large-scale popular unrest and test government stability.

- The conflict with Iran has at least temporarily smoothed the tensions between Saudi Arabia and the UAE, which emerged in part over divergent visions for Yemen, as they seek to present a united front against Iran's aggression, avoid extensive damage, and preserve their economic transformation agendas. In the aftermath of the conflict, these tensions could reemerge, with implications for a broad range of regional issues.

- Syria's Government is focused on asserting control over the vast territory formerly controlled by the Kurdish-led Syrian Democratic Forces and advancing President Ahmad al-Shara's goal of unifying Syria. Shara' is likely to try to integrate Druze-controlled southern Syria next. His success will be shaped by his ability to establish security, govern, rebuild economic opportunities, and develop trust with skeptical domestic and foreign audiences. Syrians, for their part, hold entrenched and often conflicting visions for their country's future, and are concerned about hardline Islamist terrorist elements within the Syrian Government, a major hurdle to establishing a stable and inclusive government.

***When the conflict with Iran concludes, the region's key players are likely to reexamine longstanding assumptions and alliances as they determine how best to advance their interests in the changing region.*** Among the key decisions will be how the emerging balance of power between Jerusalem and Tehran affects the desirability of partnership with Israel and their levels of commitment to the U.S.-backed peace plan for Gaza, which represents additional opportunities for regional security and economic cooperation.

***With Iran weakened and focused on survival, Axis of Resistance members are on the back foot. Israel has seriously weakened the conventional military capabilities of these groups, which are likely to lean into asymmetric methods to threaten Israeli and U.S. interests in the region and beyond. In the meantime, non-Iran affiliated terror groups will seek opportunities to drive and take advantage of instability in the Middle East.***

HAMAS is degraded but has used the cease-fire with Israel to restore some of its capabilities and control over parts of Gaza. HAMAS's refusal to disarm and Israel's concerns about its ability to continue to threaten Israel are delaying progress toward fulfilling the terms of the President Trump's peace plan, even as stakeholders continue to develop the plan's security and governance institutions. We expect that HAMAS will accept some degree of disarmament but will seek the minimum level that it considers necessary to preserve the cease-fire while allowing it to remain the dominant force in Gaza. Israel may increase attacks against HAMAS during the coming months, depending on its progress against other adversaries, if it believes that the group is slow-rolling disarming.

Lebanese Hizballah's decision to attack Israel on behalf of Iran has exposed the group to new military pressure from Israel at the same time that support from Iran appears uncertain going forward. The group had been trying to rebuild its military capabilities and revive its political influence in Lebanon, but renewed conflict with Israel almost certainly will further weaken the group and lead to internal debate about its future. Hizballah's actions have also prompted Lebanon's leaders to declare its military activities to be illegal, but Hizballah is prepared to resist domestic attempts to disarm. Meanwhile, Israel is likely to continue striking Hizballah targets and maintain its bases in southern Lebanon until it perceives that the group no longer poses a threat.

The Huthis in Yemen remain a resilient challenger to U.S. and partner interests in the region, and their military capabilities and strategic location on the Red Sea allow them to try to extort concessions from the international community.

ISIS and al-Qa'ida will seek to expand their safe havens in Syria as they aim to play spoiler by exploiting governance gaps, sectarian violence, and external interventions to stage attacks that undermine trust in the Syrian Government's ability to provide security. ISIS probably is indoctrinating thousands of children of former ISIS fighters who fled from displaced persons camps in northeast Syria and preparing them to serve as the next generation of ISIS members.

**Iran Strategic Overview**

*Operation Epic Fury almost certainly has curtailed Iran's ability to project power, but it is using all of its remaining capabilities—including advanced ballistic missiles, UAVs, and the Axis of Resistance—to retaliate against us and our allies in the hope of bringing the conflict to a close. Even before the conflict, Iran's strategic position was significantly degraded by setbacks in the region and its failure to resolve domestic frustrations.*

- Iran has incurred a series of strategic setbacks since October 2023, including Israel's degradation of Lebanese Hizballah and the ouster of the Asad regime in Syria. Iran's credibility among its proxies and partners as a steadfast opponent of Israel was undermined by its failure to retaliate for Israeli actions during the Gaza conflict, including the killing of senior IRGC-QF officers and Hizballah Secretary General Hasan Nasrallah.

- The economic, political, and societal seeds of popular discontent in Iran persist and could threaten further domestic strife akin to widescale and prolonged internal protests in 2022, 2023, and 2025-2026. The economy is beset by low growth, exchange rate volatility, and high inflation, exacerbating the population's discontent. Absent sanctions relief, these trends probably will continue for the foreseeable future. The Iranian public is also cognizant of—and deeply frustrated by—government mismanagement and high-level corruption, factors which manifest themselves in low voter turnout and high cynicism about the likelihood of affecting political change through peaceful means.

- If the regime survives, Tehran almost certainly will seek to exact revenge for the death of Supreme Leader Ayatollah Ali Khamenei; it still maintains its long-term strategic intent to avenge the death of former IRGC-QF Commander Qasem Soleimani by targeting current and former U.S. officials.

## Africa

African governments will use their wealth in critical minerals to seek partnerships that will deliver them meaningful assistance. Concurrent conflicts and crises across the continent will continue to put large numbers of U.S. citizens at risk and cause further instability. Infectious diseases endemic to Africa, such as Ebola and Mpox, continue to crop up in new regions on the continent and threaten to spill over.

- Africa harbors vast reserves of critical minerals that are vital to U.S. advanced defense systems and economic competitiveness. China-based firms own more productive mines across Africa for five critical minerals—bauxite, cobalt, graphite, lithium, and manganese—than any other country. These minerals are all critical to advanced weapon and computer processing technology, areas in which China is seeking to become a global leader and achieve technological self-reliance.

Africa has increasingly become a focal point for the global Sunni jihadist movement, as al-Qaʻida and ISIS have exploited weak governance and local conflicts to expand their areas of operation, heightening the threat to U.S. interests in the region and fueling instability.

- Al-Shabaab has encroached on Mogadishu, Somalia, where U.S. personnel are located, during the past year and intensified indirect-fire attacks there. Moreover, al-Shabaab continues to coordinate media with other parts of al-Qaʻida and has provided funding to AQAP in Yemen. Al-Qaʻida elements in the Sahel have implemented an economic blockade of Bamako, Mali, threatening the Malian Transition Government's hold on power and the U.S. presence in the city.

- U.S. military operations in Somalia have hindered ISIS-Somalia's ability to pursue attacks against the U.S. and U.S. interests in the region, while ISIS in West Africa and the Sahel have increased the intensity of their attacks against local security forces and have expanded their areas of operation, moving closer to cities with a U.S. presence.



# EXHIBIT 21



# THE WHITE HOUSE

### WASHINGTON

# UNITED STATES COUNTERTERRORISM STRATEGY



# TABLE OF CONTENTS

Presidential Foreword ................................................................. 3

Introduction | Good versus Bad Counterterrorism ...................... 4

The Threat .................................................................................. 5

Our Counterterrorism Strategy .................................................. 6

    Our CT Principles ................................................................. 6

    Our CT Priorities .................................................................. 6

    The Goals of Our CT Strategy ............................................. 7

Counterterrorism Resources ....................................................... 8

    Counterterrorism and Presidential Diplomacy ...................... 9

Counterterrorism by Region ..................................................... 10

Terrorists and Weapons of Mass Destruction .......................... 15

America First Counterterrorism .................................... 16

## PRESIDENTIAL FOREWORD

When I returned to the White House on January 20, 2025, four years of weakness, failure, surrender, and humiliation under the last administration came to an end. Today, our nation is strong, our borders are secure, and the United States is respected all over the world. We are once again putting America First.

As part of my commitment to defending America from all enemies, foreign and domestic, we are once again working to crush the threat of terrorism. Within 43 days, we apprehended the terrorist mastermind of the attack on Abbey Gate in Afghanistan that left 13 American service members dead. In just one year, we brought back 106 American hostages from captivity abroad without paying a single dollar to their captors. We designated key chapters of the Muslim Brotherhood as the terrorist groups they have always been. We mobilized the Department of Homeland Security to remove illegal alien criminals and Jihadist sympathizers from our country. We ended the war in Gaza, secured the release of all remaining hostages, and began the process of ensuring Gaza can no longer serve as a haven for terrorism and extremism by bringing security and prosperity to the region through the Board of Peace. Operation Midnight Hammer and Operation Epic Fury have dealt devastating blows to the world's number one state sponsor of terror, the sinister regime in Iran, to ensure they can never have a nuclear weapon.

At the same time, my Administration has put an unprecedented focus on dismantling threats to the American homeland in our Hemisphere. We are no longer permitting the cartels and gangs who have poisoned millions of Americans to freely operate in our region or smuggle their drugs, guns, or trafficked women and children into our country. Last year, I rightfully designated the deadly cartels as terrorist organizations, and began using the strength and power of the U.S. military to stop and destroy their operations. Our Armed Forces also demonstrated their incredible power and skill by capturing the narco-terrorist outlaw Venezuelan dictator Nicolás Maduro, bringing him to face American justice. We will not let cartels, Jihadists, or the governments who support them plot against our citizens with impunity. Terrorists of any kind will not be allowed to find safe harbor here at home or attack us from abroad.

Our new U.S. Counterterrorism Strategy is a return to common sense and Peace through Strength. As I said after our first successful counterterrorism mission, just days after I was sworn back in office – if you hurt Americans, or are planning to hurt Americans, "We Will Find You and We Will Kill You."

President Donald J. Trump
The White House
May 2026

# INTRODUCTION | GOOD VERSUS BAD COUNTERTERRORISM

*"In our every principle and action, America and Americans must always come first."*

President Trump, (NSS)

Under the Trump Administration, protecting the United States and our citizens is once again the goal of our national security and foreign policy. That is what we mean by America First. America First has a wide variety of components, from securing our borders to bringing jobs back to America, all to the benefit of the American people.

Counterterrorism (CT) is a core part the national security mission, and its primary objective is to protect Americans from being harmed by terrorist groups and to deter and undermine the support they



receive from enemy actors. Additionally, we recognize that a new type of domestic terrorism has emerged, driven by violent extremists who have adopted ideologies antithetical to freedom and the American way of life.

Our counterterrorism operations will be executed apolitically and founded upon reality-based threat assessments. Our counterterrorism powers will not be used to target our fellow Americans who simply disagree with us. We will not permit the weaponization of America's unparalleled CT capabilities for partisan purposes and in contravention of every American's God-given rights.

*President Donald J. Trump highlights the importance of Peace through Strength during a visit to Al Udeid Air Base, Qatar, May 15, 2025.*

The fact pattern under the Biden Administration was clear: individuals at the highest level of the U.S. Government used their significant powers to politically target individuals in the interests of those they favored, wanted to keep in power, or to help win elections. Millions of Americans have lost confidence in the rectitude of the most powerful elements of our Federal government; the national security apparatus of the United States. That confidence can only be won back when counterterrorism is executed uninfected by politics, and if those who used their counterterrorism powers as a weapon against the innocent pay the full judicial cost for their crimes against the civil rights of innocent Americans.

As President Trump stated in his 2025 National Security Strategy, the "[D]epartments and agencies of the United States Government have been granted fearsome powers. Those powers must never be

4

abused, whether under the guise of 'deradicalization,' 'protecting our democracy,' or any other pretext. When and where those powers are abused, abusers must be held accountable." A radical shift is therefore needed in U.S. counterterrorism, as demonstrated by our successes in the first year of the second Trump Administration.

# THE THREAT

> *"We must protect our country from invasion, not just from unchecked migration but from cross-border threats such as terrorism, drugs, espionage, and human trafficking."*
>
> President Trump, (NSS)

Under the leadership of President Trump, America is again the world's most powerful nation, with the largest economy in history, the most advanced technologies, and the bravest and most skilled warfighters the world has ever seen. This newfound strength has been amply demonstrated by historic operations such as the neutralization of the Iranian nuclear threat under Operation Midnight Hammer and Operation Epic Fury and the arrest and rendition of Venezuelan dictator Nicolás Maduro under Operation Absolute Resolve.

But the terrorist threat has changed. We face new categories and combinations of violent actors that make the established ways of doing counterterrorism insufficient or obsolete. We face a multiplicity of deadly threats from terror groups and non-state actors often secretly supported by governments who wish to undermine us.

Currently we face three major types of terror groups:

- Narcoterrorists and Transnational Gangs
- Legacy Islamist Terrorists
- Violent Left-Wing Extremists, including Anarchists and Anti-Fascists

We can defeat every single one of these groups, but the threat is significant and pervasive.

The borderless America created by the Biden Administration was so badly exploited by threat actors that during one 12-month period of the previous administration, more Americans died as a result of the illicit drugs flooded into the country by the cartels than all the U.S. servicemen killed in combat since 1945. That is an existential threat that President Trump does not tolerate.

# OUR COUNTERTERRORISM STRATEGY

## OUR CT PRINCIPLES

America's new U.S. Counterterrorism Strategy is driven by the principle that America is our homeland. Americans should be safe to live their lives without the fear of terror attacks, the threat of Jihadists, the flooding of our communities with deadly drugs at the hands of foreign narcoterrorists, or violent left-wing extremists who have adopted radical ideologies antithetical to the principles upon which our Republic was founded. Additionally, we will continue to ensure our CT structures are not weaponized against the American people, as prior administrations allowed.

When it comes to state actors, our priority is to identify and fully degrade the lines of covert support provided to cartels and Islamists by our adversaries. This includes overt actions, such as sanctions, shadow fleet oil tanker interdiction, and covert operations to make funding and state-sponsorship very costly to inimical regimes, including their provision of dual-use technologies – especially drones, advanced conventional weapons, or the precursor chemicals used to make deadly narcotics. These CT operations include offensive cyber operations against those planning to kill Americans or who support those plotting to do so.

## OUR CT PRIORITIES

Our CT Strategy first prioritizes the neutralization of hemispheric terror threats by incapacitating cartel operations until these groups are incapable of bringing their drugs, their members, and their trafficked victims into the United States. At the same time, we will continue to find and remove the cartel and gang members who were let into our country under the Biden Administration while using FTO designations to strangle the commercial and logistical sinews of their organizations.

Jihadi terrorists have continued to plot against and kill Americans, in part because of the failed "forever war" policies of prior Republican administrations, the empowerment of terror-sponsoring regimes like Iran under Democrat administrations, and a past unwillingness to challenge Islamist ideologies head on. As a result, our second priority is the targeting and destruction of the top five Islamist terror groups that have the intent and capabilities to execute External Operations against the United States, starting with al Qaeda – especially its most aggressive subgroup, al Qaeda in the Arabian Peninsula (AQAP) – and ISIS, starting with ISIS-Khorasan (ISIS-K). With the FTO-designation of the Muslim Brotherhood (MB), we will continue maintaining pressure on the global Jihadi movement until global MB enterprises can no longer recruit and fund terror against the United States.

Our nation has not been well served by its Intelligence Community (IC), which has been mired in old ways of looking at threats, or has been actively weaponized by its leadership as a political tool. Whether plotting against conservative Catholics attending traditional mass in Virginia, parents standing up for their children at schoolboard meetings, Members of Congress, or President Trump and his associates, this Administration will continue to prohibit the IC from being used politically against innocent Americans. As real threats were ignored or underplayed, Americans have witnessed the politically motivated killings of Christians and conservatives committed by violent left-wing

6

extremists, including the assassination of Charlie Kirk by a radical who espoused extreme transgender ideologies.

In addition to cartels and Islamist terror groups, our national CT activities will also prioritize the rapid identification and neutralization of violent secular political groups whose ideology is anti-American, radically pro-transgender, and anarchist. We will use all the tools constitutionally available to us to map them at home, identify their membership, map their ties to international organizations like Antifa, and use law enforcement tools to cripple them operationally before they can maim or kill the innocent. We will do the same with the state sponsors of such groups and those governments undertaking lethal plots on U.S. soil or against Americans anywhere.

Finally, and in a special strategic category, we will maintain and increase our national assets to combat and render safe the most dangerous terrorist threat to America: non-state acquisition and use of weapons of mass destruction, especially the terrorist use of nuclear or radiological devices. This mission, and the attribution of nuclear threats, remain Presidential priorities as laid out during the first Trump Administration in NSPM-35 and NSPM-36. Technological advances since then necessitate a re-examination of the threat and an update to our relevant CT policies.

## THE GOALS OF OUR CT STRATEGY

The mission of the counterterrorism structures of the U.S. Government is to identify those groups that have the intent and capability to plot attacks against Americans and then neutralize them.

This mission can be broken down into three simple functions:

- Identify terror actors and plots before they happen.
- Cut off their arms, funding, and recruiting streams.
- Ultimately destroy established threat groups.

This necessitates:

- Designation of cartels and transnational gangs as FTOs to make available additional intelligence authorities and deny and disrupt their financial streams and access to the United States.
- Taking necessary and specific actions in self-defense to neutralize imminent threats to the United States.
- A series of similar high-intensity but short campaigns against the five Jihadist groups deemed by the CIA as the most dangerous and capable of External Operations targeting the American homeland and U.S. citizens. This includes al Qaeda and ISIS.
- Diplomatic, financial, cyber, and covert actions to undermine or deter inimical state actors from assisting designated FTOs – whether cartels, Jihadists, or violent left-wing radicals.

As the world's most powerful nation, our means to achieve these goals are tremendous, but not unlimited. We must therefore prioritize our targets and our operations against them.

Beyond the three categories of terrorist threats to the homeland, our Counterterrorism Strategy addresses five functional aspects of the current CT environment:

- New and evolving collaboration between nation-states and threat groups such as cartels.

- New and deepening alliances between the far-left and Islamists, i.e., the "Red-Green" alliance.

- New and evolving alliances between established terrorist groups, such as the collaboration between Al Shabaab and the Houthis.

- Exploitation of new weapons, like drones, by cartels and Jihadists, as well as the provision of these technologies to terrorists by state actors, namely, Iran, China, and Russia.

- The remaining threat of terrorists acquiring and using nuclear, biological, or chemical weapons – President Trump has rightly labeled *the single greatest threat to this world.*"

Additionally, there is the special category of terror-like actions taken by state actors, including acts of sabotage and the use of proxies, assassinassions, and what some of our allies have labeled "hybrid" attacks. We will continue to work with our CT partners to make it impossible for such state-driven terrorism to occur in the homeland.

# COUNTERTERRORISM RESOURCES

The National Security Strategy and National Defense Strategy clearly articulate America's significant means and resources to sustain and defend our people and way of life, from our sacred geography, incredible natural and human resources, and unparalleled wealth powered by limitless innovation to a historic work ethic that have made us the greatest power on Earth.

When it comes to counterterrorism, our resources specifically include intelligence agencies and units who, since 9/11, have become the world's best at "Finding and Fixing" high value targets anywhere in the world. They also include Tier 1 and Tier 2 military units without peer anywhere in the world able to close with and "finish" these targets.



*Two Screen captures on September 15, 2025, depicting a U.S. military strike on a Venezuelan drug cartel vessel on its way to the United States.*

8

Here at home, the Departments of Justice and Homeland Security have returned to their priority function of identifying, investigating, and arresting terrorists and cartel members before they kill or poison Americans. The Department of the Treasury's Threat Finance team, in collaboration with the Department of State, is aggressively targeting any entity or individual connected to designated terrorist organizations with sanctions.

Additionally, there are a number of nations around the world whose militaries, law enforcement agencies, and intelligence units have become the United States' close CT allies and partners. They too are valuable resources that we wish to increasingly lean on as we redistribute the burden of countering global terror threats, which the United States has borne disproportionately.

The above military, law enforcement, and intelligence activities will continue to be complemented and amplified by aggressive information operations to demoralize terror organizations and undermine their anti-American and anti-Western propaganda. We have assets outside the realms of hard security in the informational space that were allowed to atrophy in recent years or were used for partisan political purposes. These were previously de-weaponized and must now be reinvigorated to demoralize and delegitimize terror threat groups and their enablers.

## COUNTERTERRORISM AND PRESIDENTIAL DIPLOMACY



*American schoolteacher Marc Fogel, freed after three and a half years in prison, was welcomed home by the man who liberated him, President Donald Trump.*

Within our counterterrorism resources, one of our greatest non-kinetic tools is the power of presidential diplomacy. The safe return of all hostages and Americans Wrongfully Detained by authoritarian regimes is a number one priority for President Trump. As a result, more than 100 Americans have been brought back home in just the first 15 months of President Trump's second term.

America will never give up on our citizens. Countries that wrongfully detain our citizens run the danger of being designated as State Sponsors of Wrongful Detention, with all the attendant consequences that accrue, and as the regimes in Iran and Afghanistan know, there are true consequences to this designation.

# COUNTERTERRORISM BY REGION

## A. OUR HEMISPHERE

The Trump Administration is in large part defined by a return to common sense which dictates that some things are more important than others and that when it comes to geography, some regions are more important than others.

> *"After years of neglect, the United States will reassert and enforce the Monroe Doctrine to restore American preeminence in the Western Hemisphere, and to protect our homeland."*
>
> President Trump, (NSS)

Understanding the untold carnage wreaked by the cartels against Americans for decades, especially during the borderless Biden years, on his first day back in office, President Trump designated the cartels and gangs flooding drugs, weapons, and illegal aliens into the United States as FTOs. The President has mandated that this problem be combated using the whole of government to ensure that we achieve our objective of degrading and eliminating the cartels and their ability to impact the national security of the United States.

The President has authorized dozens of strikes by the Department of War against cartel drug boats, resulting in a more than 90% decrease in maritime drug smuggling into the United States. Integrating countercartel and counterterrorism efforts allows the U.S. to disrupt the shared networks, financing, and logistical routes used by both designated drug traffickers and Islamist terrorists.

With Operation Absolute Resolve, President Trump took action where so many prior Presidents had not. In a textbook Special Operations mission in support of federal law enforcement, the illegitimate leader of Venezuela, a cartel boss in league with terror-sponsor Iran and its terror proxy Hezbollah, was apprehended and brought to the United States to face justice for his crimes against Americans.

The connections between the cartels and Jihadi terrorism are rooted in the massive drug revenues that fund terrorist organizations and transnational criminal networks and enable their operations against the United States. Operation Absolute Resolve proves that the "Trump Corollary," the blueprint for a modern Monroe Doctrine, is already the reality in our Hemisphere.

We will continue our military and law enforcement campaigns against all the cartels and gangs designated as terrorist organizations by the President. At the same time, we will continue to target their finances and precursor supply lines to cripple their means of production and the movement of profits. We will do so in concert with local governments when they are willing and able to work with us. If they cannot, or will not, we will still take whatever action is necessary to protect our country, especially if the government in question is complicit with the cartels. Under President Trump, the United States will continue to dismantle the cartel networks and disrupt their recruiting and funding streams until they are neutralized and the regimes who helped them are no longer able to do so.

## B. THE MIDDLE EAST

The Middle East has been the main focus of U.S. counterterrorism since the rise of modern terrorism in the 1960s and following the attacks on 9/11. Our growing domestic energy production means the Middle East is no longer as central to America's stability, yet threats from this region remain, and our counterterrorism goals continue to be specifc and rooted in realistic threat analysis.

On Day Eight of the second Trump Administration, President Trump gave the directive to revert to the CT rules of engagement used during his first term regarding strikes against terrorist targets, delegating much of that authority back down to Combatant Commanders instead of the White House, as it was under the Biden Administration. This led to our first successful CT strike just three days later against a senior ISIS leader.

*"America will always have core interests in ensuring that Gulf energy supplies do not fall into the hands of an outright enemy, that the Strait of Hormuz remain open, that the Red Sea remain navigable, that the region not be an incubator or exporter of terror against American interests or the American homeland, and that Israel remain secure."*

President Trump, (NSS)

Since that first strike, our forces have neutralized hundreds of Jihadist terrorists in multiple countries, focusing on the five most dangerous Jihadi groups who are capable of External Operations. Our CT Strategy is predicated on maintaining and increasing that pressure on those groups until they no longer pose a threat to the homeland because they are destroyed, or because we can hand suppression operations over to capable allies or partners.

However, the greatest threat to the United States emanating from the Middle East comes specifically from Iran, directly in the form of its nuclear and missile capabilities, and indirectly in the form of the billions of dollars it funnels to its terror proxies, including Hezbollah.

Decisive actions by the President, such as the strike on Iranian terror-mastermind Qasem Soleimani during the first Trump Administration, Operation Midnight Hammer last year against Iran's nuclear capabilities, and Operation Epic Fury against Iran's military capacity and nuclear ambitions, will continue until the regime in Tehran is no longer a threat to the United States.

At the same time, we will continue to focus our kinetic, intelligence, and cyber operations against Iranian-backed terror proxies who plot against Americans, and we will take decisive action against regime actors who plot attacks against Americans in the homeland, as well as Iranian dissidents and Israelis in our country.

As part of our Counterterrorism Strategy, given that freedom of maritime navigation is crucial to the U.S. economy, we will not allow strategic waterways such as the Strait of Hormuz or Red Sea to be held hostage by non-state or state actors. In Yemen, we are prepared to take decisive military action again if our ships are endangered by the Houthis.

President Trump knows that all modern Jihadi groups, from al Qaeda to ISIS to Hamas, can trace their roots back to one organization: the Muslim Brotherhood. The MB is the root of all modern Islamist terrorism predicated on recreating the Muslim Caliphate and killing or enslaving non-

11

Muslims. That is why he took the historic step of issuing an Executive Order that declared the original Egyptian MB chapter, along with the Jordanian and Lebanese chapters, as FTOs, soon to be followed by others. Given the Muslim Brotherhood's key role in promoting modern terrorism, we will continue to designate its branches across the Middle East and beyond as FTOs to crush the organization everywhere it operates.

## C. EUROPE

The nations of Europe remain our preeminent and long-term counterterrorism partners. The world is safer when Europe is strong, but Europe is greatly threatened and is both a terror target and an incubator of terror threats.

Terrorists often seek to attack European nations to undermine their democratic institutions and their ties to the United States. Yet, a conglomerate of nefarious actors – al Qaeda, ISIS, cartels, and state actors – have freely exploited Europe's weak borders and diminished CT resources to turn Europe into a permissive operating environment for plotting against Europeans and Americans. It is unacceptable that wealthy NATO allies can serve as financial, logistical, and recruitment hubs for terrorists. Europe still has an opportunity to change its individual and collective counterterrorism destiny if it recognizes the actual threat and takes action now.

> *"American officials have become used to thinking about European problems in terms of insufficient military spending and economic stagnation. There is truth to this, but Europe's real problems are even deeper."*
>
> President Trump, (NSS)

Unfettered mass migration has been the transmission belt for terrorists. Europe can be strong again if it rediscovers traditional principles of freedom of speech, has honest conversations about Islamism, devotes sufficient resources to mitigate terrorism and cartel threats within its nations, and then actively shares its threat intelligence globally and moves counterterrorism burdenshifting to take greater responsibility for its own security. This includes CT operations in Africa.

Europe must significantly increase its CT efforts immediately. It is clear to all that well-organized hostile groups exploit open borders and related globalist ideals. The more these alien cultures grow, and the longer current European policies persist, the more terrorism is guaranteed. As the birthplace of Western culture and values, Europe must act now and halt its willful decline.

Under President Trump, America has returned to common sense and reality-based counterterrorism. We are working with allies and partners who share our threat assessment of cartels, Jihadists, and violent left-wing extremists. We are coordinating CT operations, sharing actionable intelligence, and providing expertise. We will continue to work with those nations who understand the threat, who take requisite actions themselves, and who are not undermining the principles that define our shared civilization. We will also work closely with our serious CT partners in Europe to jointly counter covert state action that looks like terrorism – to include sabotage and assassination plots – and which they have categorized as "hybrid threats."

## D. AFRICA

Perhaps the greatest counterterrorism victory of the first Trump Administration was the destruction of the physical Caliphate of ISIS. President Trump unleashed the greatest fighting force the world has ever seen, and within a matter of weeks, a Jihadi insurgency which controlled vast territories across Iraq and Syria was gone.

Subsequently, the surviving remnants of the world's most dangerous terrorist group of the modern age were forced to relocate to Africa and Central Asia, in turn exploiting the ungoverned spaces there, especially during the years of failed counterterrorism policies under President Biden. As a result, today there are parts of Africa where a resurgent terror threat is the reality. These include in West Africa, the Sahel region, the Lake Chad Basin, Mozambique, Sudan, and of course Somalia, where parts of ISIS have re-established themselves and Al Shabaab maintains its tribal-based Islamist insurgency.

In Africa, we have two clear goals that depart from the nation-building and interventionist policies of the past. The first is to guarantee that none of the Jihadi groups can build a base of operations that allows them to plot and execute attacks against the United States and American interests around the world. The second is to protect Christians, who have been slaughtered at the hands of these Jihadi groups.

After decades of forever wars that did not serve the interests of the American people, we are set on bringing home our troops and downsizing our global footprint. This, however, does not mean we will ignore threat groups in Africa capable of External Operations which seek to attack our interests. We are rebuilding bilateral CT relations with African governments who had been ignored or insulted by Biden-era neocolonial policies focused on globalist left-wing cultural hegemony. We will continue to work together with governments threatened by groups like ISIS and al Qaeda affiliates who threaten us as well, and assist them with actionable intelligence and CT partner-force development until our shared foes no longer pose a serious threat to either them or us. Wherever possible, we will marry such CT cooperation with the stabilizing effect of heightened trade and commercial relations, as witnessed by President Trump's historic peace deal between Rwanda and the Democratic Republic of the Congo – an example of how security is a prerequisite for prosperity. We will also continue to use our breadth of tools for designating and targeting global terror networks and FTOs operating in Africa, such as the designation of the Sudanese and Egyptian chapters of the Muslim Brotherhood.

Secondly, the plight of the most persecuted people on Earth has been ignored for too long. While America is not a neocolonial power set on shaping African nations in its image, we will not permit terrorist groups operating on the continent to massacre Christians with impunity. With the decisive action President Trump recently took in Nigeria, he made it clear that the slaughter of Christians will not go unchecked. As President Trump said on Christmas Day in 2025: "I have previously warned these Terrorists that if they did not stop the slaughtering of Christians, there would be hell to pay, and tonight, there was."

In Africa, we will maintain a light military footprint and expect regional and nearby partners to accept a greater portion of the CT burden, share effective intelligence, and degrade common threats as they

13

arise. African nations have almost limitless potential, but only if their governments exercise sovereign control over their territory and close space to terrorists and violent extremists.

## E. ASIA

President Trump keeps his promises to the American people, especially to the families who lost loved ones to terror attacks under prior administrations. Just 43 days into his new term, as he was addressing a Joint Session of Congress, the President announced that the mastermind of the Abbey Gate massacre that killed 13 servicemembers in Afghanistan was arriving on U.S. soil that night to face justice. Whether the threat emanates from Central Asia or closer to home, it will continue to be dealt with under this Administration.

Asia includes the most populous Muslim nations and, as a region, is central in the spread of Islamist ideology, the recruiting of terrorists, and the raising of funds for attacks against the homeland and maritime trade routes vital to the United States and our partners, including Japan, South Korea, and Australia.

As recent attacks and disrupted terror plots inside America make clear, the South and Central Asian diaspora populations here, along with our Arab populations, are being targeted for radicalization by these terror groups. As a result, the United States and regional partners must jointly develop effective counter-propaganda means to identify and neutralize the media platforms of terrorist groups and identify and locate plotters before they can kill Americans. The United States is open to new partnerships in Asia where shared CT interests are identified.



*Mohammad Sharifullah, AKA Jafar, is apprehended and extradited for the murder of American warfighters at Abbey Gate in Afghanistan in August 2021.*

In 2025, President Trump rebuilt critical relationships with partners in South and Central Asia because these relationships are crucial to reducing the terrorist threat to the homeland. But our European partners must increase their CT operations in Asia, as in Africa and the Middle East. We will work with them, but will not bear the brunt of the burden to protect wealthy nations who should be able to act as mature counterterrorism actors.

Al Qaeda and ISIS still operate across numerous countries in Asia, exploiting ungoverned space to establish safe-havens, or in the case of Iran, are being directly sheltered by inimical regimes outside Asia. It is not cost-effective, wise, or even possible for the United States to continue to conduct CT activities everywhere, all at once, and in a vacuum. Peace can only be achieved through strength, therefore we will further burdenshare and burdenshift CT efforts to countries in South and Central Asia.

14

President Trump has ushered in a new dawn of burdenshifting, and now is the time to work more aggressively with partners to crush lingering terrorist threats to the United States, especially when it comes to External Operations-capable terror groups like al Qaeda and ISIS.

# TERRORISTS AND WEAPONS OF MASS DESTRUCTION

The primary responsibility of the U.S. Government's counterterrorism enterprise is to prevent a mass-casualty terror attack on American soil. Weapons of mass destruction (WMD) provide terrorists with the ultimate means to cause such harm. Therefore, preventing terrorists from developing, acquiring, or using chemical, biological, radiological, or nuclear weapons is a "no-fail" mission of U.S. counterterrorism efforts.

From Aum Shinrikyo's Tokyo Sarin gas attack in 1995, through al Qaeda's nuclear ambitions prior to and after 9/11, to ISIS seeking chemical weapons in the last decade, terrorists have consistently sought to develop, acquire, and use the most destructive technologies available.

To ensure any terrorists who credibly pose a threat to Americans never actually gain the capbility to conduct a WMD attack:

- We will continue to work with partners to deny terrorists access to dangerous WMD-related materials, technologies, or information.

- We will continue to hold states that sponsor, supply, or facilitate WMD terrorism accountable for their actions.

- We will continue to maintain a robust counterterrorism WMD crisis-response capability to globally search for, characterize, defeat, attribute, identify the origin of, and provide for the safe disposition of WMD threat materials and devices.

- We will continue to enhance our capabilities to anticipate and manage the impact of emerging and disruptive technologies such as autonomous vehicles, artificial intelligence, additive manufacturing, and next-generation nuclear power.

- We will continue to combat illicit fentanyl and its core precursor chemicals as Weapons of Mass Destruction. Hundreds of thousands of Americans have died from fentanyl overdoses and we will hold accountable the FTOs, cartels, and their state sponsors for this WMD threat to our citizens.

In summary, the U.S. Government will use diplomatic, intelligence, military, economic, law-enforcement, and scientific capabilities, including kinetic and non-kinetic actions where appropriate, to thwart this threat.

# AMERICA FIRST COUNTERTERRORISM

For the 25th Anniversary of the 9/11 terror attacks, America has returned to a common sense and reality-based Counterterrorism Strategy.

President Trump has affected a complete revision of how we defeat threats to America predicated on national sovereignty and civilizational confidence and the objective of destroying the groups who would kill Americans or hurt our interests as a free nation. This applies to cartels, Jihadists, left-wing violent extremists, state actors and state sponsors, or any future terror threat.

Under the leadership of President Trump, our CT Strategy is one of action and strength. Through his CT Strategy, President Trump and his Administration will always put America first, defending its people and homeland from terrorists, and always make America more safe and secure.